HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
Kyle J. Ortiz
Brian F. Shaughnessy
David E. Blabey Jr.

*Counsel for Plaintiffs as Against Defendants Other Than*
*Reed Smith LLP and Louis M. Solomon*

GOULSTON & STORRS PC
One Post Office Square
Boston, MA 02109
(617) 574-3575
Jennifer B. Furey (admitted *pro hac vice*)
Nathaniel R.B. Koslof (admitted *pro hac vice*)
Jaclyn Grodin
Rae Berger

*Counsel for Plaintiffs as Against All Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: ELETSON HOLDINGS INC., *et al.*, | : | Chapter 11 |
| | : | Case No. 23-10322 (JPM) |
| Debtors.[1] | : | Jointly Administered |

--------------------------------------------------------------------------x

| | | |
|---|---|---|
| ELETSON HOLDINGS INC.; ELETSON CORPORATION; ELETSON CHARTERING INC.; EMC INVESTMENT CORPORATION; KASTOS SPECIAL MARITIME ENTERPRISE; FOURNI SPECIAL MARITIME ENTERPRISE; KINAROS SPECIAL MARITIME ENTERPRISE; and KIMOLOS II SPECIAL MARITIME ENTERPRISE, | : : : : : : : : | |
| | : | Adv. Pro. No. 25-01120-jpm |
| Plaintiffs, | : | |
| v. | : : | |
| REED SMITH LLP; LOUIS M. SOLOMON; | : | |

---

[1] The Debtors in these Chapter 11 Cases were: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively, the "Debtors"). References to the "Debtors" with respect to conduct that occurred prior to the Effective Date of the Plan (described below) are to the pre-effective date Debtors. References to the "Debtors" with respect to conduct that occurred following the Effective Date of the Plan are to the post-effective date Debtors.

VASSILIS KERTSIKOFF; VASILIS                        :
HADJIELEFTHERIADIS; LASCARINA                       :
KARASTAMATI; KONSTANTINOS                           :
HADJIELEFTHERIADIS; IOANNIS ZILAKOS;                :
EMMANUEL ANDREOULAKIS; ADRIANOS                     :
PSOMADAKIS; PANOS PAXINOS; ELENI                    :
GIANNAKOPOULOU; NIKI ZILAKOU;                       :
LASSIA INVESTMENT COMPANY; GLAFKOS                  :
TRUST COMPANY; FAMILY UNITY TRUST                   :
COMPANY; ELAFONISSOS SHIPPING                       :
CORPORATION; KEROS SHIPPING                         :
CORPORATION; APARGO LIMITED; FENTALON              :
LIMITED; and DESIMUSCO TRADING LIMITED,            :
                                                    :
                    Defendants.                     :
------------------------------------------------------------------------x

## FIRST AMENDED COMPLAINT

**TABLE OF CONTENTS**

**Page**

SUMMARY OF THE ACTION ........................................................................................ 2

JURISDICTION AND VENUE ...................................................................................... 4

PARTIES ....................................................................................................................... 5

A.    Plaintiffs ............................................................................................................. 5

B.    Defendants .......................................................................................................... 9

      1.    The Former Principals ............................................................................ 9

      2.    The Former D&Os ............................................................................... 11

      3.    The Former Shareholders ..................................................................... 14

      4.    The Cypriot Nominees .......................................................................... 15

      5.    Reed Smith LLP and Solomon ............................................................. 16

C.    Eletson Gas ...................................................................................................... 17

ALLEGATIONS ........................................................................................................... 17

A.    General Background ......................................................................................... 17

      1.    The Principal Families ......................................................................... 17

      2.    The Historical Relationship Between Reed Smith and the Principal
          Families ................................................................................................ 18

B.    Defendants' Pre-Arbitration Conduct and Admissions ................................... 19

      1.    Defendants' Failure to Exercise the Buyout Option (Jan.–Mar. 2022) ............... 19

      2.    The Retention of Reed Smith and Admission that the Buyout Option Had
          Lapsed (July 20-21, 2022) ................................................................... 21

C.    The Arbitration ................................................................................................ 23

      1.    Eletson's Arbitration Demand (July 29, 2022) .................................... 23

      2.    The Bankruptcy Filing (March 2023) .................................................. 25

      3.    Defendants' Fraudulent Post-Bankruptcy Position that the Option Was
          Exercised for the Benefit of "Nominees" (April-May 2023) ............... 27

D.    The Former Principals and Reed Smith Seek to Cover-Up their Lies ............ 32

      1.    The Failure to Produce Documents in Arbitral  Discovery (Sept. 2022-
          March 2023) ......................................................................................... 32

      2.    The Lies to the Arbitrator (July 11-28, 2023) ..................................... 34

      3.    The Arbitration Award Accepted the Former Principals' Representations
          (July-Sept. 2023) ................................................................................. 36

E.    Defendants Continue Their Fraud in the Bankruptcy Court in Violation of
    Multiple Federal Criminal Statutes ................................................................. 37

      1.    Cover-Up Efforts in the Bankruptcy Court and  District Court (Oct. 2023-
          July 2024) ............................................................................................ 38

      2.    Levona's Amended Petition and Discovery (July 2024-Present) ......... 40

F.    Confirmation of the Chapter 11 Bankruptcy Plan (November 2024)................................ 41

G.    The Effect of Confirmation.................................................................................................. 42

H.    The Confirmation Appeal and its Dismissal (November 2024-February 2025)............... 44

I.    Defendants' Efforts to Undermine and Obstruct the Plan ................................................ 46

    1.    Reed Smith and Others Immediately Begin Scheming to Obstruct the Plan (October 2024) ................................................................................................... 46

    2.    Reed Smith and Others Immediately Scheme to Transfer Control of Gas Vessel's Outside of Eletson (October 2024-Present)............................................. 47

    3.    The Minority Shareholders Petition for Appointment of a Provisional Board (November 2024) ..................................................................................... 48

    4.    Reed Smith and Others Refuse to Update or Assist in Updating LISCR (November 2024-Present) ....................................................................................... 52

    5.    Defendants Oppose Recognition of the Plan in Liberia (November 2024-Present) ........................................................................................................ 56

    6.    Defendants Oppose Recognition of the Plan in Greece (November 2024-Present) ........................................................................................................ 57

    7.    Defendants Oppose Recognition of the Plan in the United Kingdom (November 2024-Present) ....................................................................................... 59

    8.    Defendants Take Actions Around the Globe to Obstruct the Plan and Improperly Use the Fraudulently Obtained Arbitration Award........................... 60

        a.    The Improper LISCR Actions (March 2025-Present) ............................ 60

        b.    The Improper Marshall Islands Proceeding (April 2025-Present)........... 61

        c.    The Improper German Petition (April 2025-Present)............................. 61

        d.    Related Corp. Proceeding (August 2025-Present) ................................. 62

        e.    Improper/Unauthorized Chartering of an Eletson Vessel (June 2025) ...................................................................................................... 63

        f.    Defendants' Lies Concerning Ownership and Control (November 2024-Present) ...................................................................................... 63

        g.    The Former Principals Instruct Eletson Vessels to Evade Arrest ........... 65

        h.    The Former Principals Fraudulently Enter into Contracts for Corp. ....... 68

J.    The Sanctions Opinions and Orders (January 2025-November 2025) ............................ 69

K.    Defendants' Obstruction and Conversion ....................................................................... 73

    1.    Defendants Refuse to Turn Over Property of Holdings (November 2024-Present) ........................................................................................................ 73

    2.    Defendants Interfere with Access to Bank Accounts (November 2024-Present) ........................................................................................................ 76

    3.    The Former D&Os Change Eletson's Contracts to Convert Plaintiffs' Property ..................................................................................................................... 78

        a.    The December 2024 Invoices .................................................................. 78

        b.    The January 2025 Invoices ...................................................................... 83

        c.    Defendants Declare Defaults by Novum (January 2025) ....................... 84

        d.    Continued Improper Communications with Novum and Oaktree (January 2025-Present) ........................................................................... 86

4.    Defendants' Illegal Maneuvering Stymied Plaintiffs' Efforts  to Receive the Charterhire Payments Due to Them ................................................................ 89

5.    Defendants Frustrate Plaintiffs' Efforts to Recover Other Charterparty Payments Due to Them (November 2024-Present) .............................................. 91

6.    Plaintiffs have asked Defendants for information regarding Kinaros and Kimolos, including amounts due to those SMEs in connection with the use of the vessels "Kinaros" and "Kimolos" by third parties, but as of the date of this Amended Complaint, Defendants have refused and/or failed to provide any information to Plaintiffs in that regard.  The foregoing conduct violated 18 U.S.C. § 152(9).Defendants Convert Plaintiffs' Management Agreements  (November 2024) ......................................................... 91

7.    The Former Principals Coordinate with the Oaktree Parties to Take Action Adverse to Plaintiffs (November 2024-Present) ...................................................... 92

L.    Reed Smith and Solomon Aided and Abetted the Conversion ......................................... 94
M.    Defendants' Lies Concerning the Occurrence of the Effective Date .............................. 96
N.    Disgorgement of Reed Smith's Fees ................................................................................. 97

CAUSES OF ACTION ................................................................................................................ 98

COUNT I: CIVIL RICO (18 U.S.C. § 1962(c)) (against the Former Principals, Andreoulakis, Solomon and Reed Smith) .............................................................................................................. 98

A.    The RICO Enterprise ........................................................................................................ 98
B.    The RICO Defendants ..................................................................................................... 101
C.    The RICO Defendants' Conduct Violated 18 U.S.C. § 1962(c) .................................... 104

1.    Bankruptcy fraud in violation of 18 U.S.C. § 152(2) ........................................ 106
2.    Bankruptcy fraud in violation of 18 U.S.C. § 152(3) ........................................ 109
3.    Bankruptcy fraud in violation of 18 U.S.C. § 152(5) ........................................ 110
4.    Bankruptcy fraud in violation of 18 U.S.C. § 152(9) ........................................ 110
5.    Wire fraud in violation of 18 U.S.C. § 1343 ...................................................... 111
6.    Obstruction of justice in violation of 18 U.S.C. § 1503(a) ................................ 113
7.    Obstruction of justice in violation of 18 U.S.C. §1512(c) ................................. 114
8.    Aiding and abetting in violation of 18 U.S.C. § 2(a) and (b) ............................. 115

D.    Pattern of Racketeering Activity ..................................................................................... 116
E.    Causation and Damages ................................................................................................... 117

1.    Joint and Several Liability .................................................................................. 117
2.    Treble Damages and Attorneys' Fees ................................................................. 118

COUNT II: RICO CONSPIRACY (18 U.S.C. § 1962(d)) (against the Former Principals, Andreoulakis, Solomon and Reed Smith) ................................................................................. 118

F.    Treble Damages and Attorneys' Fees ............................................................................. 119

COUNT III: CONVERSION OF PROPERTY (against all the Former D&Os and the Former Shareholders) ............................................................................................................................ 120

COUNT IV: CONVERSION OF FUNDS (against the Former D&Os and Former Shareholders) ...................................................................................................................................................... 121

COUNT V: AIDING AND ABETTING CONVERSION (against Reed Smith and Solomon) 122

COUNT VI: BREACH OF CONTRACT (against all Defendants) ......................................... 123

COUNT VII: TORTIOUS INTERFERENCE WITH CONTRACT (against all Defendants)... 124

COUNT VIII: BREACH OF FIDUCIARY DUTY (Holdings and Corp. against Reed Smith and Solomon)........................................................................................................................... 125

A.    Existence of a Fiduciary Duty...................................................................... 126
B.    The Breach of Fiduciary Duty ...................................................................... 127
C.    Damages........................................................................................................ 128

COUNT IX: CONSPIRACY (against all Defendants) ................................................... 129

(against all Defendants) ............................................................................................. 129

PRAYER FOR RELIEF ............................................................................................. 130

Plaintiffs Eletson Holdings Inc. ("Holdings"), Eletson Corporation ("Corp."), Eletson Chartering Inc. ("Chartering"), EMC Investment Corporation ("EMC"), Kastos Special Maritime Enterprise ("Kastos"), Fourni Special Maritime Enterprise ("Fourni"), Kinaros Special Maritime Enterprise ("Kinaros"), and Kimolos II Special Maritime Enterprise ("Kimolos" and, collectively with Kastos, Fourni, and Kinaros, the "SMEs" and each an "SME Party") (collectively, "Plaintiffs") hereby file this First Amended Complaint (the "Amended Complaint") against the following individuals and entities (collectively, "Defendants"):

(1) Defendant Reed Smith LLP ("Reed Smith") and its Head of International Litigation, Defendant Louis M. Solomon ("Solomon");

(2) Defendants Vassilis Kertsikoff ("Kertsikoff"), Lascarina Karastamati ("Karastamati"); and Vasilis Hadjieleftheriadis ("Hadjieleftheriadis"), and (collectively, the "Former Principals");

(3) Defendants Emmanuel Andreoulakis ("Andreoulakis"), Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Adrianos Psomadakis ("Psomadakis"), Panos Paxinos ("Paxinos"), Eleni Giannakopoulou ("Giannakopoulou"), and Niki Zilakou (collectively, together with the Former Principals, the "Former D&Os");

(4) Defendants Lassia Investment Company ("Lassia"), Glafkos Trust Company ("Glafkos"), Family Unity Trust Company ("Family Unity"), Elafonissos Shipping Corporation ("Elafonissos"), and Keros Shipping Corporation ("Keros") (collectively, the "Former Shareholders"); and

(5) Defendants Apargo Limited ("Apargo"), Fentalon Limited ("Fentalon"), and Desimusco Trading Limited ("Desimusco") (collectively, the "Cypriot Nominees").

1

**SUMMARY OF THE ACTION**

1. This action arises from a coordinated, multi-year scheme by former Eletson insiders and their lawyers to unlawfully seize control of Plaintiffs' most valuable assets, siphon corporate revenues, and sabotage a court-approved Chapter 11 reorganization. The scheme was conceived, executed, and sustained through perjury, fabricated evidence, obstruction of justice, and the misuse of sham litigation across multiple jurisdictions worldwide.

2. At its core, this case concerns Defendants' efforts, using Eletson's resources and funds, to retain control of the Eletson fleet, including the vessels in Eletson Gas LLC ("Gas")—a crown-jewel subsidiary—after they failed to exercise a contractual buyout option that would have preserved that control. Rather than accept the consequences of the lapse, or work with their counterparty, Levona Holdings, Ltd. ("Levona"), Defendants turned to Eletson's longtime outside counsel, Reed Smith LLP, led by its Head of International Litigation, Louis M. Solomon, to engineer an end-run around both the governing contracts and federal bankruptcy law.

3. Reed Smith's improper involvement goes back many years. In connection with this action, its effort began with a sham arbitration. Knowing that the buyout option had lapsed unexercised, Defendants—under Reed Smith's direction—fabricated a false narrative that the option had been exercised for the benefit of offshore "nominees" controlled by the former insiders. To support that fiction, Defendants submitted perjured testimony, withheld dispositive documents, and manufactured evidence, ultimately inducing the arbitrator to issue an award that was deliberately structured to divert control of Gas outside the bankruptcy estate.

4. The fraud did not stop there. Defendants carried the same false narrative into the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the United States District Court for the Southern District of New York (the "District Court"), submitting dozens of knowingly false declarations, obstructing discovery, and concealing

2

evidence, all orchestrated by Reed Smith.  These actions violated multiple federal criminal statutes, including bankruptcy fraud, wire fraud, and obstruction of justice.

5.      When Plaintiffs' creditors successfully confirmed a Chapter 11 plan [Bankr. ECF 1132] (the "Plan") in November 2024—stripping Defendants of ownership, management authority, and control—Defendants escalated their misconduct.  Despite the confirmed and unstayed Plan, Defendants refused to relinquish control, diverted millions of dollars in charter hire and other revenues, falsified corporate records, interfered with bank accounts, instructed vessels to evade arrest, and launched a global campaign of obstruction in the United States, Greece, Liberia, the United Kingdom, Germany, the Marshall Islands, and elsewhere.

6.      Reed Smith and Solomon played a central role throughout.  Even after being terminated as counsel by operation of the Plan, they continued to work with the former insiders, advancing positions directly adverse to their former clients, misrepresenting authority, resisting turnover of client files and records, and facilitating the conversion of corporate assets.  Reed Smith's commitment to the scheme went so far as to invent non-existent entities it purported to represent.  Reed Smith profited handsomely from this misconduct, earning tens of millions of dollars in fees and serving as escrow agent for millions more in unlawfully diverted funds.

7.      The Bankruptcy Court has repeatedly sanctioned many of the Defendants for their conduct, issuing multiple contempt and sanctions orders finding ongoing violations of the Plan and confirmation order [Bank. ECF 1220] (the "Confirmation Order").  Yet long after the Plan went effective on November 19, 2024 (the "Effective Date"), Defendants have persisted in their obstruction, making clear that they have no intention of complying with federal court orders absent judicial intervention.

8.      Accordingly, this Amended Complaint asserts claims for civil RICO, conspiracy, conversion, and breach of contract against the Former Principals, as well Plaintiffs' former outside counsel (*i.e.*, Reed Smith LLP, led by its Head of International Litigation, Louis M. Solomon) and former in-house counsel (*i.e.*, Emmanuel Andreoulakis).  It also asserts breach of fiduciary duty claims against Reed Smith and Solomon for continuing to act directly adverse to their former clients and claims against the Former Shareholders of the above-captioned Debtors, as well as their alter-ego Cypriot Nominees, for their respective roles in the fraudulent scheme.

9.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered damages exceeding $200 million, including lost revenues, loss of goodwill, reputational harm, massive litigation costs, and the denial of the benefits of their confirmed bankruptcy reorganization.  Plaintiffs bring this action to halt Defendants' ongoing misconduct, recover their stolen property, and hold Defendants—lawyers included—accountable under civil RICO and state law.

### JURISDICTION AND VENUE

10.     The Bankruptcy Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference, M-431*, dated January 31, 2012, of the District Court referring to this Court all proceedings arising under title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") or arising in or related to a case under title 11.

11.     This adversary proceeding is commenced pursuant to section 105(a) of the Bankruptcy Code and Rule 7001(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

12.     Plaintiffs consent to the entry of final orders and judgments by this Bankruptcy Court in this adversary proceeding pursuant to Bankruptcy Rule 7008.

4

13.     The confirmed chapter 11 Plan and this Bankruptcy Court's Confirmation Order expressly provide for the retention of jurisdiction over all matters arising out of, and related to, the Debtors' chapter 11 cases (the "Chapter 11 Cases"), as set forth in Article XI of chapter 11 reorganization plan [Bankr. ECF 1132[2]] (the "Plan") and paragraph WW of the Confirmation Order.

14.     This Bankruptcy Court has personal jurisdiction over each Defendant pursuant to Rule 7004 of the Bankruptcy Rules.  Each Defendant has maintained at least minimum contacts with the United States in connection with the claims asserted herein, including by the Debtors' voluntary commencement of the Chapter 11 Cases (as authorized by their controlling parties), the Debtors' participation in the Chapter 11 Cases, and Defendants' individual participation in the Chapter 11 Cases.

15.     Venue in the Bankruptcy Court is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and is related to the Chapter 11 Cases commenced under the Bankruptcy Code and pending in this Bankruptcy Court.

## **PARTIES**

### A.     **Plaintiffs**

16.     Plaintiff Holdings is a corporation domiciled in the Marshall Islands and is the ultimate parent of the Eletson family of companies (collectively, "Eletson").  Eletson is an international gas shipping company which owned and operated a fleet of medium and long-range gas tanker ships that carry a wide range of refined petroleum products, including crude oil.  Eletson operated its fleet through wholly owned subsidiaries of Holdings.  These subsidiaries owned or chartered the vessels.  Holdings was one of the Debtors in the above-captioned Chapter 11 Cases.

---

[2] Citations to documents from *In re Eletson Holdings Inc.*, No. 23-10322-JPM, will hereinafter be cited as "Bankr. ECF."

Holdings was a Managing Member, holding a 100% interest of Eletson Finance (US) LLC ("Eletson Finance (US)"), a Delaware limited liability company. Holdings was previously owned by Lassia, Glafkos, and Family Unity (collectively, the "Former Majority Shareholders"), each of which previously held approximately 30.7% of the equity in Holdings, and by Elafonissos and Keros (collectively, the "Former Minority Shareholders"), each of which previously held 3.92% of the equity in Holdings. As described below, the Plan went effective on November 19, 2024, and the occurrence of the Effective Date had several key consequences pursuant to the Confirmation Order and the Plan itself, including that: (1) all notes, stock, and other documents giving rise to claims against and interests in the former Debtors (including the interests of the Former Majority and Former Minority Shareholders) were automatically cancelled, (2) ownership and control of the Debtors was vested in their creditors, (3) the directors and officers of each Debtor prior to the Effective Date were deemed to have resigned, and (4) the Plan automatically terminated the retention of the Debtors' prior counsel and professionals, including Reed Smith.

17.     Plaintiff Corp. is a corporation organized under the laws of Delaware, and is a wholly owned subsidiary of Holdings. Corp. managed Eletson's fleet of ships in exchange for a management fee.

18.     Plaintiff Chartering is a corporation organized under the laws of the Marshall Islands, and is a wholly owned subsidiary of Holdings. Chartering acted as the sub-charterer for certain of the vessels operated by the SMEs.

19.     Plaintiff EMC is a corporation organized under the laws of the Marshall Islands, and is a wholly owned subsidiary of Holdings. EMC performed certain corporate treasury functions for Holdings and its subsidiaries.

20.     Plaintiff Kastos is a special maritime enterprise ("SME") organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kastos was a party to a sale-leaseback transaction concerning the vessel "Kastos" with OCM Maritime Thames LLC ("Thames"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that was affiliated with Oaktree Capital Management, Inc. ("Oaktree"), an American investment firm.  Under the terms of this transaction: (1) Thames purchased the vessel "Kastos" from Kastos for $15,075,000, and (2) Kastos leased the "Kastos" from Thames pursuant to the bareboat charterparty dated June 24, 2020 (the "Kastos-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Kastos" out to charter parties.  As described below, beginning in approximately January 12, 2023, and continuing through approximately July 2025, Kastos was a party to the Kastos Charterparty contract with Novum (both defined below) providing for Novum's hire of the "Kastos" for $24,400 daily.

21.     Plaintiff Fourni is an SME organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Fourni was a party to a sale-leaseback financing transaction concerning the vessel "Fourni" with OCM Maritime Autumn LLC ("Autumn"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that was affiliated with Oaktree.  Under the terms of this transaction: (1) Autumn purchased the vessel "Fourni" from Fourni for $15,075,000, and (2) Fourni leased the "Fourni" from Autumn pursuant to the bareboat charterparty dated June 24, 2020 (the "Fourni-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Fourni" out to charter parties.  As described below, beginning in approximately January 12, 2023, and continuing through approximately July 2025, Fourni was a party to the Fourni Charterparty contract with Novum (both defined below) providing for Novum's hire of the "Fourni" for $24,400 daily.

22.     Plaintiff Kinaros is an SME organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kinaros was a party to a sale-leaseback financing transaction concerning the vessel "Kinaros" with OCM Maritime Rhine LLC ("Rhine"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that was affiliated with Oaktree.  Under the terms of this transaction: (1) Rhine purchased the vessel "Kinaros" from Kinaros for $14,275,000, and (2) Kinaros leased the "Kinaros" from Rhine pursuant to the bareboat charterparty dated June 24, 2020 (the "Kinaros-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Kinaros" out to charter parties.  Upon information and belief, beginning on the Effective Date and continuing through approximately July 2025, Kinaros leased the vessel "Kinaros" to one or more third parties pursuant to a charterparty contract at a rate of not less than $31,500 per day.

23.     Plaintiff Kimolos is an SME organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kimolos was a party to a sale-leaseback financing transaction concerning the vessel "Kimolos" with OCM Maritime Yukon LLC ("Yukon," and, together with Thames, Autumn, and Rhine, the "Oaktree Parties"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that was affiliated with Oaktree.  Under the terms of this transaction: (1) Yukon purchased the vessel "Kimolos" from Kimolos for $15,075,000, and (2) Kimolos leased the "Kimolos" from Yukon pursuant to the bareboat charterparty dated June 24, 2020 (the "Kimolos-Oaktree Charterparty," and, together with the Kastos-Oaktree Charterparty, the Fourni-Oaktree Charterparty, and the Kinaros-Oaktree Charterparty, the "Oaktree Charterparties") and undertook to pay the lease with funds earned from hiring the "Kimolos" out to charter parties.  Upon information and belief, beginning on the Effective Date

8

and continuing through approximately July 2025, Kimolos leased the vessel "Kimolos" to one or more third parties pursuant to a charterparty contract at a rate of not less than $33,500 per day.

### B.    Defendants

### 1.    The Former Principals

24.    Defendant Vassilis Kertsikoff (also known as Vasileios Kertsikof) was previously (1) an officer and director of Holdings, (2) a legal representative of Eletson Finance (US), (3) an officer and director of Corp., (4) an officer and director of EMC, and (5) a director, officer, owner, and/or beneficiary of Family Unity, a Former Majority Shareholder.  Kertsikoff also was an accountant and bookkeeper who maintained Eletson Finance (US)'s books and records.  To facilitate the so-called "Provisional Board" scheme (described below), Kertsikoff resigned from Holdings' board of directors and officer position on November 8, 2024.  Upon information and belief, Kertsikoff resigned as a director and/or officer of Family Unity sometime after the Confirmation Order was entered.  All of Kertsikoff's other roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, and a written consent executed by Holdings in its capacity as sole shareholder and controlling shareholder, as applicable, of Holding's subsidiaries (the "Omnibus Parent Consent").  Upon information and belief, Kertsikoff continues to assert that he controls Holdings and/or its subsidiaries to third parties.  Kertsikoff has been sanctioned by this Bankruptcy Court or being in continued violation of the Plan and the Confirmation Order.  Upon information and belief, Kertsikoff maintains a residence in Greece.  Upon further information and belief, Kertsikoff owns or owned real estate in the United States and conducts or conducted business in or directed at the City and State of New York.

25.    Defendant Vasilis Hadjieleftheriadis (also known as Vasileios Chatzieleftheriadis) was previously (1) an officer and director of Holdings, (2) a legal representative of Eletson Finance

9

(US), (3) an officer and director of Corp., (4) an officer and director of EMC, and (5) an officer and director of the SMEs. Hadjieleftheriadis also was an accountant and bookkeeper who maintained Eletson Finance (US)'s books and records. Hadjieleftheriadis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. Hadjieleftheriadis is currently and has been a director, officer, owner and/or beneficiary of Glafkos, a Former Majority Shareholder. As of February 24, 2025, Hadjieleftheriadis became an officer, owner and/or beneficiary of Lassia, a Former Majority Shareholder. All of Hadjieleftheriadis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and a separate consent by the stockholders of Holdings (the "Holdings Stockholder Consent"). Hadjieleftheriadis has the authority to transfer funds to and from the historical bank accounts of Corp., Chartering, EMC, and, on information and belief, all other subsidiaries. Hadjieleftheriadis has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order. Upon information and belief, Hadjieleftheriadis maintains a residence in Greece and conducts or conducted business in or directed at New York.

26. Defendant Lascarina Karastamati (also known as Laskarina Karastamati) was previously (1) an officer and director of Holdings, (2) a legal representative (and a self-described director) of Eletson Finance (US), (3) an officer and director of Corp., (4) an officer and director of the SMEs, (5) an officer and director of EMC, and (6) an officer, owner, and/or beneficiary of Lassia, a Former Majority Shareholder. Karastamati also was an accountant and bookkeeper who maintained Eletson Finance (US)'s books and records. Karastamati resigned from Holdings' board of directors and officer position on November 8, 2024. All of Karastamati's other roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order,

10

the Plan, and the Omnibus Parent Consent. On or around February 24, 2025, Karastamati transferred her shares of Lassia to Vasilis Hadjieleftheriadis and no longer owns or manages Lassia. Karastamati has the authority to transfer funds to and from the historical bank accounts of Corp., Chartering, EMC, and, on information and belief, all other subsidiaries. Karastamati has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order. Upon information and belief, Karastamati maintains a residence in Greece and conducts or conducted business in or directed at New York.

### 2.    The Former D&Os

27.    Defendant Emmanuel Andreoulakis (also known as Emmanouil or Manolis Andreoulakis) was previously (1) the AOR (defined below) for and a director of Holdings, (2) in-house counsel to Eletson, and (3) an officer and director of the SMEs, and is currently an officer, director, agent, and/or owner of Keros, a Former Minority Shareholder. Andreoulakis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. Andreoulakis is also the first cousin of each of the Former Principals. All of Andreoulakis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a purported member of the Provisional Board and the former AOR, Andreoulakis has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

28.    Defendant Konstantinos Hadjieleftheriadis (also known as Konstantinos Chatzieleftheriadis) was previously a director of Holdings and is an owner and/or beneficiary of Glafkos. Konstantinos Hadjieleftheriadis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. Konstantinos Hadjieleftheriadis and Vasilis Hadjieleftheriadis are brothers. All of

Konstantinos Hadjieleftheriadis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent.   As a purported member of the Provisional Board, Hadjieleftheriadis has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

29.     Defendant Ioannis Zilakos was previously a director of Holdings, and is currently an officer, director, and owner of Elafonissos, a Former Minority Shareholder.  Zilakos was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024.  All of Zilakos's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent.  As a purported member of the Provisional Board, Zilakos has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

30.     Defendant Adrianos Psomadakis (also known as Adrianos Psomadakis-Karastamatis) was previously a director of Holdings and an owner, officer, and director of Lassia. Psomadakis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024.  All of Psomodakis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent.  As a purported member of the Provisional Board, Psomadakis has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

31.     Defendant Panos Paxinos was previously a director of Holdings.  Paxinos was purportedly appointed a provisional director of Holdings by a Greek court upon the application of

the Former Minority Shareholders on November 11, 2024, and is an officer and/or owner Elafonissos. Paxinos is the son of Defendant Ioannis Zilakos. All of Paxinos's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a purported member of the Provisional Board, Paxinos has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

32.     Defendant Eleni Giannakopoulou (also known as Eleni Yannakopoulou) was previously a director of Holdings. Giannakopoulou was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024, and is an owner and/or beneficiary of Glafkos. Giannakopoulou is the daughter of Defendant Konstantinos Hadjieleftheriadis and niece of Defendant Vasilis Hadjieleftheriadis. All of Giannakopoulou's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a purported member of the Provisional Board, Giannakopoulou has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

33.     Defendant Niki Zilakou (also known as Niki Zilakos) was previously a director of Holdings. Zilakou was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024, and is an officer and/or owner of Elafonissos. Zilakou is the mother of Ioannis Zilakos and the aunt of Andreoulakis, the Hadjieleftheriadis brothers, and the Karastamati sisters. All of Zilakou's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder

Consent.  As a purported member of the Provisional Board, Zilakou has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

34.    The individual Defendants mentioned above—Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Lascarina Karastamati, Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Emmanuel Andreoulakis, Adrianos Psomadakis, Panos Paxinos, Eleni Giannakopoulou, and Niki Zilakou—are collectively referred to herein as the Former D&Os because, upon information and belief, they have all individually, by virtue of their former positions at Holdings and its subsidiaries, represented and claimed to represent Holdings and its subsidiaries, and took joint actions, described herein, to frustrate the implementation and consummation of the Plan and Confirmation Order and convert Plaintiffs' property post-Effective Date.

### 3.    The Former Shareholders

35.    Upon information and belief, Defendant Lassia is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia.  Lassia previously held approximately 30.7% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to the Confirmation Order and the Plan.  Lassia has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

36.    Upon information and belief, Defendant Glafkos is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia.  Glafkos previously held approximately 30.7% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to the Confirmation Order and the Plan.  Glafkos has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

37.    Upon information and belief, Defendant Family Unity (sometimes referred to as "Family Unit") is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia.  Family Unity previously held approximately 30.7% of the equity in Holdings, but its

14

equity interests in Holdings were extinguished as of the Effective Date pursuant to the Confirmation Order and the Plan. Family Unity has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

38.     Upon information and belief, Defendant Elafonissos is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Elafonissos previously held 3.92% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to, as applicable, the Confirmation Order and the Plan. Elafonissos has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

39.     Upon information and belief, Defendant Keros is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Keros previously held 3.92% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to, as applicable, the Confirmation Order and the Plan. Keros has been sanctioned on multiple occasions for being in continued violation of the Plan and Confirmation Order.

#### 4.     The Cypriot Nominees

40.     Defendant Apargo is a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Apargo's parent company is Davit Seas Limited, a privately held entity. On information and belief, the Kertsikoff family owns a stake in Apargo and Vassilis Kertsikoff acted as a "representative" for Apargo for the purposes of arbitration and litigation. Bankr. ECF 1850, at 10. Apargo is one of the so-called Cypriot Nominees.

41.     Defendant Fentalon is a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Fentalon's parent company is Ascella Limited, a privately held entity. On information and belief, the Karastamati family owns a stake in Fentalon and Lascarina

15

Karastamati acted as a "representative" for Fentalon for the purposes of arbitration and litigation. *Id.* Fentalon is one of the so-called Cypriot Nominees.

42. Defendant Desimusco is a Cypriot entity with its registered address at Ifigeneias 17, 2007 Strovolos, Nicosia, Cyprus. Desimusco's parent company is Blige Corporation, a privately held entity. On information and belief, the Hadjieleftheriadis family owns a stake in Desimusco and Vasilis Hadjieleftheriadis acted as a "representative" for Desimusco for the purposes of arbitration and litigation. *Id.* Desimusco is one of the so-called Cypriot Nominees.

### 5. Reed Smith LLP and Solomon

43. Defendant Reed Smith LLP is a global law firm with 33 offices throughout the United States, Europe, the Middle East, and Asia, including in New York.

44. Since the November 2024 Effective Date of the bankruptcy plan, which called for the automatic termination of Reed Smith, Reed Smith now claims to represent an ever-changing description of purported (but non-existent) entities, including the following:

- "Provisional Holdings" (Dist. Ct. ECF[3] 468, at 1) ("[Reed Smith] refers to its client, Holdings, as 'Provisional Holdings'….");

- "Holdings (Greece)" (Dist. Ct. ECF 545, at 1) ("[W]e will call our client Holdings (Greece).");

- "Unreorganized Holdings" (Dist. Ct. ECF 624, at 1) ("We respectfully write on behalf of the Eletson Holdings, Inc. entity that the Second Circuit recognizes as being represented by Reed Smith LLP … (for convenience, 'Unreorganized Holdings').");

- "Eletson Holdings Inc. and Eletson Corp." (Case No. 25-1313, ECF 50, at 74) (Reed Smith signing brief as "Counsel for Appellants Eletson Holdings, Inc. and Eletson Corporation"); and

- Laskarina Karastamati and Vassilis Kertiskoff (U.K. Section 32 Proceeding).

---

[3] "Dist. Ct. ECF" shall refer to the docket in the District Court case captioned *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 23-cv-07331-LJL

45.     Defendant Louis M. Solomon is a litigation partner at Reed Smith, and, more specifically, serves as Head of International Litigation for the firm.  Upon information and belief, Solomon maintains a residence in New York, New York and conducts business in New York.

**C.     Eletson Gas**

46.     Non-party Eletson Gas LLC ("Gas") is a limited liability company formed under the laws of the Republic of the Marshall Islands that specializes in liquified petroleum gas shipping.  Holdings owns 100% of the common shares of Gas.  The preferred shares of Gas are the subject of dispute, with Levona contending that the preferred shares belong to Levona, and Defendants fraudulently asserting that the preferred shares are to be transferred to the Cypriot Nominees.

<u>ALLEGATIONS</u>

**A.     General Background**

**1.     The Principal Families**

47.     Historically, Eletson was closely held, controlled, and managed by three families: the Kertsikoff, Hadjieleftheriadis, and Karastamati families (the "Principal Families").  Each of the Principal Families beneficially held approximately 30.7% of the equity in Holdings through their ownership of Liberian trust companies, i.e., the Former Majority Shareholders: (1) Family Unity, owned by the Kertsikoff family; (2) Glafkos, owned by the Hadjieleftheriadis family; and (3) Lassia, owned by the Karastamati family.  Holdings' remaining equity was beneficially held by two other families: the Zilakos and Andreoulakis families (the "Minority Families") through the ownership of other Liberian trust companies, i.e., the Former Minority Shareholders (1) Elafonissos and (2) Keros.  The three Principal Families and two Minority Families (collectively, the "Families") are all related to each other.  Solomon played the role of lead counselor to this crime family.

48.    As described above, members of the Families were also directors and officers of Holdings and of its various subsidiaries, including Corp., Chartering, EMC, Gas, and the SMEs.

### 2.    The Historical Relationship Between Reed Smith and the Principal Families

49.    Reed Smith purports to have represented Eletson for over thirty years.

50.    Reed Smith, starting with specific lawyers in or connected with its London office, acted to design, coordinate and facilitate predicate acts designed to expand and promote the goals of the Families.  By 2018, Eletson executive and in-house lawyer Andreoulakis described Reed Smith's London-based partner, Sally-Ann Underhill ("Underhill"), as a "trusted and special friend" — a term with specific meaning in the Greek culture.

51.    For years, the Former Principals relied on a distinct unit of Reed Smith partners— including Solomon (New York), Underhill (London) and Charles Weller ("Weller") (London)— to bypass ethical barriers that should constrain a law firm.

52.    For example, Underhill developed a strategy in March of 2020 to improperly delay the payments of amounts owed to creditors relating to a vessel, the Othoni.  Here, Underhill stepped out of her role as lawyer to create a commercial strategy to delay certain creditors (identified as Petrona/Evergas/Integra) from being paid timely.  This strategy came with a series of hand-crafted misrepresentations that were designed to delay but keep the creditors from realizing Eletson's financial instabilities.  Underhill worked with Andreoulakis to "delay" the creditors, including through unauthentic settlement offers or claims of "technical issues" preventing resolution.  These were material misrepresentations about the intent to pay and the true state of facts as to the solvency of the company.  The goal was to prevent the creditor from seizing the vessel until some alternative arrangement which benefited both Reed Smith and the Families

could be engineered.  In this case, Underhill set the "delay" strategy and drafted the inaccuracies used to keep the creditors at bay.

53.   Solomon also blurred conflict lines in order to benefit the Families.  Recognizing that direct communication between the participating financing party, their agent and the Former Principals could be an issue under conflict rules and firm policy, and yet wanting to use the information gained from the participating financing party for the benefit of the Families, Solomon, with the involvement of Weller, engineered an engagement that was expressly designed to use client information to coordinate the enterprise's business without any evidence of impropriety.  To the world, especially the Bankruptcy Court, there was the appearance of a lack of conflict.  However, the arrangement was never disclosed during Reed Smith's retention as counsel.

54.   The duplicitous nature of Reed Smith's activity, and the impropriety, is shown by an "off the record" call in 2025 with the participating financing party's agent where direct strategy was discussed with Weller, none of which was disclosed to the Bankruptcy Court even though the matter being discussed was clearly inconsistent with the obligation of being debtor-in-possession counsel.

B.   **Defendants' Pre-Arbitration Conduct and Admissions**

1.   **Defendants' Failure to Exercise the Buyout Option (Jan.–Mar. 2022)**

55.   As of January 2022, Gas was a liquefied petroleum gas shipping company governed by its Third Amended and Restated Limited Liability Company Agreement ("LLCA").  Dist. Ct. ECF 67-2.  Its common shares were owned by Holdings; its preferred shares were owned by Levona (an entity owned by two offshore investment funds); and certain of its ships were managed by Corp.  Dist. Ct. ECF 67-58, at 5.

56.   The LLCA grants significant governance and financial rights to the owner of Gas's preferred shares.  For example, the holders of those shares control a majority of Gas's board seats

(LLCA 3.3) and as such control the company except for certain "Fundamental Actions" that require a supermajority vote (*see* LLCA 3.2 & Schedule VII).  The preferred shareholders enjoy other rights as well.  *See, e.g.*, LLCA 2.1 (new units); 3.1(b) (officer appointments); 3.6 (default-related rights); 8.1(a), 8.1(b), 8.3 (distributions); 10.2(d) (drag along rights); 10.6 (roll-up rights); 10.7 (IPO rights).  The LLCA expressly recognizes that the preferred shares can be retired.  LLCA 1.9.

57.    By February 2022, Gas was in default on hundreds of millions of dollars of debt and several of its vessels had been arrested.  Dist. Ct. ECF 67-11; Dist. Ct. ECF 67-58, at 55.  To address Gas's financial distress, Levona, Gas, and Eletson subsidiary EMC Gas Corporation entered into a Binding Offer Letter ("BOL") on February 22, 2022.  Dist. Ct. ECF 67-10.  Under the BOL, Levona would make a working capital loan to Gas of up to $10 million (later increased to $14 million, of which at least $12.85 million was drawn) (Dist. Ct. ECF 551-2, at 50) (the "W/C Loan") and give Gas a thirty-day option, exercisable by written notice, to buy the preferred shares from Levona for $23,000,001 (the "Buyout Option").  Dist. Ct. ECF 67-10 § 2.  Gas could exercise the Buyout Option only if the W/C Loan had been fully repaid or "adequate security and/or collateral [was] provided … (the adequacy of such security being at the sole discretion of Levona)."  *Id.* § 2.2.

58.    "[I]n consideration of the grant of … [the] option," Gas agreed to transfer to Levona the shares in two Greek companies that held the vessels *Symi* and *Telendos*.  *Id.* § 1.  On March 11, 2022, Gas made that transfer and Levona funded the W/C Loan.  A "unanimous written consent" adopted by Gas's board that day stated "the sale of the [*Symi* and *Telendos*] to Levona" was "in consideration of the grant of a purchase option to [Gas]."  Dist. Ct. ECF 67-13, at 2.

59. In the thirty days after the BOL's execution, Gas did not satisfy the contractual preconditions for exercising the Buyout Option. It did not repay the W/C Loan or provide security or collateral for the loan as required (and still has not). Dist. Ct. ECF 67-58, at 35. It did not provide written notice exercising the Buyout Option. *Id.* at 43, 46. And it did not extend the Buyout Option period by repaying portions of the W/C Loan.

60. Thus, Levona proceeded as if the Buyout Option had lapsed unexercised such that Levona's ongoing relationship with Eletson involved three primary matters: (i) efforts to sell the *Symi* and *Telendos*, anticipated to net approximately $23 million, (ii) the $12.85 million W/C Loan, and (iii) Levona's continued ownership of the preferred shares.

### 2. The Retention of Reed Smith and Admission that the Buyout Option Had Lapsed (July 20-21, 2022)

61. When Levona sought to sell Gas vessels, the Former Principals and Andreolakis consulted their long-time legal advisor, Reed Smith, beginning on Wednesday and Thursday, July 20 and 21, 2022, during which time Reed Smith received dozens of background documents and discussed the issues with the Former Principals at length.

62. On July 20, 2022, Yiannis Timagenis (a former Greek lawyer for Eletson) sent an email to Karastamati and Andreoulakis attaching a document entitled "Draft Instructions to RS 20-7-22" (the "Draft Instructions"). Dist. Ct. ECF 556-4, Tab A, at 3. In the email, Timagenis asked Karastamati and Andreoulakis to "ensure they describe accurately the position" and "if [they] agree with the questions/issues" so that Timagenis "may urgently send [the Draft Instructions] to [Reed Smith]." *Id.* Karastamati immediately forwarded the email to Hadjieleftheriadis and Kertsikoff attaching the Draft Instructions. *Id.*

63. Approximately three hours later, Timagenis sent an email to Robert Wilkins and Weller of Reed Smith, copying Karastamati, Andreoulakis and a colleague of Timagenis. Dist.

Ct. ECF 556-4, Tab B, at 14.  Timagenis attached more than a dozen documents to the email to Reed Smith, all seemingly related to Eletson's brewing dispute with Levona, including a document entitled "Instructions to Reed Smith" (the "Instructions").  *Id.*

64.    The Instructions contain a detailed description of the background facts related to the dispute with Levona, including the status of the Option in the BOL.  *Id.* at 17–21.  The Instructions acknowledge that Eletson Gas did not satisfy the contractual preconditions for exercising the Option, and thus it lapsed.  Specifically, the Instructions state that "[t]he terms of the BOL have not been entirely complied with and in particular the obligations … relating to the 'Purchase Option Period' …."  *Id.* at 18 ¶ 5.  Moreover, the Instructions admit to the "lapse of the Purchase Option Period as defined in the BOL" and state that "Eletson appreciates that certain dates of the original BOL have lapsed…."  *Id.* at 1 ¶¶ 7, 8; *id.* at 22 ¶ 6(b).  Considering the Instructions' concession that option had lapsed, the Instructions make no mention of the Cypriot Nominees (the entities that Defendants now claim hold the preferred shares).

65.    On July 22, 2022, two days after receiving the Instructions, Reed Smith sent (through Timagenis) a "questionnaire" through which Reed Smith sought additional information about the dispute.  Dist. Ct. ECF 556-4, Tab J, at 77–79.  In response, on July 25, 2022, Karastamati sent responses, including a word document containing "replies on questions 4 and 6."  *Id.* at 77; Dist. Ct. ECF 556-4, Tab K, at 81–82.  In this document, Karastamati further concedes that "there was no explicit written or verbal indication the option period would be extended nor any action from Levona to inhibit our ability to exercise the purchase option."  Dist. Ct. ECF 556-4, Tab K, at 81.  Again, since she understood that the option had not been exercised, Karastamati made no mention of the Cypriot Nominees.

66.     Armed with this information, and having had days to consider the issues, Reed Smith sent Levona a cease-and-desist letter on Sunday, July 24.  Dist. Ct. ECF 148-3.  The cease-and-desist letter did not assert that the Buyout Option had been exercised in favor of the Cypriot Nominees and instead focused primarily on attempting to derail the sale of the vessels.

### C.     The Arbitration

#### 1.     Eletson's Arbitration Demand (July 29, 2022)

67.     The Former Principals and Reed Smith caused Eletson to file an arbitration demand on July 29, 2022.  Dist. Ct. ECF 67-16.  Despite their knowledge that the Buyout Option lapsed, the arbitration demand asserted that the Buyout Option had been exercised on March 11, 2022, and that Levona thus had no interest in Gas through which it could sell Gas's assets.  Dist. Ct. ECF 67-16, at 8–9.  The demand asserted that Eletson had exercised the option for its own benefit (i.e., not for the benefit of the Cypriot Nominees).

68.     The Former Principals and Reed Smith took the foregoing position in multiple filings in the arbitration.  In an October 25, 2022 affidavit, Kertsikoff testified that "[p]rior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes referred to as shares) of the Company.  As of March 11, 2022, Eletson Holdings became the ***sole unit holder*** of the Company."  Dist. Ct. ECF 67-20 ¶¶ 9, 28(e) (emphasis added).  Reed Smith repeated this new position in three briefs filed in the arbitration over the next three weeks.  Dist. Ct. ECF 67-21, at 17; Dist. Ct.  ECF 67-22, at 13; Dist. Ct. ECF 67-23, at 16.  And Reed Smith's arbitration filings consistently sought relief only for and on behalf of Holdings and Gas.  JAMS Dkt. 28, at 9; JAMS Dkt. 61, at 22.

69.     Defendants took the same position with third parties.  For example, on November 7, 2022, as part of formal KYC diligence, Eletson lawyer Elena Vandorou, copying Eletson chief accountant Dmitri Stamos and others, sent an organizational chart to ABN AMRO Bank NV

("ABN AMRO"). Dist. Ct. ECF 500-3; *see* Dist. Ct. ECF 551-1, at 294:6–13. The chart had been formally signed, stamped, and certified as "complete valid and up to date" that same day by Andreoulakis, (Dist. Ct. ECF 500-3, at 8), an Eletson in-house lawyer who is not only a first cousin of the Former Principals but also is supposed to have known about the Cypriot Nominees' purported nomination. Dist. Ct. ECF 551-1, at 292:7–294:2. This chart made no reference to the Gas preferred shares, consistent with the option having been exercised *by and for Gas*, *i.e.*, resulting in retirement or cancellation of the preferred shares. Dist. Ct. ECF 500-3.

70.     When asked about the November chart during his deposition, Kertsikoff's only response was that it was "clearly erroneous" because, in his view, "Holdings [was] not the sole shareholder of Gas." Dist. Ct. ECF 551-1, at 299:4–301:9. This contradicted his prior October 25 declaration. Dist. Ct. ECF 67-20 ¶ 9. Kertsikoff further testified that, had he been asked to sign the chart in 2022, he would "totally" have "not signed it" because it was "obviously erroneous" in its failure to reflect the Cypriot Nominees' purported ownership of the preferred shares. Dist. Ct. ECF 551-1, at 303:19–304:2.

71.     In fact, Kertsikoff *did* sign such an org chart—twice. On December 5, also as part of formal KYC diligence, Vandorou sent Berenberg Bank an "up to date chart of [Gas]" identical to the "obviously erroneous" one she had sent to ABN AMRO a month earlier. Dist. Ct. ECF 551-46, at 3, 12. The chart was formally signed, stamped, and certified by both Kertsikoff and Karastamati (a lawyer) on December 2, as "complete, valid and up to date." *Id.* at 12. Although Kertsikoff and all three of Eletson's in-house lawyers had formally signed, stamped, and/or sent such documents, Kertsikoff during his deposition had no response other than to insist that it, too, had been "[c]learly erroneous." Dist. Ct. ECF 551-1, at 308:6–23. Kertsikoff's statement was false and in criminal violation of 18 U.S.C. §§ 152(2) and (3). Kertsikoff and Karastamati signed

24

a similar chart again on December 13, which Vandorou then sent to Berenberg Bank as an "update."  Dist. Ct. ECF 551-47, at 2, 20.

72.    In February 2023, a finance broker sent Kertsikoff an "updated slide deck" for himself and "VK [*i.e.*, Kertsikoff] … to review again."  Dist. Ct. ECF 551-56; Dist. Ct. ECF 499-1.  The slides state that Levona's equity had been transferred "back to the Company [i.e., Gas]," such that "Eletson Holdings is [currently] the sole shareholder of Eletson Gas."  Dist. Ct. ECF 499-1.  During his deposition, Kertsikoff repeatedly contradicted himself, variously testifying that this statement was (i) not false, (ii) false but not material, and (iii) true if interpreted as a reference to Holdings' affiliates (which he conceded are not mentioned in the document).  Dist. Ct. ECF 551-1, at 319:4–321:3.  Yet again, Kertsikoff's statements were false and in criminal violation of 18 U.S.C. §§ 152(2) and (3) and 18 U.S.C. §§ 1512(c).

### 2.    The Bankruptcy Filing (March 2023)

73.    The Former Principals knew from the outset of the arbitration (and conveyed as much to Reed Smith) that their position was fraudulent and without merit, but they proceeded anyway.  On information and belief, they did so in order to buy time to allow them to siphon remaining cash from Eletson, knowing the company was underwater and headed for bankruptcy.  On this last point, they were correct.

74.    As the arbitration was ongoing in early 2023, Holdings and certain affiliates (the "Debtors") were deeply insolvent and owed their creditors at least $450 million, including more than $320 million on account of First Preferred Ship Mortgage Notes due January 15, 2022 (the "Notes").  The Debtors never made a single cash payment over the life of the Notes and failed to repay the Notes at maturity.  Dist. Ct. ECF 67-26, 67-27, 67-28, 67-29, 67-30.

75.    Therefore, on March 7, 2023, certain creditors filed involuntary petitions against the Debtors under Chapter 7 of the Bankruptcy Code (the "Petitions") in the Bankruptcy Court.

They were later joined by 10 additional creditors (collectively, the "Petitioning Creditors"). The Petitioning Creditors included institutions as well as individual retail investors who were collectively owed hundreds of millions of dollars, largely on account of the Notes that had remained in default and unpaid for years. One of those creditors was Pach Shemen LLC ("Pach Shemen"), an entity under common ownership with Levona.

76.    Despite not being a bankruptcy attorney by trade,[4] Solomon, who was serving as lead counsel of Holdings and Corp. in the arbitration, inserted himself as lead counsel on behalf of the Debtors in the bankruptcy proceeding in order to further protect and facilitate the fraud being consummated in the arbitration for the benefit of the Former D&Os.

77.    On April 14, 2023, the Debtors moved to dismiss the Petitions, and months of litigation between the Debtors and their creditors ensued. On the eve of trial, the Debtors agreed to convert the Chapter 7 involuntary cases to voluntary cases under Chapter 11. As the District Court later observed, under the "stewardship" of Kertsikoff, Karastamati, and Hadjieleftheriadis, "Holdings voluntarily sought the protection and assistance of the United States Bankruptcy Court for the Southern District of New York."

78.    On September 25, 2023, the Court entered an order converting the cases to Chapter 11, initiating the above-captioned Chapter 11 Cases.

79.    Following the conversion of the bankruptcy cases, disagreements ensued between the then-owners of Holdings (*i.e.*, the Former Shareholders), on the one hand, and the Debtors' creditors, on the other, concerning the future direction and ownership of the company. Those

---

[4] On Reed Smith's website, bankruptcy is not included as an area of Solomon's expertise, and Solomon is not among the attorneys listed as "Key Contacts" in Reed Smith's bankruptcy group. *Louis M. Solomon*, REED SMITH (last visited Dec. 23, 2025), https://www.reedsmith.com/our-people/louis-m-solomon/.

disagreements played out, among other things, in the filing of competing chapter 11 reorganization plans.  The Petitioning Creditors proposed two plans, and the Debtors, supported by the Former Majority Shareholders, filed a third one.

80.    The Debtors' plan—which the Bankruptcy Court ultimately determined could not be confirmed because, *inter alia*, it was not feasible and violated the absolute priority rule—was to be funded through a contribution from the Former Majority Shareholders.  The Former Majority Shareholders submitted a commitment letter to this Bankruptcy Court purporting to commit them to provide a $30 million "new value" contribution to the Plan.  The letter was signed by Karastamati, Hadjieleftheriadis, and Kertsikoff on behalf of the Former Majority Shareholders, and by Karastamati on behalf of each of the three Debtors.

81.    Kertsikoff submitted at least ten declarations to the Bankruptcy Court during the bankruptcy cases, including a so-called "First Day Declaration," as well as a 28-page declaration in support of confirmation.  Hadjieleftheriadis submitted nine declarations to the Bankruptcy Court, including a 23-page declaration in support of confirmation.  As set forth below, several of these declarations contained knowingly false statements, rendering each of them a separate criminal violation of 18 U.S.C. §§ 152(2) and (3).

### 3.    Defendants' Fraudulent Post-Bankruptcy Position that the Option Was Exercised for the Benefit of "Nominees" (April-May 2023)

82.    On April 20, in a publicly-filed complaint, Defendants, through Eletson, reiterated the position that they had been taking for months, i.e., that "Eletson Gas" was "a wholly-owned subsidiary of Eletson Holdings."  Compl. ¶ 33, Dkt. 1, *Eletson Holdings Inc. v. Murchinson Ltd.*, No. 23-01132 (JPM) (Bankr. S.D.N.Y.).

83.    However, on April 25, 2023, after the bankruptcy filing and shortly before the hearing in the arbitration was scheduled to begin, the Former Principals and Reed Smith radically

altered their position by asserting—*for the first time*—that Gas had purportedly secretly nominated the Cypriot Nominees to receive the preferred shares "effect[ive] immediately upon Eletson's exercise of the option."  Dist. Ct. ECF 551-71 ¶ 47.  They contended the transfer occurred on March 11, 2022.  Dist. Ct. ECF 67-50 ¶ 419; *see* Dist. Ct. ECF 67-58, at 18.  Kertsikoff and Reed Smith have both admitted that the sudden disclosure of the purported nomination was an effort to evade the consequences of Holdings' bankruptcy.  Dist. Ct. ECF 551-1, at 327:14–331:17 ("it was … becoming clear to us that even if … the claim was awarded, the … bankruptcy strategy … of Lenova [sic] would have that award actually go to Holdings from Gas.  So it was very important for us to establish that the party that … stood to lose was … the ["nominees"], who … were allowed and had become the owners of the preferreds.").

84.    The "evidence" of the purported nomination was roughly six pages of largely handwritten notes in Greek purportedly memorializing discussions between the Family and bearing handwritten dates between January (before the option even existed) and October 2022. Dist. Ct. ECFs 67-5, 67-6, 67-7, 67-8, 67-9.  Kertsikoff later testified that he does not recall documents evidencing the nomination other than those produced late in the arbitration.  Dist. Ct. ECF 551-1, at 286:8-10.  In the bankruptcy, Karastamati testified that there had been no corporate formalities associated with the supposed transfer—merely claiming that there was "a family meeting" during which she, Kertsikoff, and Hadjieleftheriadis sat around a table and represented both sides of the transaction (*i.e.*, Gas *and* Cypriot Nominees).  Bankr. ECF 591-1, at 31, 34–35. The purported nomination, had it occurred, conferred a windfall on the Cypriot Nominees at Holdings' expense, as Kertsikoff admitted that no consideration for the purported transfer has been paid.  Dist. Ct. ECF 551-1, at 337:6-21.

28

85.    The only individuals within Defendants' "family" who even claim to have known about the supposed transfer to the Cypriot Nominees were the Former Principals and Andreoulakis (who himself seems to have forgotten about the purported nomination in subsequent documents). Indeed, Eletson's own employees—even those employees responsible for administering Gas's finances, legal files, and governance processes—were unaware of this supposed important change of ownership. *See* Dist. Ct. ECF 551-1, at 286:11–288:3 ("as of November 2022 … the only people who knew about the nomination in favor of the ["nominees"] were … family members"). Likewise, at least one of Eletson's in-house attorneys responsible for responding to financial diligence inquiries was also unaware. *Id.* at 291:2–292:6 (Vandorou was unaware of the purported nomination).

86.    Similarly, on the other side of the supposed transaction, the Cypriot Nominees' accountants and other advisors were entirely unaware of the alleged nomination. The absence of any communications between the Cypriot Nominees and their accountants and advisors after purportedly acquiring such a large asset is notable in its own right but is particularly telling because the Cypriot Nominees apparently have no other significant assets.

87.    As seen below, the nomination was a complete fiction devised by Reed Smith at the eleventh hour as an end-around the bankruptcy at the expense of Reed Smith's own clients, Holdings and Gas.

88.    On March 22, 2023, Solomon sent an email to various individuals, including the Former Principals and several lawyers at the Timagenis law firm. In that email, sent just fifteen days after the bankruptcy petition was filed, Solomon explained that an exercise of the Buyout Option in favor of Holdings—as Eletson had until then consistently argued had occurred—would trigger the cancellation of the preferred shares and leave Holdings (and hence its creditors), as the

sole owner of Gas. Such an outcome ought to have been acceptable to Reed Smith, as counsel to Holdings in the arbitration and the bankruptcy. However, reflecting Reed Smith's actual loyalties to the Former Principals, Solomon devised, out of whole cloth, a "'nominee' argument" (internal quotation mark in original) which would evade the consequences of Holdings' bankruptcy. Dist. Ct. ECF 659-1, at 3 (explaining "any argument that redemption should not lead to cancellation is likely weak" but that "we do not need to win that argument if the 'nominee' argument wins"); *see id.* at 2 (telling a colleague a nomination is "our very best option at this point"). Critically, Solomon's later statements and testimony indicate that he was unaware of any facts which would support the existence of a nomination when writing that message, *see* Dist. Ct. ECF 51-33, at 6 (Solomon explaining that he asked clients "why don't we just transfer it to the nominees," who he claims replied that they "have already done it"); Dist. Ct. ECF 551-62, at 397:19–22 (testifying same conversation took place in April 2023), Solomon told his clients that they would discuss the issue further and "need[ed] to make sure our testimony is consistent with the facts." Dist. Ct. ECF 659-1, at 2; *see also* Dist. Ct. ECF 659-2 (Solomon to Reed Smith's arbitration team in April 2023: "[T]his [statement in draft witness statement] is really very wrong and will severely hurt our client…. ***Levona's interests in the Company must be recognized to be extinguished, or were transferred to Eletson pursuant to the BOL***. Let's not repeat that ever again.") (emphasis in original). This confirms that Solomon, in collaboration with other Defendants, invented the purported nomination in an intentional effort to evade the consequences of Holdings' bankruptcy.

89.     Moreover, notes of a May 8 meeting show Reed Smith and the Former Principals failing to invent details about the supposed nomination, including terms as basic as who would receive the €3 million in consideration that the nominees had supposedly agreed to pay for the shares. Indeed, a lawyer present at the meeting recognized that deciding who was to receive that

money was not a detail but rather "necessary for this [nomination] to be a full valid binding agreement." Dist. Ct. ECF 659-3, at 3.

90.    Rather than ask the supposed witnesses (who were present at the meeting) to explain what had actually happened, Reed Smith instead determined what would be most advantageous to the Former Principals in the bankruptcy and arbitration and worked backward from there. Solomon explained what he "need[ed] [his] witnesses to know": "that a nominee of Gas will get the preferred and there was negotiation with 3 companies. They must accept it as the nominee, there must be consideration." *Id.*  Indeed, when asked what witnesses should say if cross-examined on this issue, Solomon did not counsel them to tell the truth but rather suggested they defer to lawyers with more knowledge about what might be necessary to make the story stick, explaining that another lawyer involved in Eletson's bankruptcy "need[ed] time to think about this." *Id.*  Solomon also told his clients that all of them needed to testify "that we thought we did what we needed to" on March 11, 2022, and they "need an answer for why [Eletson] didn't act that way after March 11." *Id.* at 5.

91.    The Arbitration hearings began in May 2023. Dist. Ct. ECF 67-58, at 5. During the hearings and in their witness statements, the Former Principals—Karastamati, Kertsikoff, and Hadjieleftheriadis—each lied about the alleged nomination.

92.    All three witnesses testified in the Arbitration that "[f]rom issuance of the preferred shares, through execution of the BOL, and then after, the preferred interests have never been owned or controlled by Holdings or Corp." Dist. Ct. ECF 595-2 ¶ 100. Instead, "the preferred interests were transferred to [the Cypriot Nominees] effective upon the transfer of the preferred interests from Levona on or about March 11, 2022." *Id.* ¶ 108; Dist. Ct. ECF 551-75, at 71:24–73:12 (Karastamati); *id.* at 287:23–291:13 (Kertsikoff); Dist. Ct. ECF 595-1 ¶¶ 194, 198 (Kertsikoff);

Dist. Ct. ECF 551-77, at 94:7–25 (Hadjieleftheriadis); Dist. Ct. ECF 595-25 ¶¶ 104, 109 (Hadjieleftheriadis).  This testimony was prepared and elicited by Solomon and Reed Smith despite their role as counsel for Holdings and despite the obvious harm to Holdings.

93.    The Arbitration hearings closed on June 13, 2023.  Dist. Ct. ECF 67-58, at 5.

**D.    The Former Principals and Reed Smith Seek to Cover-Up their Lies**

**1.    The Failure to Produce Documents in Arbitral
Discovery (Sept. 2022-March 2023)**

94.    In the arbitration, Eletson's obligation to produce documents primarily arose from at least two sources.  *First*, JAMS Rule 17(a) required the "voluntary and informal exchange of all non-privileged documents and other information … relevant to the dispute or claim …."  The arbitrator reiterated the parties' Rule 17(a) obligations in all seven of his procedural orders.  *See, e.g.*, JAMS Dkt. 17 ¶ 7; Dist. Ct. ECF 551-62, at 122:9–124:6.  *Second*, the parties engaged in formal discovery process involving dozens of document requests and objections and multiple motions to compel.  *See, e.g.*, JAMS Dkt. 49 (Eletson motion to compel).  Eletson agreed to produce documents concerning multiple topics, including whether the Buyout Option had been exercised.

95.    Notwithstanding the obligation to produce certain categories of documents, the Former Principals—guided by Reed Smith—***knowingly*** withheld highly relevant documents from the arbitrator.

96.    These documents are highlighted in Levona's recently filed summary judgment memorandum of law in support of vacatur of the arbitration award.  Dist. Ct. ECF 549.  For example, on June 28, 2023, Eletson as Debtor produced a document to Pach Shemen and the other creditors in Eletson's bankruptcy case—*i.e.*, the July 25, 2022 email describing a future "Buyout

of Murchinson," including a $15 million payment for the "Murchinson partnership share."  Dist. Ct. ECF 127-4.  This document is relevant to whether the option was exercised at all by Eletson.

97.     In an email to Reed Smith on Friday afternoon, July 7, Levona's arbitration counsel, Frankel, Rubin, Klein, Payne & Pudlowski, P.C. ("Frankel Rubin"), identified the newly-produced bankruptcy document by bates number and asked Reed Smith to produce it in the arbitration together with "subsequent documents/communications relating to [it]."  Dist. Ct. ECF 148-6, at 5–6.  In doing so, Frankel Rubin emphasized that it had "not seen the documents, nor know their contents." *Id.*

98.     The reaction inside Reed Smith was swift and intense.  Reed Smith attorneys exchanged no fewer than 20 emails *just that night*, each with the same distinctive subject line as Frankel Rubin's email ("ELETON/LEVONA"), including seven that attached the document Frankel Rubin had inquired about.  Solomon himself sent seven emails regarding the issue between 7:41pm and 10:15pm ET that Friday night—including emails to Eletson's arbitration and bankruptcy teams at Reed Smith as well as Kertsikoff, Hadjieleftheriadis, Karastamati, and Eletson's Greek counsel.

99.     Reed Smith's internal and external discussions continued all day Sunday, including in response to a follow-up email from Frankel Rubin.  Finally, at 10:20pm, after having considered the issue all weekend, Solomon responded to Frankel Rubin.  The email accused Frankel Rubin, Levona, and other "complicitors" of having engaged in "unlawful" and "doubly unpardonable" "violations" of the protective order.  Dist. Ct. ECF 148-6, at 4.

100.    Yet, Reed Smith knew that these statements were untrue.  On July 9, 2023, Solomon asked his team at Reed Smith several questions about that document, including whether "[it was] called for in any doc[ument] request" in the arbitration and any "directives ending the production

period at the commencement of the arbitration."  Dist. Ct. ECF 659-6, at 8–9.  A Reed Smith associate responded that the document was "arguably called for" by RFP 11, "could also be covered by" RFPs 6, 9, and 10, and noted the disclosure requirements under JAMS Rule 17(a) and the arbitrator's seven Procedural Orders citing the rule.  *Id.* at 4–8.  In an email to fellow Reed Smith counsel on July 10, a Reed Smith associate wrote, "I'm not seeing anything in Belen's orders that sets the discovery cut off as the commencement of the arbitration."  Dist. Ct. ECF 659-7, at 2.2.  And on July 11, a Reed Smith associate quoted RFPs 6, 9, and 10 in an otherwise-blank email to partner Colin Underwood in the same chain with Solomon's July 9 questions.  Dist. Ct. ECF 659-6, at 2.  When Solomon told the arbitrator, among other things, that the document "was not called for by any document request," Dist. Ct. ECF 485-19, at 2, that it was not "important," *id.*, and that it was not "pertinent or material to the controversy," Dist. Ct. ECF 551-84, at 3, he had just been told otherwise by his own colleagues—in response to questions that he had posed to them.  And Solomon also knew that the document related to a "buyout" of Levona, which was the central issue of the arbitration, as Kertsikoff later admitted in his deposition.  Dist. Ct. ECF 551-1, at 238:19-239:2.  Solomon's response to Frankel Rubin constituted a criminal violation of 18 U.S.C. §§ 1343 (wire fraud) and 1503(a) (obstruction of justice by threats).

### 2.    The Lies to the Arbitrator (July 11-28, 2023)

101.    On July 11, 2023, Levona asked the arbitrator to order Eletson to produce the withheld document.  *See* Dist. Ct. ECF 67-52, at 2.  Eletson, through Reed Smith, opposed that request in a letter to the arbitrator on July 13.  Dist. Ct. ECF 485-19.  The letter had been carefully drafted—the result of more than 80 emails between and among Reed Smith, the Former Principals, and Eletson's Greek lawyers as reflected on Reed Smith's privilege log in the days following Frankel Rubin's original July 7 request for the withheld document.  The product of all that work was a series of misrepresentations and lies.

34

102.    Reed Smith's July 13 letter began by accusing Levona of having "violate[d] the protective order in the Bankruptcy Court."  Dist. Ct. ECF 485-19, at 2.  Reed Smith's letter then proceeded to misrepresent the substance and relevance of the document.

103.    First, although the document describes a future "buyout of Murchinson" and a $15 million payment for the "Murchinson partnership share," Dist. Ct. ECF 127-4—issues at the heart of the dispute in the arbitration—Reed Smith took advantage of the fact that the arbitrator (and Levona) had never seen the document by representing, astonishingly, that "*there is [not] anything important about the document*" and *"[t]he document was not called for by any document request in the arbitration*."  Dist. Ct. ECF 485-19, at 2 (emphasis added).

104.    Those statements were knowingly false.  Kertsikoff, during his deposition, admitted that the document was important: "Q. [T]his discussion of the buyout with Murchinson … was an *important issue* in the arbitration, right?  A. *[Y]eah, it was their main issue*."  Dist. Ct. ECF 551-1, at 238:19–239:2 (emphasis added).  Indeed, the representations in Reed Smith's July 13 letter were so far from true that even Solomon was unwilling to call them true at his deposition: "Q. Sitting here today do you believe that the statements in this letter are all true?  A. *I do not know what the … word 'true' means* when you're not talking about a factual statement."  Dist. Ct. ECF 551-62, at 255:3–8 (emphasis added).

105.    Second, Reed Smith's letter represented that the document and hence the attached model *had not been "seen"* by the Former Principals "before this week."  Dist. Ct. ECF 485-19, at 2 (emphasis added).  That representation was at best deeply misleading.  Kertsikoff saw a near-identical version of the relevant model.  More generally, as shown above, other witnesses had seen and engaged with multiple versions of the same model, with the same file name, and were fully familiar with its contents and context.  *See* Dist. Ct. ECF 551-1, at 236:11–237:24 (testifying that

35

"the July 13 [proposal] … and then the [similar models] later … [were] part of" "one continuum" and "just … further refinements of the same analysis concerning the same subject matter more or less," which were matters as to which he had "general awareness"); Dist. Ct. ECF 484, at 15 (Reed Smith contending that document "contains a further refinement of the analysis contained in the [July 13 proposal]"); Dist. Ct. ECF 559-27 (email with Kertsikoff and attached "EG Model (Tufton & 2 LEG Refi & Overdraft) 25.07.2022 v4.xlsx").

106.    Third, Reed Smith's letter falsely stated that Kertsikoff, Hadjieleftheriadis, and Karastamati "could have had nothing meaningful to say about [the July 25 Withheld Document]" had they been asked about it during the arbitration.  Dist. Ct. ECF 485-19, at 2.  When Kertsikoff was asked during his deposition "what do you understand [the document] to mean," he proceeded to expound upon it—meaningfully—for fifteen transcript pages.  Dist. Ct. ECF 551-1, at 223–238.

107.    Reed Smith's representations to the arbitrator concerning the withheld evidence fell well outside the bounds of zealous advocacy.  Reed Smith's letter constituted a violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1512(c).

### 3.    The Arbitration Award Accepted the Former Principals' Representations (July-Sept. 2023)

108.    On July 28, 2023, the arbitrator issued an interim award in which "after weighing the evidence," he found "that it is more likely than not that the conditions for the buyout were met" and that "Eletson Gas transferred the[] interests to" the Cypriot Nominees.  JAMS Dkt. 94, at 45. That decision was purportedly based on several factual determinations.  As relevant here, the arbitrator first found that "[t]he evidence presented in this arbitration demonstrates that the Eletson families agreed to the contingent transfer" of Gas's preferred shares to the Cypriot Nominees.  *Id.* at 27–30 (relying on Hadjieleftheriadis's witness statement).  In so finding, the arbitrator rejected Levona's argument that after March 11, 2022, Kertsikoff and Eletson's counsel had stated that

"Eletson"—not the Cypriot Nominees was "the sole shareholder[]" of Gas because, according to the arbitrator, "'Eletson' … includes its affiliates." *Id.* at 29.

109.    A final award followed on September 29, 2023, which included the above findings (the "Award").  Dist. Ct. ECF 67-58.

110.    The Former Principals aggressively touted the Award to the marketplace as the basis for their purported right to control Gas even though the Award was stayed by order of the Bankruptcy Court and under pending review for vacatur by the District Court.

111.    For instance, on February 7, 2025, the Former Principals unlawfully issued a press release on Eletson letterhead (the "Unlawful Press Release") in which they claim (i) that the Award "removed Levona/Murchinson from the ownership and management of Eletson Gas LLC's 12-vessel gas carrier fleet"; (ii) that the District Court has "substantially confirm[ed]" the Award; and (iii) that the Award "has not been vacated and to the contrary it is in the process of being recognized … in other jurisdictions around the world."  Case No. 24-cv-8672, ECF 60-3.

112.    Prior to disseminating the Unlawful Press Release, Kertsikoff sent the "last version" of the draft press release to Charles Weller of Reed Smith to review.  On information and belief, Reed Smith contributed to the content of the Unlawful Press Release, which contained knowingly false and misleading information.

**E.    Defendants Continue Their Fraud in the Bankruptcy Court in Violation of Multiple Federal Criminal Statutes**

113.    By determining to continue their fraud into the Bankruptcy Court, the RICO Defendants (defined below) knowingly committed violations of multiple federal criminal statutes, including:

- Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3), 152(5) and 152(9);

- Wire fraud in violation of 18 U.S.C. § 1343;

- Obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c); and

- As to Reed Smith, in addition, aiding and abetting the above criminal violations in further violation of 18 U.S.C. § 2.

### 1. Cover-Up Efforts in the Bankruptcy Court and District Court (Oct. 2023-July 2024).

114. In October 2023, days after the Award had issued and while briefing was ongoing on Eletson's and Levona's dueling confirmation and vacatur petitions (Dist. Ct. ECFs 46, 48, 49), Levona sought an order referring the confirmation/vacatur action to the Bankruptcy Court, where access and use of confidential documents would have been permitted. Dist. Ct. ECF 34. Defendants caused Eletson to oppose. Dist. Ct. ECF 35. The District Court denied that request and a motion for reconsideration. Dist. Ct. ECFs 36, 39.

115. Levona next moved to modify the protective order in the bankruptcy case to permit it to see and use the withheld evidence in the District Court. Dist. Ct. ECF 127-14, at 8; Dist. Ct. ECF 127-15, at 7. "Taking advantage of the fact that it alone knew what the documents said," Reed Smith opposed the motion, asserting that "there was no 'cognizable argument as to why the Documents can or should have any relevance whatsoever to the issue whether that Award should be confirmed.'" Dist. Ct. ECF 535, at 7 (quoting Dist. Ct. ECF 127-30, at 3). And Reed Smith submitted an affidavit from Kertsikoff "stating that Levona's understanding of the documents was incorrect." *Id.* at 7–8.

116. The Kertsikoff affidavit was blatantly false and, as such, a fraud on the Bankruptcy Court, aided and abetted by Reed Smith, in criminal violation of 18 U.S.C. §§ 152(2) and (3) and, in Reed Smith's case, 18 U.S.C. § 2.

117. At the November 8, 2023 hearing on Levona's motion, Reed Smith "once again asserted that Levona's efforts were simply a 'fishing expedition'" and "stated that the document Levona had previously presented to the arbitrator was not responsive to any arbitration discovery

request and that the arbitrator had decided not to consider the document because it was allegedly dated after the last relevant event in the arbitration in March 2022." Dist. Ct. ECF 535, at 8. The Bankruptcy Court denied Levona's motion. Dist. Ct. ECF 127-16, at 51:5–8.

118.    Nonetheless, Levona persisted in its efforts and Reed Smith persisted in its steadfast opposition. Levona filed a proof of claim in the bankruptcy case in December, thereby opening the door to discovery on the claim. Dist. Ct. ECF 127-17. Reed Smith objected, "arguing that the bankruptcy court should stay the adjudication of Levona's claim until the Award was confirmed." Dist. Ct. ECF 585, at 9 (citing Dist. Ct. ECF 127-17, at 10–12). Levona nonetheless served document requests, including requests for documents concerning the preferred shares and Buyout Option. Dist. Ct. ECF 136, at 14. Reed Smith refused to produce anything. *Id.* Levona moved to compel. Bankr. ECF 699. The Bankruptcy Court subsequently stayed all discovery regarding Levona's claim objection. Bankr. ECF 811, at 8:7–9.

119.    On March 11, 2024, the Petitioning Creditors in the bankruptcy case moved for the appointment of a Chapter 11 trustee. Bankr. ECF 468, 478. Four of the documents Levona had been trying to obtain were filed under seal as attachments to the Petitioning Creditors' brief. When Levona sought to obtain them in its capacity as a creditor, Reed Smith objected, necessitating a March 18 hearing during which the Bankruptcy Court granted Levona's request to access the documents for use in the bankruptcy case. *See* Dist. Ct. ECF 127-22, at 11:12–12:5. The Petitioning Creditors sent the documents to Levona's counsel, which promptly moved to modify the protective order so that it could use them in the District Court. Dist. Ct. ECF 136, at 14–15.

120.    Defendants' obstruction continued. In April 2024, Levona twice requested a conference regarding Reed Smith's continued refusal to have Eletson produce any discovery. Dist. Ct. ECFs 127-23, 127-24. On May 8, the Bankruptcy Court granted Levona permission to file a

motion to compel discovery, which Levona did. Dist. Ct. ECF 136, at 15. But Reed Smith "again sought delay," arguing that Levona by its motion "was impermissibly seeking to collaterally attack the Award 'as subsequently confirmed by Judge Liman.'" Dist. Ct. ECF 535, at 10 (quoting Dist. Ct. ECF 127-27, at 2). At the June 18 hearing on Levona's motion to compel, the Bankruptcy Court considered "why [it] should not modify [its] protective order to allow the district court to see [the withheld] documents." Dist. Ct. ECF 136, at 15. Reed Smith again resisted production stating that Levona had "been blustering about these Documents for nearly a full year, repeatedly claiming they show fraud in the Arbitration." Bankr. ECF 779 ¶ 3. The Bankruptcy Court granted Levona's motion to modify the protective order, finding that "extraordinary circumstances and compelling need exist." Bankr. ECF 865, at 243:5-9.

### 2.    Levona's Amended Petition and Discovery (July 2024-Present)

121.    On July 3, 2024, Levona moved for leave to file an amended petition to vacate the Award and for discovery. Dist. Ct. ECF 123. Reed Smith opposed. Dist. Ct. ECF 147. Before the motion had been fully briefed, Levona obtained another withheld document via discovery in a separate arbitration in London, and an order from that arbitrator permitting Levona to use the document in the District Court; Levona supplemented its motion with that document. Dist. Ct. ECFs 138, 139.

122.    The Court granted Levona's motion to amend, ruling that "[a]ccording to the documents … [a]s late as August 2022, after Eletson had filed the arbitration, Eletson was trying to raise funds in order to purchase the Preferred Interests and was contemplating that it would have to pay more for those interests than contemplated under the [Buyout] Option." Dist. Ct. ECF 162, at 17. The Court further explained that the withheld evidence, if credited, shows that "Eletson [under the control of the Former Principals] *engaged in fraudulent activity* that Levona could not have discovered and that went to a pivotal issue in the arbitration." Dist. Ct. ECF 162, at 46–47

(emphasis added).  Moreover, Levona had "identified sufficient facts to establish" that "Eletson [under the control of the Former Principals] constructed extraordinary obstacles to prevent Levona from uncovering its fraud," and Levona "did not bring a claim for fraud because based on Eletson's actions it was prevented from doing so."  Dist. Ct. ECF 162, at 33–35.

123.    On August 20, 2025, Levona filed its summary judgment memorandum of law in support of vacatur of the arbitration award on the basis that the award was procured by fraud, Dist. Ct. ECF 549, and Holdings and Corp.—under new management and represented by new counsel— joined Levona's vacatur petition.  Dist. Ct. ECF 555.  The District Court held a hearing on Levona's vacatur petition on December 9, 2025, following which the District Court took Levona's vacatur petition under advisement.

**F.      Confirmation of the Chapter 11 Bankruptcy Plan (November 2024)**

124.    From September 10, 2024 through September 13, 2024, the Bankruptcy Court held a hearing to consider confirmation of the competing plans.  Defendants Kertsikoff and Hadjieleftheriadis testified at the confirmation hearing on behalf of the Debtors.  On October 25, 2024, after the nearly week-long trial, the Bankruptcy Court issued a decision (the "Confirmation Decision") confirming the chapter 11 Plan proposed by the Petitioning Creditors and rejecting the Debtors' proposed plan.

125.    On November 4, 2024, the Bankruptcy Court entered the Confirmation Order confirming the Plan.  The Confirmation Order, among other things, (1) required all relevant parties to cooperate in good faith to implement and consummate the Plan; (2) directed the Debtors to "take or not take any and all actions as instructed by the Petitioning Creditors" and to not "take any actions inconsistent with the Plan or th[e] Confirmation Order"; and (3) determined that "all property of each of the Debtors' Estates, including . . . interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and Affiliates, shall vest in Reorganized

41

Holdings free and clear of all claims, Liens, encumbrances, charges, and other interests, except as may be provided pursuant to the Plan or this Confirmation Order."

126. On November 19, 2024, the Effective Date, the Plan went effective upon the Petitioning Creditors' filing of the notice of Effective Date, which confirmed that all conditions precedent to the Effective Date set forth in Section 9.1 of the Plan were satisfied or waived. Reed Smith and its clients did not dispute that the Effective Date occurred. *See* Bankr. ECF 1344, at 73:16–19 (Reed Smith admitting that "[t]he [E]ffective [D]ate occurred").

127. On November 19, 2024, after the Plan became effective, Holdings' new Chief Executive Officer Adam Spears wrote a letter instructing Reed Smith that it was forbidden from taking any action or making any decisions on behalf of Holdings or its subsidiaries "without the express written approval or instructions from the new personnel designated by" Holdings, including Mr. Spears.

### G. The Effect of Confirmation

128. The confirmation and effectiveness of the Plan had several key consequences.

129. *First*, the Plan became binding as against (among others) the Debtors, their equity security holders, and Related Parties (defined below). *See* 11 U.S.C. § 1141(a).

130. *Second*, the Plan displaced the Debtors' existing ownership, vesting new ownership in the creditors eligible to receive new equity on account of their claims under the Plan.

131. *Third*, the Plan displaced the Debtors' existing management and governance structure. In keeping with these provisions, the articles of incorporation of Holdings were amended to reflect the reorganized entity, and a new board of directors was constituted (the "New Board"), comprising Adam Spears, Leonard Hoskinson, and Timothy Matthews.

132. *Fourth*, the Plan terminated the retention of the Debtors' prior counsel and professionals. Holdings retained its current counsel as of the Effective Date.

133.     *Fifth*, the Plan and Confirmation Order imposed various ongoing duties of compliance, and vested the reorganized company and its new ownership with various rights of enforcement.  Among other things: (i) paragraph 5(i) of the Confirmation Order authorized the Debtors to "carry out and implement all provisions of the Plan," and required the Debtors and each of their "Related Parties" (a term that included owners, officers, directors, affiliates, agents, and attorneys) to "cooperate in good faith to implement and consummate the Plan," and (ii) paragraph 12 of the Confirmation Order enjoined all parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, from taking any actions to interfere with the implementation or consummation of the Plan.

134.     *Sixth*, the Plan enjoined all former equity holders from "commencing or continuing in any manner any action or other proceeding of any kind with respect to any" equity interest.

135.     In short, following the Effective Date of the Plan, both ownership and management of Holdings changed hands and became vested in the individuals and entities specified in the Plan—*i.e.*, Holdings' creditors—who were given the right to enforce the Plan.

136.     On and after the Effective Date, Holdings took several steps to take control of the Debtors' subsidiaries, including Corp. and the SMEs, the equity interests of which automatically vested in reorganized Holdings free and clear of any other interest.  In its capacity as the 100% equity holder of Corp. and the SMEs, Holdings (among other things) directed: (1) the removal of the then-existing directors and officers of Corp. and the appointment of new directors and officers, who were authorized to act on behalf of Corp.; (2) the removal of the then-existing directors of each of the SMEs and the appointment of new directors authorized to act on behalf of each of the SMEs; and (3) the removal and revocation of all directors and officers of each of the Holdings' wholly owned or controlled companies and each such company's subsidiaries.

137.    In the wake of these changes, and as the District Court recognized in a January 24, 2025 oral ruling: (1) the new board is now the operative board of Holdings, with authority to act on behalf of Holdings, (2) on the Effective Date, the former board members ceased to be directors or managers of Holdings; (3) Holdings (as reorganized) is the only Eletson Holdings Inc.; and (4) the Confirmation Order is binding on, among others, the Former Majority Shareholders, Former Minority Shareholders, Former D&Os, and Holdings' former counsel, Reed Smith.

**H.      The Confirmation Appeal and its Dismissal (November 2024-February 2025)**

138.    On November 7, 2024, the Debtors filed a notice of appeal from the Confirmation Decision (the "Plan Confirmation Appeal").  The Debtors neither sought nor obtained a stay pending appeal of the Plan Confirmation Appeal.

139.    On November 25, 2024, Holdings, the Petitioning Creditors, and the Creditors' Committee filed a stipulation with the District Court seeking to dismiss the Plan Confirmation Appeal with prejudice (the "Appeal Dismissal Stipulation").

140.    On December 23, 2024, the District Court held a hearing to consider the Appeal Dismissal Stipulation.  During that hearing, the District Court ruled as follows:

> I'm going to grant the stipulation of dismissal.  Because, number one, there is an order of the Court, the bankruptcy court, that has become final that I am to honor. And that order recognizes the new board of Eletson, gives the new board of Eletson, under [section 5.2 of the Plan], the ability to act on behalf of Eletson.  That's under [sections 5.10 and 5.11 of the Plan], and gives them under the plan of confirmation, authority with respect to this appeal.  If the former owners of Eletson, the former directors of Eletson, want relief from those provisions of the plan, go to what is or would have been the bankruptcy court and not to me.

Dist. Ct. ECF 238, at 31:10–23.

141.    On December 30, 2024, the District Court so-ordered the Appeal Dismissal Stipulation (the "Appeal Dismissal Stipulation Order").

142.    On January 16, 2025, Reed Smith and Rimon P.C. ("Rimon") filed a Notice of Appeal of the Appeal Dismissal Stipulation Order purportedly on behalf of Holdings, Eletson Finance (US) LLC, and Agathonissos Finance LLC.  Holdings did not retain Reed Smith or Rimon and did not authorize either Reed Smith or Rimon to file a Notice of Appeal on Holdings' behalf.

143.    The District Court struck the Notice of Appeal.  In its extensive bench ruling on February 14, 2025, the District Court (1) pointed out the "inherent absurdity" of the Provisional Board's (defined below) arguments that foreign recognition of the Confirmation Order is necessary before the Confirmation Order is effective; (2) held that the Provisional Board and Reed Smith are not entitled to speak for Holdings before the District Court, and that post-Effective Date actions purportedly taken by the Provisional Board's counsel on behalf of Holdings were "plainly unauthorized," likening counsel to "interloper[s]" and striking the notices of appearance and notices of appeal that the Provisional Board's counsel purported to file on Holdings' behalf; and (3) issued an indicative ruling that Holdings' decision to dismiss the Plan Confirmation Appeal should be recognized and that the Second Circuit Court of Appeals (the "Second Circuit") should dismiss the Plan Confirmation Appeal.[5]  Case No. 24-cv-8672 (LJL), Dkt. 66; Case No. 23-cv-7331 (LJL), Dkt. 270.

144.    The District Court also emphasized during argument that the Former D&Os and Former Shareholders' failure to do everything they reasonably could to help implement the Plan was itself a violation of the Confirmation Order.  As the District Court observed: "[I]t does strike me as odd that those same individuals who asked the U.S. court to reorganize their entity could then purport to represent the reorganized entity, the entity that they said U.S. court would reorganize, and then, purporting to represent them, take a position opposite to the plan." *Id.*  The

_____

[5] The District Court's dismissal of the Confirmation Appeal is on appeal before the Second Circuit.

45

District Court also observed, in colloquy with Reed Smith, that: "You're arguing on behalf of Eletson Holdings that Eletson Holdings hasn't [sought recognition] that Eletson Holdings should do. . . . haven't you just confessed to your own wrongdoing?" *Id.*

## I.      Defendants' Efforts to Undermine and Obstruct the Plan

145.    Despite the clear mandates of the Plan and Confirmation Order to "cooperate in good faith" and assist with implementation of the Plan, the Defendants have refused to cooperate with efforts to consummate the Plan, and have in fact obstructed it.  These persistent and improper efforts began before the Effective Date and have continued to the present day.

### 1.      Reed Smith and Others Immediately Begin Scheming to Obstruct the Plan (October 2024)

146.    Upon the Plan's confirmation, the Petitioning Creditors contacted Reed Smith to begin closing discussions and requested standard diligence information such as copies of corporate constituent documents, loan agreements, employment agreements, and an employee roster, among other things.  On October 30, 2024, counsel for the Petitioning Creditors also requested that Reed Smith put the Petitioning Creditors in touch with key personnel to begin discussions regarding the Employee Incentive Plan under the Plan.  Two weeks later, the Petitioning Creditors explicitly directed the former Debtors to provide the requested information pursuant to paragraph 5(iii) of the Confirmation Order.  Still, Reed Smith and the other Defendants continued their refusal to cooperate, obstructing justice in violation of 18 U.S.C. § 1512(c), and did not join a single closing call until the final closing call on the Effective Date (during which they raised no objection to the closing of the Plan transactions and the declaration of the Effective Date).

147.    Moreover, despite being bound by the Confirmation Order and the Bankruptcy Code to implement the Plan, Reed Smith openly expounded on Defendants' intention to obstruct

implementation of the Plan.  For example, on November 12, 2024, Reed Smith informed the

District Court that Defendants intended to contest the Plan's effectiveness, stating:

> We know that the plan says that shares of Holdings, old Holdings, might be
> extinguished, but even that is explicitly subject to applicable law, and that
> applicable law is not U.S. law, it's Liberian law.  I'm not suggesting anything that
> I know; the only thing I know to represent to your Honor is that we asked the same
> Liberian counsel whom your Honor knows from the last time whether a U.S.
> bankruptcy order is automatically enforceable in Liberia.  It is not.

Dist. Ct. ECF 208, at 7:13–21.  In a letter to the Bankruptcy Court filed later that day, Reed Smith

argued that "a recognition proceeding is needed in both Liberia and Greece to ensure the

Confirmation Order's enforceability."  Bankr. ECF 1241.  Reed Smith advanced this frivolous

position even though (1) the Confirmation Order and Plan provide that the Court-ordered

ownership change would take place automatically upon the Effective Date; (2) Reed Smith has

never identified any party in Liberia against whom the Confirmation Order needs to be enforced;

and (3) the position advanced by Reed Smith was against the interests of Holdings, its former

client.

148.    Furthermore, despite Reed Smith's obligation to cooperate with the Plan, there is

no evidence that Reed Smith ever instructed the Former D&Os or the Former Shareholders to

comply with the Plan.  Upon review of documents on Eletson's Microsoft Server, Eletson has not

discovered a single instance in which Reed Smith notified the Former D&Os or the Former

Shareholders of their obligation to comply with the Plan or otherwise encourages such compliance.

### 2.    Reed Smith and Others Immediately Scheme to Transfer Control of Gas Vessel's Outside of Eletson (October 2024-Present)

149.    On or about October 30, 2024, Andreoulakis solicited attorneys at Reed Smith's

London office to attempt to replace the management of ships controlled by Corp. with management

entities controlled by the Former D&Os to ensure continuity of control of the assets and diversion

of revenue after the Effective Date.  After Andreoulakis and Reed Smith discussed this by phone,

Reed Smith and Andreoulakis worked together to transfer control of at least four different vessels, the *Antikithira*, *Ithacki*, *Kalolimnos*, and *Kithira*, from control of Corp., to a new entity that would be outside the scope of Eletson. Andreoulakis admitted explicitly that "the attached management agreements refer to the vessels which are subject to reorganization proceedings" in the United States. Such conduct constitutes bankruptcy fraud by Andreoulakis and aiding and abetting bankruptcy fraud by Reed Smith in violation of 18 U.S.C. §§ 152(5) and (8).

### 3. The Minority Shareholders Petition for Appointment of a Provisional Board (November 2024)

150. On November 8, 2024, four of Holdings' officers and board members purportedly resigned those positions. A few days later, in violation of the binding Confirmation Order, Former Minority Shareholders Keros and Elafonissos filed a petition on an *ex parte* basis with the First Instance Court of Piraeus in Greece (the "Piraeus Court") seeking appointment of a provisional board of directors of Holdings to "turn against" the Confirmation Decision and "to oppose" the Confirmation Order. Defendant Zilakos submitted a declaration in connection with the petition. Keros was represented in the Piraeus Court by its shareholder and representative Stylianos Andreoulakis, the son of Defendant Andreoulakis.

151. On November 11, 2024, the Piraeus Court issued a temporary order appointing four individuals to replace the resigning directors and a "Provisional Board" for "temporary management" of Holdings with the mandate to take care of urgent business of Holdings and to appoint lawyers to protect its interests, particularly before the Bankruptcy Court or other New York courts. The eight-member Provisional Board consisted of: Hadjieleftheriadis; his brother, Konstantinos; Ioannis Zilakos; Andreoulakis; Psomadakis; Paxinos; Giannakopoulou; and Niki Zilakou.

152.    The Piraeus Court scheduled a subsequent hearing for February 4, 2025 to consider reconstituting the board.

153.    The Former Minority Shareholders sought this February 2025 hearing even though (1) Holdings' board was set to be reconstituted automatically upon the occurrence of the Effective Date pursuant to the terms of the Plan; (2) the Former D&Os were not seeking to stay the Confirmation Order; and (3) the Former D&Os were enjoined from taking "any actions inconsistent with the Plan or [the] Confirmation Order without the prior written consent of the Petitioning Creditors or further order of the [Bankruptcy] Court."

154.    After the Effective Date, the Provisional Board took the position that its "members are the only parties authorized to represent and/or bind Holdings."  Indeed, on November 26, 2024, just one week after the Effective Date, Andreoulakis, on behalf of Hadjieleftheriadis, confirmed to Solomon that Hadjieleftheriadis was the President of Holdings and that the Provisional Board had "authority to act" and retained Reed Smith "to protect its interests" in the bankruptcy proceedings and other related litigation in the United States.  The foregoing conduct violated 18 U.S.C. § 1343.

155.    On December 5, 2024, the Provisional Board, by unanimous consent of the members, retained Reed Smith purportedly to represent Holdings "and directed Reed Smith to refuse all requests" contained in certain letters from the new (and legitimate) board of reorganized Holdings.  In addition, the Provisional Board, by unanimous consent of the members, directed Reed Smith "to object to or pursue other legal remedies disputing the authority of Togut [i.e., Holdings' new counsel] or any other counsel that was not appointed by the Provisional Board, and to file any document requested to support the Appeal [of the Confirmation Order]."

156.    Upon retention, Reed Smith, in coordination with the Provisional Board, Karastamati and Kertsikoff, hatched a strategy to obstruct implementation and consummation of the Plan and Confirmation Order and sow confusion to third parties regarding the control of Holdings and its subsidiaries.  For example, on December 13, 2024, Reed Smith, copying Karastamati, Kertsikoff, and Hadjieleftheriadis, suggested that their position be that the duly constituted board of Holdings, which included Adam Spears, did not have control over Holdings and would not have control of Holdings until certain action was taken abroad to recognize the Plan and Confirmation Order of the Bankruptcy Court.  The foregoing conduct violated 18 U.S.C. § 1343.

157.    This direction and strategy continued, and upon information and belief, continues to this day.  For example, on February 10, 2025, even after the Consummation Decision and Order (defined below), Reed Smith coordinated with various Former D&Os and purported members of the Provisional Board, including Andreoulakis, Kertsikoff, and Psomadakis, to support their position that Holdings was still "controlled by the provisional board" and that the duly constituted board, according to the Plan and Confirmation Order, did "not have full control of Eletson Holdings" until recognition of the Plan in Greece and Liberia.  The foregoing conduct violated 18 U.S.C. § 1343.

158.    The Provisional Board also retained a Greek law firm, the Daniolos Law Firm (the "Daniolos Firm"), and a Liberian law firm, Lex Group Liberia LLC ("Lex Group") to aid in the obstruction.  John Markianos-Daniolos ("Daniolos") of the Daniolos Firm submitted testimony to the Bankruptcy Court disputing the authority of Holdings to take various actions in Greece.  He also appeared in court in Greece on behalf of the Provisional Board, taking positions against the interests and objectives of Holdings.  Betty Lamin-Blamo ("Lamin-Blamo") of the Lex Group

similarly offered written and live testimony to the Bankruptcy Court disputing the authority of Holdings to take various actions in Liberia.  Lamin-Blamo and the Lex Group also appeared in court in Liberia on behalf of the Provisional Board, taking positions against the interests and objectives of Holdings.

159.    The Provisional Board, variously referring to itself as "Provisional Holdings," "Holdings (Greece)" or "Unreorganized Holdings" has, through the joint and collective action of its members, filed pleadings and taken positions in litigations in the United States and abroad designed to undermine the Plan.  Many, if not all, of these litigations are sham litigations designed merely to delay and obstruct implementation of the Plan.  Hadjieleftheriadis has exercised a significant majority interest control over purported Provisional Holdings since he beneficially controls two of the Former Majority Shareholders—Defendants Glafkos and Lassia.  Insofar as Provisional Holdings exists, the Hadjieleftheriadis family is in a position to exercise full control over it.

160.    The Piraeus Court's order constituting the Provisional Board was a temporary one, and contemplated a further hearing at a future date.  When the court subsequently considered the matter on a more complete record, it issued a June 6, 2025 decision dismissing the ex parte petition that had led to the formation of the so-called Provisional Board.  In that June 6 decision, the Piraeus Court wrote that "[t]he claim that the voluntary bankruptcy of the US Bankruptcy Court-Southern District of New York on October 25, 2024, and the court order of November 4, 2024, confirming the same . . . have no legal effect in Greece, is unfounded."

161.    Despite the June 6 decision, Defendants still contend that they control Holdings and its subsidiaries.  For instance, on June 6, 2025, Hadjieleftheriadis, in an email to Reed Smith and

Daniolos, copying Andreoulakis, still claimed to "act with authority on behalf of Eletson Holdings, Inc. and Eletson Corporation."  The foregoing conduct violated 18 U.S.C. § 1343.

162.   In other emails following the June 6 decision, Daniolos and Andreoulakis, copying Reed Smith, Hadjieleftheriadis, Karastamati, and Kertsikoff, further coordinated their strategy to oppose the June 6 Decision, calling the decision "deplorable" and yet admitting that the decision will "blow considerable collateral damage."

**4.      Reed Smith and Others Refuse to Update or Assist in Updating LISCR (November 2024-Present)**

163.   Reed Smith and the other Defendants also refused to update or assist in updating LISCR, LLC—the Liberian International Ship & Corporate Registry ("LISCR")—to reflect the change of ownership that occurred on the Plan's Effective Date.

164.   On November 12, 2024, counsel for the Petitioning Creditors emailed Reed Smith requesting (1) that Reed Smith and the Debtors identify the designated individual at Holdings' existing address of record ("AOR") on file with LISCR; and (2) that the existing AOR complete a form of letter, to be held in escrow and submitted on the Effective Date, instructing LISCR to update its AOR for Holdings to reflect Holdings' new AOR and authorized personnel (the "LISCR Letter").  Reed Smith did not respond to these requests, and instead at a hearing on November 13, 2024 claimed that they were advised that providing the requested LISCR Letter would violate Liberian criminal law.  The foregoing conduct violated 18 U.S.C. § 152(2).

165.   On November 17, 2024, Reed Smith sent an email to the Petitioning Creditors confirming that they would not update LISCR.  Reed Smith separately submitted a declaration stating that "Liberian counsel [i.e., Lex Group] had advised the directors of Holdings to refrain from taking any action regarding the change to the Address of record."

166.   Defendants' obstruction with changing the AOR and updating LISCR continued for months, requiring a flurry of otherwise-unnecessary motion practice that resulted in contempt findings and sanctions.

167.   On November 25, 2024, Holdings filed its first sanctions motion at Bankr. ECF 1268 (the "First Sanctions Motion").  Among other things, Holdings asserted in the First Sanctions Motion that Reed Smith, the Daniolos Firm, and the Former Majority Shareholders "ha[d] refused to take steps" requested by Holdings to implement the Plan, including properly updating LISCR "to reflect the change in ownership that occurred on the Plan's Effective Date . . . as required under Section 5.4 of the Plan."  Holdings further asserted that Defendants had been asked to "file a change of the AOR (address of record) or file [Holdings'] new corporate documents with LISCR" but that "[t]he [Defendants] have refused to even identify the current AOR or who is currently authorized to make filings with LISCR."  Several of the Defendants objected to the First Sanctions Motion on December 10, 2024.

168.   On December 10, 2024, Hadjieleftheriadis filed with LISCR a Certificate of Election and Incumbency of Holdings that certified that the Provisional Board—namely Hadjieleftheriadis, Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Psomadakis, Giannakopoulou, Paxinos, and Andreoulakis (as non-executive director)—were the duly elected directors of Holdings.  The certificate was signed by Hadjieleftheriadis and filed with LISCR on December 11, 2024.  The foregoing conduct violated 18 U.S.C. § 1512(c).

169.   On December 16, 2024, Andreoulakis circulated the certificate to Reed Smith, copying Karastamati, Hadjieleftheriadis, and Kertsikoff, in order to further oppose updating the LISCR.  The foregoing conduct violated 18 U.S.C. § 1343.

170.    On January 24, 2025, the Bankruptcy Court issued an oral decision granting the First Sanctions Motion (the "Consummation Decision"), which was followed on January 29, 2025 by an accompanying order (the "Consummation Order"). In the Consummation Decision, the Bankruptcy Court ordered the "former shareholders, officers, directors, [and] counsel" of Holdings to "assist in amending the AOR and updating the corporate governance documents, including the amended articles of incorporation with LISCR."

171.    In the Consummation Order, the Bankruptcy Court ordered the same things already required by the Confirmation Order, *i.e.*, the Bankruptcy Court required Defendants to work in good faith to facilitate the Plan's consummation in full.

172.    Defendants did not comply with the Consummation Decision or Order.

173.    On February 6, 2025, Holdings filed a second sanctions motion related to Defendants' continued refusal to update the AOR in violation of the Consummation Order (the "Second Sanctions Motion").

174.    At a hearing on February 20, 2025, the Bankruptcy Court granted the Second Sanctions Motion, in part, finding that its earlier orders had not been complied with (the "February Sanctions Opinion"). Despite this finding, however, the Bankruptcy Court determined to "provide the parties one final opportunity for compliance," and directed various of the Defendants to take a series of specific actions directed at identifying and updating the AOR, including a directive to submit under seal to the Bankruptcy Court the identity of the AOR.

175.    Despite the Bankruptcy Court's crystal-clear instructions, Defendants did not comply with the February Sanctions Opinion.

176.    Each of the Former Majority Shareholders submitted a certification that helped to illustrate their non-compliance with the February Sanctions Opinion (the "Certifications"). Lassia,

in a document signed by Karastamati, certified to the Bankruptcy Court that it had "no knowledge" of the identity of the AOR, no power to direct the AOR, and had thus "requested from Mr. Vasilis Hadjieleftheriadis in his capacity as President of the provisional Board of Directors of EHI . . . to instruct the current AOR." Family Unity, in a document signed by Stavriana Kertsikoff, made a substantively identical certification. Glafkos, in a document signed by Hadjieleftheriadis, referred to a separate certification submitted by Hadjieleftheriadis himself, in which he disclaimed prior knowledge of the AOR, expressed that he was "hesitant to instruct the . . . AOR to act," and therefore would confirm only that he "advised the current AOR of the order of the New York Bankruptcy Court." The foregoing conduct violated 18 U.S.C. § 152(2).

177.    Giannakopoulou, Paxinos, and Psomadakis, members of the purported Provisional Board, also submitted certifications that disclaimed knowledge of Holdings' AOR and/or authority to instruct the AOR. The foregoing conduct violated 18 U.S.C. § 152(2).

178.    Each of the members of the purported Provisional Board submitted such certifications notwithstanding the fact (which was later revealed) that, since April 2024, the AOR was actually Defendant Emmanuel Andreoulakis, *a member of the Provisional Board*, who, along with his cousin, Defendant Ioannis Zilakos, declined to submit a certification regarding the identity of the AOR despite being directed to do so in the February Sanctions Opinion.

179.    The identity of the AOR was not submitted under seal to the Court.

180.    On February 27, 2025, as a result of the parties' noncompliance, the Bankruptcy Court entered an order (the "February Sanctions Order"), which sanctioned "the purported Provisional Board," Hadjieleftheriadis, the Former Majority Shareholders, and the AOR $1,000 per day until the parties complied with various requirements, including updating the AOR with the LISCR and submitting the identity of the AOR to the Court.

55

181.    On March 13, 2025, through Holdings' own efforts, LISCR updated Holdings' AOR, and Holdings was subsequently redomiciled in the Republic of the Marshall Islands.

182.    The change to Holdings' AOR was not accomplished with the assistance of any Defendant, each of whom—rather than helping update LISCR as required—did not cooperate or facilitate the AOR change at all.

183.    On March 19, 2025, also through Holdings' own efforts, LISCR updated Corp.'s AOR, and Corp. was also subsequently redomiciled in the Marshall Islands.  LISCR updated this, despite Hadjieleftheriadis submitting a signed declaration to LISCR that same day, declaring that he, along with Ioannis Zilakos and Konstantinos Hadjieleftheriadis, were the duly elected and acting directors of Corp.

### 5.    Defendants Oppose Recognition of the Plan in Liberia (November 2024-Present)

184.    In the face of the Defendants' obstructionist tactics, Pach Shemen, a Petitioning Creditor and a shareholder of Holdings, determined to commence a proceeding in a Liberian court on January 7, 2025 (the "Liberian Proceeding") seeking recognition and enforceability of the Confirmation Decision and Confirmation Order in Liberia and an order instructing the LISCR to change the AOR.

185.    The Provisional Board held two meetings—one on November 29, 2024, and one on January 8, 2025—attended by Hadjieleftheriadis, Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Niki Zilakou, Psomadakis, Giannakopoulou, Paxinos, and Andreoulakis.  At those meetings, the members of the Provisional Board unanimously resolved to retain Liberian counsel, Lex Group, to, among other things, oppose recognition of the Plan in Liberia and request a court judgment confirming that the Confirmation Order cannot be judicially recognized in Liberia.

186.     Further, on January 8, 2025, Daniolos emailed Lex Group and copied Andreoulakis to say that all five Former Shareholders—Lassia, Glafkos, Family Unity, Elafonissos Shipping, and Keros—who still claimed to own shares in Holdings, intended to intervene and support the efforts to oppose recognition of the Plan in Liberia.

187.     On January 9, 2025 the Provisional Board, purporting to act as Holdings, and the Former Majority Shareholders, with the assistance of Lex Group, filed papers in opposition to the relief sought in the Liberian Proceeding.  Among other things, the Provisional Board and the Former Majority Shareholders asserted—falsely—that Mr. Spears had not been authorized to act as the foreign representative in Liberia by "any . . . competent authority," despite Mr. Spears having been recognized as the Foreign Representative for Holdings in Liberia pursuant to a consensual order of the Bankruptcy Court.  Holdings demanded that the Provisional Board withdraw its opposition papers, but the Provisional Board did not comply.

188.     Pach Shemen ultimately dismissed the Liberian Proceeding on March 14, 2025 after Holdings changed its domicile to the Republic of the Marshall Islands.

### 6.     Defendants Oppose Recognition of the Plan in Greece (November 2024-Present)

189.     Likewise facing opposition to the Plan in Greece, on February 3, 2025, Holdings filed an application in the Court of First Instance of Athens (the "Athens Court") seeking recognition of the Confirmation Order (the "Greek Recognition Petition").

190.     On February 4, 2025, the Daniolos Firm moved to dismiss the Greek Recognition Petition, arguing, among other things, that Greek judicial recognition of the Confirmation Order is a prerequisite to the Confirmation Order having legal effect anywhere, without qualification. Also on February 4, 2025, the Provisional Board, again purporting to act as Holdings, and the Former Minority Shareholders sought to intervene in (and oppose) the Greek Recognition Petition.

191. The Greek Recognition Petition was heard before the Athens Court on March 19, 2025. At the March 19 hearing, Karastamati appeared and testified against recognition of the Confirmation Order.

192. Karastamati also testified at an April 1, 2025 hearing before the Piraeus Single-Member Court of First Instance in support of the Former Minority Shareholders' petition for the appointment of a temporary board of directors of Holdings. At the hearing, Karastamati testified, among other things, that (a) the Petitioning Creditors were bogus (hoax) creditors, (b) Holdings was coerced to commence its chapter 11 case, (c) the Petitioning Creditors acted in bad faith by commencing a bankruptcy plan against Holdings, and (d) Holdings has not elected the board of directors, despite the fact that the members of the board are listed in the certificate of incumbency issued by the LISCR. Each of these arguments was previously considered and rejected by the Bankruptcy Court in its October 25, 2024, decision (which was not appealed) that allowed the Petitioning Creditors' proofs of claims and overruled the Debtors' objections thereto.

193. On February 27, 2025, Holdings received an email from the Sofos & Partners Law Firm purporting to serve a copy of a notice of the filing of an unauthorized motion for injunctive relief (the "Improper Greek Motion") filed on February 19, 2025, in the Member First Instance Court of Piraeus. The Improper Greek Motion names certain of Holdings' new officers and directors (Adam Spears and Leonard Hoskinson), one of its new shareholders (Pach Shemen), and others as defendants-respondents. The Improper Greek Motion was filed by the Kalavros Law Firm, which improperly claimed to act on behalf of plaintiffs-applicants Holdings and certain of Holdings' subsidiaries (Corp., Gas, and the four SMEs), as well as Holdings' Former Minority Shareholder Elafonissos.

194. The Improper Greek Motion challenged the Bankruptcy Court's jurisdiction and seeks unlawful relief in direct contravention of the Bankruptcy Court's and the District Court's findings and orders, including (a) an injunction preventing Holdings' new (court-approved) officers, directors, and shareholders from exercising even the most fundamental management and ownership rights vested in them by the Plan and Confirmation Order, including, (i) claiming to represent Holdings or its subsidiaries, (ii) performing any acts of administration or management of Holdings or its subsidiaries, (iii) claiming that the boards of directors of Holdings and its subsidiaries have been changed, and (iv) attempting to register any changes with any authority, including LISCR; and (b) the imposition of a monetary fine of €5,000, at least three months incarceration, and fees and other costs.

195. A hearing on the Improper Greek Motion took place in Greece on April 1, 2025. At the April 1 hearing, Karastamati appeared and testified in support of permanent appointment of the Provisional Board.

### 7. Defendants Oppose Recognition of the Plan in the United Kingdom (November 2024-Present)

196. Reed Smith also brought actions on behalf of Karastamati and Kertsikoff in the United Kingdom under Section 32 of the Arbitration Act of 1996. Reed Smith asked the UK arbitrator to find that the Former D&Os controlled Gas and prevent recognition of the Chapter 11 Plan in the United Kingdom.

197. Reed Smith's representation of Karastamati and Kertsikoff in this action was directly adverse to Holdings. The arbitrator found in a judgment dated July 14, 2025 that Holdings is controlled by the directors appointed under the Plan. He also refused to recognize the arbitration award because the District Court had suspended recognition and enforcement of the award.

**8.      Defendants Take Actions Around the Globe to Obstruct the Plan and Improperly Use the Fraudulently Obtained Arbitration Award**

**a.      The Improper LISCR Actions (March 2025-Present)**

198.    As noted above, on March 13, 2025, through the efforts of Holdings and with no assistance from Defendants, LISCR updated Holdings' AOR to Adam Spears.  Thereafter, on March 18, 2025, certain of Defendants—including Elafonissos and the Former Majority Shareholders—commenced a new action in the Supreme Court of Liberia (the "Liberian Court") against LISCR challenging the change in Holdings' AOR (the "First LISCR Action").  These parties filed the First LISCR Action in Holdings' name, even though this was not authorized by Holdings and Holdings was no longer a Liberian company.

199.    Shortly after, the Liberian Court issued a temporary stay of any further LISCR actions related to subsidiaries of Holdings (the "Temporary Stay").  The Temporary Stay initially interfered with Holdings' efforts to re-domicile Corp. and EMC and change the AORs of its remaining Liberian subsidiaries.

200.    On March 28, 2025, the Liberian Court issued an order rejecting the First LISCR Action and lifting the Temporary Stay.  Holdings was then able to successfully update the AOR for its remaining Liberian subsidiaries, and all of Holdings' Liberian subsidiaries, including Corp. and EMC, were re-domiciled in the Marshall Islands.

201.    On April 8, 2025, Holdings was informed that persons purporting to act on behalf of Eletson Corp. and EMC filed a substantially similar petition in the Liberian Court against LISCR, again challenging the change in Holdings' AOR and arguing, among other things, that LISCR was not authorized to change the AOR.

202.    On April 13, 2025, Andreoulakis, through his counsel, sent a letter to LISCR alleging that LISCR's updating of the AOR of each of the former Liberian companies was improper.

### b.    The Improper Marshall Islands Proceeding (April 2025-Present)

203.    On April 23, 2025, Andreoulakis, Glafkos, Lassia, and Family Unity filed a complaint in the High Court of the Republic of the Marshall Islands against Holdings, Corp. and other affiliated entities, seeking to reveal the administrative agent and address of record of each defendant and/or to remove and replace the current applicable administrative agent and address of record for each defendant.

### c.    The Improper German Petition (April 2025-Present)

204.    On April 9, 2025, Joh. Berenberg, Gossler & Co. Bank ("Berenberg")—a financial institution that provides banking services to Holdings' subsidiaries, including Corp. and EMC— finally released account statements relating to certain corporate accounts.  Berenberg's production followed months of obstruction by the Former D&Os, particularly Hadjieleftheriadis, who repeatedly challenged Holdings' authority to access these accounts.  Access was only provided after Holdings provided a certificate of incumbency and other materials to Berenberg.

205.    The very next day, on April 10, 2025, Berenberg informed Holdings that Holdings' former officers and directors had initiated an action in Hamburg, Germany (the "Improper German Petition") seeking injunctive relief against Berenberg.  The foregoing conduct violated 18 U.S.C. § 1512(c).

206.    Holdings had been working with Berenberg following the Effective Date to effectuate a change in the authorized representatives for bank accounts held in the name of Corp. and EMC (the "Accounts").  Through working with Berenberg, the company obtained bank

statements showing potentially millions of dollars in funds available at Corp. and EMC, to which the new owners of Holdings do not yet have access.  The Improper German Petition further evidences attempts by Defendants to interfere with implementation of the Plan.

### d.        Related Corp. Proceeding
### (August 2025-Present)

207.    On August 6, 2025, Corp., through its counsel D.K., Avgitidis & Associates ("Avgitidis"), filed a motion before the Piraeus Court seeking information from the former board members of Corp., which it needed to oppose a pending involuntary bankruptcy proceeding of Corp. initiated by a third party.  At a hearing on September 19, 2025, before the Piraeus Court, an attorney appeared and purported to represent Corp. pursuant to authorization granted by Hadjieleftheriadis, who himself alleged that he is the sole legal representative of Corp.

208.    At the same hearing, Andreoulakis appeared on behalf of Hadjieleftheriadis, Karastamati, and Kertsikoff to argue that Leonard Hoskinson, the legally appointed director of Corp., had no power of representation.

209.    During the hearing, Andreoulakis, Hadjieleftheriadis, Karastamati, and Kertsikoff also argued that that the former board members of Corp. have not been displaced "while claiming that they alone are the lawful representatives of the Company" and that they "do not have documents of the Company" that Avigitdis was seeking.

210.    On September 19, 2025, Andreoulakis filed a memorandum, again on behalf of Hadjieleftheriadis, Karastamati, and Kertsikoff, stating that Hadjieleftheriadis purports to be the "sole legal representative" of Corp.  The memorandum contained other representations asserting that Hadjieleftheriadis is the lawful representative of Corp. in Greece.

> **e.   Improper/Unauthorized Chartering of an Eletson Vessel**
> **(June 2025)**

211.    Upon information and belief, Kertsikoff fraudulently represented that he was acting for an Eletson entity when he authorized a shipbroker to sign a charterparty agreement for the Anafi, a vessel in the Eletson fleet, to Indian Oil Corporation Ltd. ("IOCL").  Kertsikoff appended to the charterparty an unauthorized confirmation purporting that the owner of the vessel, BSL MGC Limited ("BSL") had no objection to the deployment of the vessels to IOCL under a time charter arrangement (the "No Objection Confirmation").

212.    The No Objection Confirmation, dated June 25, 2025, signed by Psomadakis, and bearing, *inter alia*, a seal purporting to be from BSL, alleges that EMC Gas Corporation was instructed by BSL to confirm that there was no objection to the deployment of the Anafi.

213.    However, upon information and belief, BSL never instructed EMC Gas Corporation to confirm that BSL had no objection to the Anafi being deployed, and the purported BSL seal placed on the document is a forgery.  This belief is based, in part, on a letter from BSL's registered agent Tufton Corporate Services Limited ("Tufton"), in which Tufton stated:

> We confirm that on or before June 25,2025 the BSL seal placed on the right-hand side of the [No Objection Confirmation] is not a seal used by BSL.  The company did not maintain a separate company stamp during this period.

214.    By IOCL's own admission, the No Objection Confirmation was instrumental in them entering into the charterparty for the Anafi.

> **f.   Defendants' Lies Concerning Ownership and Control**
> **(November 2024-Present)**

215.    Finally, Defendants have used the limbo their improper obstruction has created in order to lie to the market about whether the New Board comprised of Adam Spears, Leonard Hoskinson, and Timothy Matthews actually controls Eletson.

216. For example, shortly after the Effective Date, the Former D&Os made a public proclamation that they will not comply with the Plan or the Confirmation Order. As detailed in a November 21, 2024 article in *TradeWinds*, a market-leading media outlet for the global shipping industry:

> The 'incumbent [former] officers [of Holdings]' said in a statement sent to TradeWinds that any attempt by the 'purported new equity owners' of [Reorganized Holdings] to appoint management or directors at the Liberian company was 'premature and ineffective.' This is due to a lack of recognition of their capacity and authority in the courts of Liberia and Greece, where the business is located[.]

Hadjieleftheriadis, former president of Holdings who falsely and fraudulently claimed to still hold that title, was quoted as saying: "While we respect the US bankruptcy process, the recent decision is under appeal and we must also respect international law."

217. On January 2, 2025, Hadjieleftheriadis executed a *Certificate of Election and Incumbency of Eletson Holdings Inc.*, which, on January 3, 2025, was filed with LISCR (the "Certificate of Incumbency"). The Certificate of Incumbency states that the duly elected, qualified, and acting directors of Holdings are the members of the purported Provisional Board appointed by the Greek court, and that Hadjieleftheriadis is the president and treasurer and Andreoulakis is the secretary of Holdings. Although there is no evidence that the Greek order was recognized by a Liberian court, and the Certificate of Incumbency was filed with LISCR by the AOR without first seeking recognition of the Greek order in a Liberian proceeding, the Certificate of Incumbency was used by Defendants in violation of the Confirmation Order to frustrate implementation of the Plan. The foregoing conduct violated 18 U.S.C. §§ 152(2) and (3).

218. In another example, upon information and belief, an agent of the Former D&Os filed a request with the Hellenic Republic-Ministry of Shipping and Island Policy that the agency issue a certificate confirming the directors of the Kimolos II SME. The certificate was issued on February 5, 2025. The certificate stated that the board of directors for the Kimolos II SME was

Hadjieleftheriadis (as president/treasurer), Karastamati (as vice president) and Andreoulakis (as secretary). The certificate stated that the company was to be represented and bound by the board of directors.

219. On February 7, 2025, the Former Principals issued a press release on Eletson letterhead in which they claimed "the U.S. Bankruptcy Court confirmed a reorganization plan proposed by Pach Shemen, but it only contemplated corporate governance changes for Eletson Holdings '*where permitted by applicable law*.' . . . . Importantly, these order related **only** to Eletson Holdings, Inc., a holding company incorporated in Liberia with its principal place of business in Piraeus, Greece. **No operating ship-owning or ship-management subsidiary was involved in the U.S. bankruptcy proceedings.**" (emphasis in original).

220. Moreover, the Former Principals, with the assistance of Reed Smith, attempted to purchase three of the vessels from Tufton under the false pretenses of authority into companies they owned personally.

221. As described below, Defendants' lies to the market regarding whether the Plan's effectiveness and the Confirmation Order's enforceability have allowed Defendants to wrongfully usurp Plaintiffs' property. The acts of Defendants as described in this subsection of the Amended Complaint constituted violations of 18 U.S.C. §§ 152(5) and (9).

### g. The Former Principals Instruct Eletson Vessels to Evade Arrest

222. On January 7, 2025, the United States District Court for the Southern District of Texas, Brownsville Division (Case No. 1:25-cv-00004) issued an order for the arrest of one of Eletson's vessels, the KINAROS. The arrest application was granted pursuant to Supplemental Rule D, as sought by Holdings as plaintiff in that action (along with Corp. and Kinaros) seeking to obtain control over their bareboat chartered asset.

223.    Accordingly, on January 9, 2024, Leonard Hoskinson (CEO of Corp. and Authorized Representative of Kinaros) sent an email to the Captain of the KINAROS to inform him of the arrest warrant.  He specifically instructed the Captain to: "(1) immediately proceed at full reasonable speed to . . . the Port of Brownsville; (2) refrain from deviating from this course or calling at any other port until further instructions."

224.    Nonetheless, in clear evasion of Holding's direction and the order for arrest, the KINAROS did not proceed to the Port of Brownsville and instead drifted at approximately 13 nautical miles from the Texas shore, *i.e.*, stayed outside of the territorial sea of the United States, for several days before sailing away.

225.    On information and belief, the Former Principals or agents acting on their behalf usurped authority and instructed the KINAROS to evade that arrest.  The basis for that belief is that there is no other logical explanation for why a vessel, with cargo operations to undertake at port, would drift and then run.  On information and belief, given that the KINAROS was approximately 13 nautical miles from the Texas shore at the time of such evasion, U.S. wire communications were used in connection with providing those instructions.

226.    Further grounds informing that allegation include that, when the KINAROS was eventually arrested in Trinidad and Tobago, crew members gave statements about having been ordered by Greek officers to incinerate extensive amounts of paperwork.  They likewise reported having seen the Chief Engineer and the Third Engineer carry computer hard drives through the vessel.  The removal and destruction of information demonstrated that the Former Principals had enlisted officers loyal to them to eliminate relevant evidence.

227.    On or about February 3, 2025, the KIMOLOS (another vessel in Eletson's fleet) was arrested in Panama pursuant to an application made by Kimolos II SME, Corp. and Holdings.

On information and belief, the Former Principals also sought to evade that arrest via the dangerous

manipulation of that vessel's AIS data:

- On information and belief, on or about January 31, 2025, the Former Principals, or their agents under their control, deliberately spoofed the publicly available website for vessel tracking, www.marinetraffic.com, and/or otherwise interfered with the AIS reporting system of the KIMOLOS as being at the Balboa anchorage on the Pacific side of the Panama Canal, when in reality the KIMOLOS was on that day still sailing through the Caribbean sea towards Panama.

- On information and belief, the Former Principals, or their agents under their control, turned off or otherwise interfered with the AIS reporting of on its voyage to Panama, resulting in the vessel's position not being reported for over 11 hours.

- On information and belief, in the days leading up to the arrest, the Former Principals, or their agents under their control, also misrepresented the estimated time of arrival of the KIMOLOS to the Panama Canal Authority and/or other authorities in Panama, stating the vessel would arrive and would transit the Canal. In fact, at or about 22:00 on February 2, 2025, the KIMOLOS arrived with a gas cargo at Bahia Las Minas, Panama, a port on the Atlantic side coast of Panama that can be accessed without transiting the Canal and is not part of the Canal zone.

228.   Later that February and in March of 2025, three Eletson vessels were successfully

arrested pursuant to Supplemental Rule D in the Southern District of Texas, by Holdings, Corp.

and respective SMEs in furtherance of Holdings' efforts to obtain control over their time and

bareboat chartered assets from the Former Principals and their affiliates:

- On February 6, 2025, the KITHNOS was arrested in Case No. 2:25-cv-00042 in the Southern District of Texas (the "KITHNOS Arrest Action").

- On February 12, 2025, the KITHIRA was arrested in Case No. 4:25-cv-00755 in the Southern District of Texas (the "KITHIRA Arrest Action").

- On March 7, 2025, the ITHACKI was arrested in Case No. 6:25-cv-00016 in the Southern District of Texas (the "ITHACKI Arrest Action").

229.   In each of the foregoing arrest actions, in which the respective SMEs were named

as plaintiffs, attorneys from the law firm of Royston, Rayzor, Vickery & Williams LLP ("Royston

Rayzor") appeared, and they purported to do so on behalf of the SMEs "on the authority of [their]

lawful directors" (KITHNOS Arrest Action, D.E. 41, KITHIRA Arrest Action D.E. 27, and

ITHACKI Arrest Action D.E. 28). In other filed papers, they further contended that this was "on the ultimate authority of the Cypriot Nominees" (KITHNOS Arrest Action, D.E. 51, KITHIRA Arrest Action, D.E. 55, ITHACKI Arrest Action, D.E. 29). The same attorneys relatedly filed Verified Statements of Right or Interest (KITHNOS Arrest Action, D.E. 42, KITHIRA Arrest Action D.E. 28, and ITHACKI Arrest Action D.E. 24). Those Statements of Interest were verified, pursuant to 28 U.S.C. § 1746 by Karastamati (KITHNOS Arrest Action, D.E. 42-1 and ITHACKI Arrest Action D.E. 24-1) and by Kertsikoff (KITHIRA Arrest Action D.E. 28-1).

230. The papers described in the preceding paragraph were filed electronically via the Southern District of Texas court's Electronic Filing System.

231. The acts of the Former Principals as described in this subsection of the Amended Complaint constituted violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1512(c).

232. The damages caused by the conduct described in this subsection constitute domestic injuries. Indeed, Corp. was domesticated to Delaware on April 29, 2025. The historical patterns of the Gas vessels involved routine voyages to load ports in the United States. Moreover, all of the injuries flow from the RICO Defendants' (defined below) wrongful commitment to do anything whatsoever to prevent Holdings from realizing the value of its assets in the Eletson fleet following Holdings' Chapter 11 reorganization.

### h. The Former Principals Fraudulently Enter into Contracts for Corp.

233. On at least one occasion, the Former Principals or their agents fraudulently impersonated Corp. to fraudulently enter into purported contracts on Corp.'s behalf.

234. For example, in or about July 2025, the court in the KITHNOS Arrest Action ordered the vessel's substitute custodian and its counsel to conduct an in person visit to the ship, inclusive of crew interviews and welfare assessments. The substitute custodian's counsel made

arrangements for a medical provider to accompany the visit.  While *en route* to the ship, that attorney sent an email to another medical service provider called Med Solutions International ("Med Solutions" which has a 646 / New York area code) which had apparently provided telehealth psychological consultations to three crew members between Friday, June 27, and Wednesday, July 2.  The substitute custodian's counsel sought to arrange for the medical provider to speak with the Med Solutions doctor.

235.    Med Solutions' response stated that "Med Solutions was assigned by Eletson Corporation for mental health support and you can appreciate contents of sessions are confidential.  Thus, we would require Eletson's authorization to disclose any information."

236.    Corp. is a direct, wholly-owned subsidiary of Holdings.  Nobody having a chain of appointments tracing to Holdings had assigned Med Solutions to do anything.  Under the circumstances, it is clear that persons acting on behalf of the Former Principals, and fraudulently holding themselves out as agents of Corp., had purported to contract with Med Solutions.

**J.    The Sanctions Opinions and Orders (January 2025-November 2025)**

237.    In the face of the Defendants' obstructionist tactics, Holdings has been compelled to file a series of sanctions motions seeking to compel compliance with the Plan.  These motions have resulted in repeated rulings from the Bankruptcy Court finding, as fact, that various of the Defendants are acting in continued violation of the Plan and Confirmation Order.

238.    In January 2025, as noted above, the Bankruptcy Court issued the Consummation Decision and Consummation Order, directing the AOR, the Former Majority Shareholders, the Former Minority Shareholders, Reed Smith, and the Daniolos Firm to comply with the Plan.

239.    In February 2025, as noted above, the Bankruptcy Court issued the February Sanctions Order, which found that the purported Provisional Board, Hadjieleftheriadis, the Former Majority Shareholders, and the AOR had violated the Plan and Confirmation Order.

240. In particular, in the February Sanctions Order, the Bankruptcy Court found that the Provisional Board, Hadjieleftheriadis, and the Former Majority Shareholders failed to (i) instruct the AOR to communicate with and take direction from Holdings, (ii) update or amend the AOR, and (iii) update or amend Holdings' corporate governance documents on file with LISCR.

241. In the February Sanctions Order, the Bankruptcy Court also found each member of the Provisional Board, Hadjieleftheriadis, and the Former Majority Shareholders in contempt for failure to submit under seal the identity of the AOR by February 24, 2025.

242. Additionally, the Bankruptcy Court found the AOR—which (as was later revealed) was Andreoulakis—in contempt for failing (i) to communicate with and take direction from Holdings, (ii) to indicate that it had or would update or amend the AOR, and (iii) to indicate that it had or would update or amend Holdings' corporate governance documents on file with LISCR.

243. In the February Sanctions Order, the Bankruptcy Court imposed coercive monetary sanctions of $1,000 per day against each individual member of the Provisional Board, Hadjieleftheriadis, each Former Majority Shareholder, and the AOR (Andreoulakis).

244. On March 13, 2025, in response to yet another sanctions motion, the Bankruptcy Court issued another sanctions Order (the "March Sanctions Order"), in which it found that the purported Provisional Board, Hadjieleftheriadis, the Former Majority Shareholders, and the Former Minority Shareholders were in ongoing violation of the Confirmation Order for failing to comply with their obligations and continuing to act in violation of the Chapter 11 Plan.

245. In particular, the March Sanctions Order found that the Provisional Board, Hadjieleftheriadis, the Former Majority Shareholders, and the Former Minority Shareholders were active in opposing judicial recognition proceedings in Liberia and Greece and had not yet withdrawn those oppositions in either forum, even after ordered to do so in February.

246.    In the March Sanctions Order, the Bankruptcy Court imposed coercive monetary sanctions of $5,000 per day against each individual member of the Provisional Board, Hadjieleftheriadis, each Former Majority Shareholder, and each Former Minority Shareholder.

247.    In another sanctions Order dated July 8, 2025 (the "July Sanctions Order"), the Bankruptcy Court found that the purported Provisional Board, Hadjieleftheriadis, Karastamati, the Former Majority Shareholders, and the Former Minority Shareholders were each in ongoing violation of the Confirmation Order.

248.    In particular, the July Sanctions Order found that the Provisional Board, Hadjieleftheriadis, Karastamati, the Former Majority Shareholders, and the Former Minority Shareholders failed to withdraw any and all filings that oppose or undermine the judicial recognition of the Plan and the Confirmation Order and initiated new proceedings.

249.    Further, the Bankruptcy Court found that Karastamati opposed the Confirmation Order by testifying in opposition to the Plan, in a Greek Court.

250.    In the July Sanctions Order, the Bankruptcy Court imposed coercive monetary sanctions of $10,000 per day against each individual member of the Provisional Board, each of the Former Majority Shareholders, and each of the Former Minority Shareholders.  The Bankruptcy Court also imposed coercive monetary sanctions of $5,000 per day against Karastamati.

251.    In August 2025, the Bankruptcy Court found that the Cypriot Nominees were in contempt of the Bankruptcy Court's Stay Relief Order (issued in April 2023) due to actions they took in February 26, 2024, in, among other things, authorizing Gas to record the Cypriot Nominees' purported ownership of the preferred shares in Gas's share registry and remove board members and appoint new board members based on the that ownership claim (the "August 2025 Order").  The Bankruptcy Court then ordered the Cypriot Nominees to rescind their changes to the

share registry and to the board of directors of Gas, with which they have not complied.  The foregoing conduct violated 18 U.S.C. §§ 152(5), 1512(c).

252.    In another sanctions Order dated October 31, 2025 (the "October Sanctions Order"), the Bankruptcy Court found that Andreoulakis, Hadjieleftheriadis, Karastamati, and Kertsikoff were each in ongoing and continuing violations of the Confirmation Order.

253.    In particular, the October Sanctions Order found that Andreoulakis, Hadjieleftheriadis, Karastamati, and Kertsikoff were in contempt because of the representations that each individual made before a Greek Court in September 2025 regarding the legal representation of Corp.  The Bankruptcy Court ordered each party to withdraw any filings and enjoined each party from making any filings that opposed or undermined the authority or Leonard Hoskinson or Mark Lichtenstein as lawful agents of Corp.

254.    In the October Sanctions Order, the Bankruptcy Court imposed coercive monetary sanctions of $15,000 per day against Andreoulakis and Hadjieleftheriadis, $10,000 per day against Karastamati, and $5,000 per day against Kertsikoff.

255.    Most recently, in yet another a sanctions Order dated November 19, 2025 (the "November Sanctions Order"), the Bankruptcy Court found that Karastamati, Kertsikoff, and the Cypriot Nominees were in contempt of the August 2025 Order for taking certain actions concerning the ownership of Gas.

256.    The Cypriot Nominees acknowledged that Kertsikoff and Karastamati voluntarily acted for two of the Cypriot Nominees.  Additionally, the District Court had previously found that there is "little difficulty in concluding that Gas, Lascarina Karastamati, Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Lassia Investment Company, Family Unity Trust Company, and Glafkos Trust

Company are sufficiently in privity with, in active concert with, aiding and abetting [the Cypriot Nominees] to bring them within range of the Court's contempt power."

257. Thus, in the November Sanctions Order, this Court found that Karastamati and Kertsikoff acted in concert with the Cypriot Nominees in being in contempt of the August 2025 Order by failing to rescind their changes to the share registry and to the board of directors of Eletson Gas.

258. In the November Sanctions Order, this Court imposed coercive monetary sanctions of $1,000 per day against Karastamati and Kertsikoff.

### K. Defendants' Obstruction and Conversion

259. After the Confirmation Order was entered, and continuing through the date of this Complaint, Defendants engaged in a scheme to convert Plaintiffs' assets for the Former D&Os' benefit in violation of the Plan and Confirmation Order. This scheme involved refusing to turn over property of the estate to Holdings, and changing bank instructions for payments due under certain charterparties, so as to divert those payments from Holdings to the Former D&Os. This course of conduct by Defendants comprised multiple violations of 18 U.S.C. §§ 152(5) and (9) (bankruptcy fraud), 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1512(c) (obstruction of justice).

#### 1. Defendants Refuse to Turn Over Property of Holdings (November 2024-Present)

260. Shortly after the Bankruptcy Court entered the Confirmation Order, counsel for Holdings (then, counsel for the Petitioning Creditors) requested various documents and information from Reed Smith in an attempt to satisfy the waivable condition precedent to the Effective Date that "the Debtors' assets, including . . . the Debtors' books and records, shall have been transferred to Reorganized Holdings." Whether or not these assets were transferred prior to the effective date, under paragraph 7 of the Confirmation Order, section 5.2(c) of the Plan, and

73

sections 1141(b) and (c) of the Bankruptcy Code, all such assets, "including interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and Affiliates" and, by extension, the assets of such affiliates to the extent the affiliates were wholly owned by one of the Debtors, vested in Holdings as of the Effective Date.

261. In response to counsel's information requests, Reed Smith declined to provide any of the information and documents that are critical to Holdings' ability to operate the Debtors and their subsidiaries post-Effective Date, stating "there is no provision in the Plan or the Confirmation Order allowing the Plan Proponents to 'direct' the Debtor prior to the Effective Date." The foregoing conduct violated 18 U.S.C. §§ 152(9) and 1512(c).

262. Reed Smith further asserted that it could not provide documents under the control of non-Debtor subsidiaries because it did not represent those subsidiaries. These requests for documents and information included the following:

- "Provide an employee roster for all Subsidiaries, identify key personnel, and facilitate and schedule / coordinate discussions with the Petitioning Creditors' representatives and employees; identify payroll provider and personnel involved in coordinating payroll";

- "Provide copies of all employment-related agreements with Subsidiaries, including, without limitation, any agreements regarding employment, services, separation, retention, severance, incentive, bonus, consulting, contractor or related agreements or arrangements";

- "Provide copies of any employee benefit plans and retirement plans at the Subsidiaries";

- "Provide copies of (or otherwise access to) all books and records of the Debtors and the Subsidiaries, including all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all Subsidiaries";

- "Provide copies of loan agreements, liens, indemnification agreements, and agreements for indebtedness for all Subsidiaries; if any of the foregoing does not exist in a written agreement, provide a description of all such agreements";

- "Provide a list of all members of the board (or other similar governing body) and officers for all Subsidiaries, including contact information and KYC/AML

74

information for each; identify whether any counsel (in house or otherwise) representing any officers or directors in any legal actions";

- "Provide a list of all legal, financial, and other professionals retained/employed by the Debtors and all Subsidiaries, outstanding amounts due to each, and points of contact";

- "Provide a list (or other description) of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by the Debtors and all Subsidiaries";

- "Provide copies of all insurance policies, including, without limitation, D&O insurance (including any tail coverage) to which Eletson Holdings is listed as an additional insured and information related to any insurance benefits, including claims, rights, and proceeds, arising therefrom";

- "Provide a list of material contracts and material suppliers for all Subsidiaries";

- Provide a list of all bank accounts and authorized signatories for all Subsidiaries, along with approved users, account information, and points of contact at each bank";

- "Identify personnel responsible for IT and related services and provide access to Eletson's email platform and website";

- "Identify employee(s) responsible for assisting the Petitioning Creditors and their counsel with consummating the Plan and transitioning the ownership and management of the company, including providing available days and times this week to discuss closing matters."

263. In addition to the foregoing, Reed Smith, Karastamati, Kertsikoff, Andreoulakis, and Hadjieleftheriadis worked to obstruct Holdings' efforts to obtain its client files from its British Virgin Islands counsel, including by providing such counsel with edits to its proposed correspondence refusing turnover of the files.

264. Reed Smith, the Daniolos Firm, and various members of the purported Provisional Board also worked to obstruct Holdings' efforts to obtain books and records from Eletson's Stamford offices. On December 19, 2024, when Hadjieleftheriadis learned that representatives of Holdings intended to take possession of such books and records, he emailed Reed Smith and the Daniolos Firm. Solomon responded to that email with a draft of a note for one of the members of

the purported Provisional Board to send to counsel to Holdings. The draft prepared by Solomon asserted that Holdings "is not Eletson Holdings Inc., has neither right nor color of right to write on behalf of Holdings or to seek or obtain access to the Stamford Office. Any attempt to try to gain access would be a violation of Holdings' rights and, we are advised, criminal." The draft was circulated to Hadjieleftheriadis, Kertsikoff, Karastamati, Andreoulakis, and Daniolos. The foregoing conduct violated 18 U.S.C. §§ 152(9), 1343 and 1503(a).

265.  Holdings outlined the refusal of Reed Smith, the Former D&Os and the Former Shareholders to comply with their obligations under the Plan to provide various documents and information (all such documents and information, the "Converted Personal Property") in the First Sanctions Motion, and the Bankruptcy Court ultimately entered the Consummation Order, which found that each of the Defendants had received notice of the First Sanctions Motion and "required" and "directed" various parties, including all of the Defendants, "to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof." Despite multiple demands, Defendants have not turned over the Converted Personal Property, which is property of Holdings. Upon information and belief, Hadjieleftheriadis is in possession of some of the Converted Personal Property, which is located in "on-site files" at Eletson's office in Piraeus, Greece.

### 2.  Defendants Interfere with Access to Bank Accounts (November 2024-Present)

266.  Defendants have also interfered with Holdings' access to its bank accounts.

267.  For example, on January 10, 2025, Daniolos sent a memo titled "Eletson Bank Accounts With ABN" to representatives of ABN AMRO bank, copying Hadjieleftheriadis, Karastamati, and Kertsikoff. The memo asserted that Daniolos was counsel to, *inter alia*, "the members of Board of Directors of Eletson Holdings Inc." The memo asserted, among other things,

that the new owners and managers of Holdings were not authorized representatives of Holdings and that ABN should "disregard any and all unauthorized communications regarding Eletson Holdings Inc., its subsidiaries and affiliated companies sent from Adam Spears and/or Leonard Hoskinson and/or Mark Lichtenstein." The foregoing conduct violated 18 U.S.C. §§ 152(9) and 1512(c).

268.    The memorandum also asserted that various Defendants were still the "only persons who are authorized to represent" Holdings and various subsidiaries including: (1) "the only lawful and valid BoD members/officers" of Holdings, which the memorandum asserted were the members of the Provisional Board—Hadjieleftheriadis, Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Niki Zilakou, Psomadakis, Paxinos, and Andreoulakis (as secretary); (2) the board of Corp., as of January 3, 2025, which the memorandum asserted were Karastamati (as president), Hadjieleftheriadis (as vice president/treasurer), and Kertsikoff (as vice president/secretary); (3) the board of EMC, as of December 13, 2024, which the memorandum asserted was Hadjieleftheriadis (as president/treasurer), Kertsikoff (as vice president), and Karastamati (as secretary); and (4) the board of Chartering, as of November 29, 2024, which the memorandum asserted was Karastamati (as president/treasurer), Hadjieleftheriadis (as vice president), and Andreoulakis (as secretary).

269.    On February 10, 2025, Hadjieleftheriadis emailed representatives of ABN AMRO bank, attaching a memo titled, "Important Update on Eletson Legal Proceedings." That memo falsely asserted, among other things, that the lawful new owners of Holdings were only "purport[ing] to be acting on behalf of" Holdings and were actually "spreading false or inaccurate information about" Holdings. The memo also falsely asserted that "[a]s of now, Eletson Holdings Inc. is governed by the eight-member board appointed by the Greek courts," and that the lawful new owners of Holdings were "spreading false rumors" and "engaging in intimidation tactics

through frivolous legal threats and proceedings." The foregoing conduct violated 18 U.S.C. §§ 1343 and 1512(c).

270. Also, on February 10, 2025, Hadjieleftheriadis emailed representatives of Berenberg the same memo mentioned above, "Important Update on Eletson Legal Proceedings."

271. Moreover, on or about May 23, 2025, a purported member of the Gas legal team called a Senior Relationship Officer at Hellenic Bank named Kristis Marneros, with the intention of gaining, or retaining, control of Corp. and Gas's bank accounts at Hellenic Bank. After the call, Marneros responded to the legal.contract@eletsongas.com email address following up, and was replied to by Penny Protopapa, a purported member of the Gas legal department. Protopapa provided documentation to give access to Corp. and Gas's accounts to Despoina-Effrosyni Kourtesi, a purported Treasury Accountant at Corp. After Protopapa provided the requisite documentation, Marneros asked what rights Kourtesi was to have vis-a-vis the accounts, whereby Protopapa responded "Kourtesi will have the following rights: view and input access."

### 3. The Former D&Os Change Eletson's Contracts to Convert Plaintiffs' Property

#### a. The December 2024 Invoices

272. As noted above, on or about January 12, 2023, Novum Energy Trading Corp. ("Novum") entered into charterparty contracts with Plaintiff Chartering providing for Novum's hires of the vessels "Kastos" and "Fourni" for a period of 3 years at a rate of $24,400 per day per vessel pro-rata, commencing from the date of delivery of the "Kastos" and "Fourni" on January 12 and January 15, 2023, respectively (the "Kastos Charterparty" and "Fourni Charterparty" and, collectively, the "Novum Charterparties").

273. Less than one week after the Novum Charterparties were executed, the parties amended each agreement by addendum (the "Kastos Charterparty Addendum #1" and "Fourni

Charterparty Addendum #1," respectively and, collectively, the "First Charterparty Addenda") to change the EMC bank account into which Novum would remit payments due under the Novum Charterparties (the "Charterparty Payments") to EMC's bank account at Berenberg (the "EMC Berenberg Account").

274.   On November 14, 2024—five days prior to the Effective Date—an agent of the Former D&Os emailed Novum and Gulfstream Tanker Chartering LLC ("GTC Brokers," which acted as a broker for certain charters between Novum and Eletson): (1) an invoice bearing debit note no. 26228 in connection with a Charterparty Payment for December 2024 in the amount of $746,945.00 under the Kastos Charterparty; and (2) an invoice bearing debit note no. 26227 in connection with a Charterparty Payment for December 2024 in the amount of $746,945.00 under the Fourni Charterparty.

275.   On November 22, 2024—three days after the Effective Date—an agent of the Former D&Os purporting to act on behalf of Corp., emailed an employee of Berenberg, requesting a status update in connection with a pending wire transfer from the Berenberg Account to an account in the name of Corp. authorized by the Former D&Os or their agents.  The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

276.   The Berenberg employee responded that same day, attaching the Confirmation Order and stating:

> Please note that we are not allowed anymore to accept any instructions from your end in line with the attached order.
>
> During the day we will cancel all your bank mandates, eBanking instructions.  The only person that until further notice authorized to instruct payments is Mr Mark Lichtenstein whose bank mandates will be implemented in the coming days.
>
> Only if Mr Lichtenstein confirms by return mail that we are allowed to release the intra-group payment by order of EMC Investment Corp. amounting to USD 57,000.00 in favour of Eletson Corp. can we proceed.

As you may understand this overall situation is also very sensitive for the bank.

277.    On November 26, 2024, an agent of the Former D&Os sent emails to Novum and GTC Brokers attaching (1) a revised invoice bearing debit note no. 26233 in connection with a charterhire payment due from Novum for December 2024 in the amount of $746,945.00 under the Kastos Charterparty (the "Revised December Kastos Invoice"); (2) a revised invoice bearing debit note no. 26234 in connection with a charterhire payment due from Novum for December 2024 in the amount of $746,945.00 under the Fourni Charterparty (the "Revised December Fourni Invoice" and, together with the Revised December Kastos Invoice, the "December 2024 Invoices").  Both emails had "NEW BANK DETAILS" in the subject line and included instructions to make payments on the December 2024 Invoices to EMC's bank account at ABN AMRO Bank (the "ABN AMRO Account"), which remained under the control of the Former D&Os, rather than the Berenberg Account, which Holdings was in the process of working with Berenberg to obtain control over.  The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

278.    None of the Plaintiffs or their post-Effective Date representatives authorized the issuance of the December 2024 Invoices.

279.    None of the Plaintiffs or their post-Effective Date representatives were notified by any of Defendants of the issuance of the December 2024 Invoices.

280.    The Former D&Os' issuance of the December 2024 Invoices violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

281.    Later on November 26, 2024, a Novum employee sent an email to agents of the Former D&Os under the subject line "EMC Investment Corporation BI Confirmation."  The Novum employee stated, among other things, that:

Our Treasury Team is trying to setup payment for DEBIT NOTE: 26233, however the banking details are different than those verified previously.

In this regard, we would greatly appreciate if you could update your banking details for your [ABN AMRO Account], via our KOMGO Portal.

282.    On November 27, 2024, an agent of the Former D&Os responded to Novum, stating: "Kindly note that four **revised** invoices were issued yesterday with different bank details tha[n] those verified previously." (emphasis in original).   Two of the four revised invoices mentioned in this email were the December 2024 Invoices.

283.    Later on November 27, 2024, a Novum employee responded to the agent of the Former D&Os, stating: "Thank you for your time this evening and taking my call.  The banking instructions have been verbally verified."

284.    None of the Plaintiffs or their post-Effective Date representatives authorized the agent of the Former D&Os to provide banking instructions to Novum that differed from those set forth in the First Charterparty Addenda.

285.    None of the Plaintiffs or their post-Effective Date representatives were notified by any of Defendants regarding the provision of banking instructions to Novum that differed from those set forth in the First Charterparty Addenda.

286.    By directing the agent of the Former D&Os to provide banking instructions to Novum that differed from those set forth in the First Charterparty Addenda, the Former D&Os violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

287.    On December 4, 2024, an employee of GTC Brokers sent emails to Novum and agents of the Former D&Os memorializing addendums to the Novum Charterparties that purported to change the banking details under those agreements to require payment into the ABN Amro Account controlled by the Former D&Os (the "Kastos Charterparty Addendum #2" and "Fourni

81

Charterparty Addendum #2," respectively and, collectively, the "Second Charterparty Addenda").

On December 5, 2024, an agent of the Former D&Os responded via email to GTC Brokers

confirming their agreement to the Second Charterparty Addenda. The foregoing conduct violated

18 U.S.C. § 152(5).

288.    None of the Plaintiffs or their post-Effective Date representatives authorized the

execution of the Second Charterparty Addenda.

289.    None of the Plaintiffs or their post-Effective Date representatives were notified by

any of Defendants of the Second Charterparty Addenda.

290.    Execution of the Second Charterparty Addenda by agents of the Former D&Os on

behalf of Kastos and Fourni violated the Confirmation Order, frustrated implementation of the

Plan, and facilitated conversion of the Charterparty Payments.

291.    From December 2 to December 9, 2024, an agent of the Former D&Os sent a series

of emails to Novum employees and agents demanding that payment be made on account of the

December 2024 Invoices to the ABN AMRO Account. The foregoing conduct violated 18 U.S.C.

§ 152(5).

292.    Notwithstanding these wrongful instructions, on or about December 10, 2024,

Novum remitted payments on account of the December 2024 Invoices to the Berenberg Account.

293.    On December 10, 2024, an agent of the Former D&Os, emailed Novum demanding

that Novum "RECALL the two [Charterparty Payments] from [the Berenberg Account] and

EFFECT THE PAYMENTS to the [the ABN AMRO Account] as per addendum." This email

further stated that "[a]ttached hereto we resent the invoices with the CORRECT bank details, as

well as the exchanges with our Charters that these bank details have been uploaded in their system

since 27/11." The agent of the Former D&Os sent a follow up email on the same day to Novum

again demanding payment to the ABN AMRO Account.  The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

294.    On December 11, 2024, two Novum employees separately responded to the agent of the Former D&Os.  The first email from Novum stated, among other things, that "[p]ayments for both the Fourni and Kastos were made on 12/9/2024 to the account listed on both invoices and that were verbally verified by our onboarding team . . . .  We will make best efforts to recall the funds, however, we also suggest that upon receipt to [the Berenberg Account], that you reject as well."   The second email stated, among other things, "if Eletson needed payment to another account, they would have to list the new account on the invoice, and we would have had to confirm the new banking instructions verbally with Eletson . . . .  Since payment was remitted on Monday, I think it's past the time we can recall it, and also believe it is past the time you are able to have your bank DK the funds."

295.    That same day, the agent of the Former D&Os emailed the Novum employees stating, among other things, that "[s]ince 26 Nov. we have sent invoices with the new bank details and on 27 Nov. we verified the details . . . .  These details were uploaded in yr system by my goodself the same day . . . .  Pls recall the payments and pay as agreed." (emphasis in original). The agent sent another follow-up email to Novum on December 11, 2024 again demanding that payment of the December 2024 Invoices be made to the ABN AMRO Account.  The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

### b.      The January 2025 Invoices

296.    On December 13, 2024, an agent of the Former D&Os sent emails to Novum and GTC Brokers attaching (1) an invoice for a Charterparty Payment for January 2025 in the amount of $746,945.00 under the Kastos Charterparty (the "January Kastos Invoice"); and (2) an invoice in connection with a Charterparty Payment for January 2025 in the amount of $746,945.00 under

the Fourni Charterparty (the "January Fourni Invoice," together with the January Kastos Invoice,
the "January 2025 Invoices," and the January 2025 Invoices together with the December 2024
Invoices, the "Improper Novum Invoices").  Both emails had "NEW BANK DETAILS" in the
subject line, and the January 2025 Invoices directed Novum to make payment to the ABN AMRO
Account.  The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

297.    On December 23, 2024, the same agent of the Former D&Os emailed Novum
seeking payment on account of the January 2025 Invoices, demanding that payment be made "in
**the ABN bank acct**, as per the relevant addendum." (emphasis in original).

298.    On December 30, 2024 and January 2, 2025, an agent of the Former D&Os sent
emails to Novum again seeking payment on account of the January 2025 Invoices.

299.    None of the Plaintiffs or their post-Effective Date representatives authorized the
issuance of the January 2025 Invoices.

300.    None of the Plaintiffs or their post-Effective Date representatives were notified by
any of Defendants regarding the issuance of the January 2025 Invoices.

301.    The issuances of the January 2025 Invoices violated the Confirmation Order,
frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

### c.      Defendants Declare Defaults by Novum (January 2025)

302.    On January 2, 2025, Novum's general counsel, emailed an agent of the Former
D&Os, stating: "Please be advised that in light of the recent U.S. Bankruptcy and District court
rulings regarding Eletson Holdings Inc. which are impacting the SMEs . . . we have placed the
payments on a treasury hold pending further documentary substantiation." (the "Novum January
2 Email").

303.    On January 7, 2025, Andreoulakis emailed Novum's general counsel and other
Novum personnel declaring a default by Novum under the Kastos Charterparty for failure to pay

the Revised December Kastos Invoice and the January Kastos Invoice.  Among other things,

Andreoulakis wrote:

> We refer to the C/P for the LPGC "Kastos" between Kastos Special Maritime
> Enterprise (Owners)[6] and Novum Energy Trading Corp dated 12 January 2023, and
> to the Addendum thereto dated 4 December 2024 (together, the "Charterparty").
>
> Pursuant to clause 9 of the Charterparty, payment of hire shall be made in
> immediately available funds per calendar month in advance, by telegraphic transfer
> to Owners' nominated account at ABN Amro Bank.
>
> However, the December Hire and the January Hire (or any of it) has not been paid.
> In the circumstances, pursuant to clause 9 of the Charterparty, Charterers are in
> default of their obligation to make proper and timely payment of the December Hire
> and the January Hire.
>
> Without prejudice to all of their other rights, the purpose of this email is to notify
> the Charterers that they are in default of their obligation to pay the December Hire
> and the January Hire, and unless the Charters pay the December Hire and the
> January Hire within seven days of receipt of this notice, including interest
> calculated in accordance with clause 9, Owners shall withdraw the Vessel from
> service of Charterers without prejudice to any other rights Owners may have under
> the Charterparty or otherwise.

304.    None of the Plaintiffs or their post-Effective Date representatives authorized

Andreoulakis to declare a default by Novum under the Kastos Charterparty.

305.    None of the Plaintiffs or their post-Effective Date representatives were notified by

Defendants that a default by Novum under the Kastos Charterparty would be declared.

306.    Andreoulakis's email declaring a default by Novum under the Kastos Charterparty

violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion

of the Charterparty Payments.

---

[6] This is an error, as Plaintiff Chartering is the party designated as the "Owner" under the Kastos
Charterparty.  Kastos Special Maritime Enterprise is not mentioned in the Kastos Charterparty.

307.    Upon information and belief, one or more of the Former D&Os or their agent(s) declared a default under the Fourni Charterparty on the basis that Novum allegedly failed to pay the Revised December Fourni Invoice and the January Fourni Invoice.

308.    None of the Plaintiffs or their post-Effective Date representatives authorized anyone to declare a default by Novum under the Fourni Charterparty.

309.    None of the Plaintiffs or their post-Effective Date representatives were notified by Defendants that a default by Novum under the Fourni Charterparty would be declared.

310.    The declaration of a default by Novum under the Fourni Charterparty violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the charterparty funds.

### d.    Continued Improper Communications with Novum and Oaktree (January 2025-Present)

311.    On January 8, 2025, Hadjieleftheriadis emailed Novum's general counsel and other Novum personnel, stating:

> You will have seen the Owners' default notices given in response to Novum's failure to pay the December and January hires for the "Kastos" and the "Fourni". We are extremely disappointed that it had to come to this, but you will appreciate that Eletson cannot operate the ships for you without being paid hire, and there is simply no lawful basis for you not to pay.

Referencing the January 2 Novum Email, Hadjieleftheriadis further stated:

> Without prejudice to all the Owners' rights, and merely for completeness, we note that on 3 January[7] Novum vaguely referred to " . . . recent U.S. Bankruptcy and District court rulings regarding Eletson Holdings Inc. which are impacting the SMEs and our understanding that new management has been installed for the vessel owning companies along with a change in vessel management (as well as new maritime counsel engaged), we have placed the payments on a treasury hold pending further documentary substantiation."  We do not know who is feeding Novum incorrect information, nor why Novum believes that the matters to which it refers could possibly excuse their obligation to pay hire.  Suffice to say that the

---

[7] Given the seven hour time difference between New York and Greece, agents of the Former D&Os located in Greece would have received the January 2 Novum Email on January 3, 2025.

issues in the NY BK and SDNY proceedings concerning Eletson Holdings are numerous and complicated, but what is important is that they are of no concern to Charterers and certainly do not impact on the Owners' or Charterers' performance of the charters in any way, as is clearly evident to the Charterers from the Vessels' continued compliance with their employment orders. Furthermore, there has been no new management nor change of Owners' counsel. Again strictly without prejudice to all the Owners' rights, which continue to be reserved, Charterers are called upon to immediately cure their default by making payment in accordance with the clause 9 notices which they have duly received.

The foregoing conduct violated 18 U.S.C. §§ 152(5) and 1343.

312.   None of the Plaintiffs or their post-Effective Date representatives authorized Hadjieleftheriadis to send the January 8, 2025 email to Novum.

313.   Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives regarding the January 8, 2025 email to Novum.

314.   Hadjieleftheriadis's January 8, 2025 email to Novum violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

315.   Later that day, counsel for Novum responded to Hadjieleftheriadis's email stating, among other things:

> As you probably know, in light of the bankruptcy proceedings in the U.S., Novum has been given different instructions from the new management of Fourni Special Maritime Enterprise and Kastos Special Maritime Enterprise ("the SME's") for hire payment. Novum has also received new payment instructions from the OCM Maritime Autumn and OCM Maritime Thames ("the OCM entities"). Thus, including your team's instructions to pay into a new account, Novum has three different new accounts for which it has been directed to pay charter hire.
>
> Novum is ready and willing to pay, but cannot pay more than once. Let us know if your team is open to the possibility of Novum paying hire into an escrow account pursuant to a three-way agreement among your team, the OCM entities and the new management. Alternatively, Novum is also considering paying the hire into the U.S. Court's registry. We have copied counsel to the OCM entities as well as counsel to the new management of the SME's on this message for easy reference and coordination.

316.     On January 10, 2025, Autumn, an Oaktree Party and the registered owner of the "Fourni" vessel, sent a letter to Fourni and Holdings to the attention of Peter Kanelos, the former CFO of Eletson and an agent of the Former D&Os, demanding that Fourni direct Novum to make Charterparty Payments directly to Autumn's bank account at Berenberg (the "Autumn Berenberg Account").  The same day, Thames, another Oaktree Party and the registered owner of the "Kastos" vessel, sent a letter to Kastos and Holdings to the attention of Kanelos demanding that Kastos direct Novum to make Charterparty Payments to the Autumn Berenberg Account.  On January 14, Hadjieleftheriadis, purporting to act as director, president, and treasurer of Fourni and Kastos, countersigned both letters (as executed, the "Fourni-Autumn Letter" and the "Kastos-Thames Letter," respectively and collectively, the "Oaktree Letter Agreements").

317.     None of the Plaintiffs or their post-Effective Date representatives authorized Hadjieleftheriadis to execute the Oaktree Letter Agreements.

318.     Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives that he would execute the Oaktree Letter Agreements.

319.     Hadjieleftheriadis's execution of the Oaktree Letter Agreements violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

320.     On January 14, 2025, Hadjieleftheriadis sent an email to Novum instructing Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account pursuant to the Oaktree Letter Agreements.

321.     Neither of the Plaintiffs nor their post-Effective Date representatives authorized Hadjieleftheriadis to instruct Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account.

322.    Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives that he had instructed Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account.

323.    Hadjieleftheriadis's instructions to Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the charterparty funds.

### 4.    Defendants' Illegal Maneuvering Stymied Plaintiffs' Efforts to Receive the Charterhire Payments Due to Them

324.    While Defendants were improperly seeking to redirect the Charterparty Payments due under the Novum Charterparties to accounts controlled by Defendants, counsel for Novum communicated with Holdings and Oaktree to resolve the confusion surrounding the conflicting payment instructions referenced in counsel for Novum's January 8, 2025 email to Hadjieleftheriadis.

325.    On January 7, 2025, maritime counsel for Holdings emailed counsel for Novum, stating, among other things, that Oaktree had communicated that it was "fine with the bankruptcy process and as we understand, [Oaktree is] satisfied that our client is now in control of the Eletson group as per the ordered bankruptcy plan." The email further stated that "[w]e have also come to an agreement with Oaktree that Novum's ongoing charter payments can be paid to" Holdings' bank account at Bank of America (the "Holdings BOA Account").

326.    Later that day, counsel for Novum responded, advising that Novum had received the notices of default from Andreoulakis, and stating:

> Novum has received conflicting instructions with regards to payment of charter hire and has been engaged in due diligence in light of the pending bankruptcy proceedings. We appreciate all of you sending documentation. Novum is ready and willing to pay charter hire. However, in light of the conflicting instructions and need for due diligence, Novum has been holding the charter hire pending resolution of these issues.

327.    On January 9, 2025, counsel for Novum emailed counsel for Holdings noting that the banking instructions under the original Novum Charterparties provided for payment to an account with DNB Bank ASA in the name of Plaintiff EMC and asking if DNB was "recognizing new management of EMC . . . or is this account also frozen?"  In a follow up email the next day, counsel for Novum noted that counsel for Holdings "mentioned that the Berenberg Account is frozen" and asked if "payment [would] be accepted" if Novum made a Charterparty Payment to that account.  The email also noted that "Reed Smith introduced a document on Monday showing that the court in Pireaus [sic.], Greece appointed a temporary board pending further court action in February" and requested corroborating documents.

328.    On January 13, 2025, counsel for Holdings responded, attaching Berenberg's November 22, 2024 email to the Former D&Os wherein Berenberg described its cancellation of the Former D&Os' bank mandates with respect to the Berenberg Account in light of the Confirmation Order.  The email also advised Novum's counsel that the Berenberg Account was not frozen, but that Berenberg was undergoing its own due-diligence process to resolve the conflicting banking instructions.

329.    On January 13, 2025, Novum's counsel advised maritime counsel for Holdings via telephone that, notwithstanding the Former D&Os efforts to the contrary, Novum had made payments on account of the Improper Novum Invoices to the Berenberg Account consistent with the First Charterparty Addenda.  Novum's counsel further reported to counsel for Holdings that Novum had agreed to the Second Charterparty Addenda without knowledge of the Confirmation Order or the changes in ownership and control of the Plaintiffs thereunder.

330.    Defendants' failures to inform Novum regarding the Confirmation Order in any post-Confirmation Order dealings with Novum, which Defendants improperly engaged in on

behalf of one or more of the Plaintiffs, violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

331.   Later on January 13, 2025, Novum's general counsel emailed Hadjieleftheriadis, copying (1) counsel for Holdings, (2) outside counsel for Novum, and (3) counsel to the Oaktree Parties.  The email stated, among other things, that "attempts at payment [of the Improper Novum Invoices] were made but certain payments were rejected by the receiving bank and/or there were delays in payment due to the competing claims for payment," that Novum had now paid the outstanding sums due under the Improper Novum Invoices plus interest "in accordance with the relevant invoices" and the Second Charterparty Addenda—*i.e.*, *to the ABN AMRO Account controlled by the Former D&Os.*  Novum's counsel noted that the interest payments were being made "under protest" and subject to clawback and/or setoff.  Novum's counsel also noted that "third parties and/or parties purporting to represent Owners propose that payments be made into bank accounts not provided for in the charterparties or addenda,"—*i.e.*, the Holdings BOA Account.

332.   Upon information and belief, during the period following the Effective Date through approximately July 2025, Novum continued to make monthly Charterparty Payments due under the Novum Charterparties to the ABN AMRO Account controlled by the Former D&Os.

333.   As will be proven at trial, Defendants' unlawful conversion has caused millions of dollars of damages to Plaintiffs every month, including, without limitation, lost SME revenues and the otherwise-unnecessary incurrence of legal fees to rectify Defendants' tortious actions.

### 5.   Defendants Frustrate Plaintiffs' Efforts to Recover Other Charterparty Payments Due to Them (November 2024-Present)

334.   Plaintiffs have asked Defendants for information regarding Kinaros and Kimolos, including amounts due to those SMEs in connection with the use of the vessels "Kinaros" and

91

"Kimolos" by third parties, but as of the date of this Amended Complaint, Defendants have refused and/or failed to provide any information to Plaintiffs in that regard. The foregoing conduct violated 18 U.S.C. § 152(9).

### 6.   Defendants Convert Plaintiffs' Management Agreements (November 2024)

335.   In early November 2024, in anticipation of the Effective Date, Reed Smith coordinated the transfer of several of Corp.'s management agreements to Eletson Shipmanagement Inc., in order to transfer management control of the associated vessels outside of the estate and to the Former Shareholders.

### 7.   The Former Principals Coordinate with the Oaktree Parties to Take Action Adverse to Plaintiffs (November 2024-Present)

336.   Since confirmation of the Plan, the Former Principals have coordinated with the Oaktree Parties, and leaned on their longstanding personal relationships with the principals of the Oaktree Parties, to cause the Oaktree Parties to act in ways directly adverse to Holdings and its subsidiaries. For example, on February 10, 2025, Kertsikoff emailed Martin Hugger, an advisor to Oaktree, attaching a memo titled "Important Update on Eletson Legal Proceedings." That memo falsely asserted, among other things, that the lawful new owners of Holdings were only "purport[ing] to be acting on behalf of" Holdings and were actually "spreading false or inaccurate information about" Holdings. The memo also falsely asserted that "[a]s of now, Eletson Holdings Inc. is governed by the eight-member board appointed by the Greek courts," and that the lawful new owners of Holdings were "spreading false rumors" and "engaging in intimidation tactics through frivolous legal threats and proceedings." The foregoing conduct violated 18 U.S.C. § 1343.

337.   On June 2, 2025, Hadjieleftheriadis, copying Kertsikoff, emailed Martin Hugger regarding operation of the vessel Kastos.

338.    On June 15, 2025, the SMEs each served on the applicable Oaktree Party a notice (collectively, the "Purchase Option Notices") that each SME Party intended to exercise its option pursuant to clause 48 of the applicable Oaktree Charterparty to purchase the vessel leased pursuant to that Oaktree Charterparty.

339.    On June 23, 2025, counsel for the Oaktree Parties sent a collective response (the "Purchase Option Response") to the Purchase Option Notices by email stating that "there may be continuing Applicable Insolvency Defaults for all of the Vessels/[Oaktree Charterparties]" that would prevent "the Purchase Options [from] . . . being exercised," pointing to alleged nonpayment and insolvency defaults under certain related charterparties.  Further, the Purchase Option Response claims that "the difficulties for [the Oaktree Parties] created by the management/ownership dispute in respect of the Vessels . . . which are such that [the Oaktree Parties] cannot even be sure that the notices to which they are responding are in fact properly authorized on behalf of the [SMEs]" have "ma[de] it impossible for [the Oaktree Parties] to perform the Purchase Options as intended by Clause 48 without their actions giving rise to a risk of litigation against [the Oaktree Parties] and/or the Vessels[.]"

340.    On June 19, 2025, counsel for the Oaktree Parties sent copies of four notices of events of default (the "Notices of Default") under the Oaktree Charterparties to Mark Lichtenstein and Adam Spears of Holdings by email.  The Notices of Default were sent by mail to Eletson Gas Inc. and the applicable SME Party at their respective offices in Greece, which are still under the control of the Former D&Os and/or their agents in both instances to the attention of Kanelos, Eletson's former CFO.  Additionally, the Notices of Default were sent by email to an Eletson email address that is controlled by the Former D&Os and/or their agents.  The Notices of Default claim that purported events of default have occurred under the applicable Oaktree Charterparty's non-

payment and insolvency provisions, and other related provisions, and attach various allegedly unpaid invoices from May and June of 2025 relating to each Oaktree Charterparty.

341.    On June 25, 2025, counsel for the Oaktree Parties sent copies of demand letters (the "Guaranty Demands") related to the guarantees dated June 24, 2020 between Holdings and each SME Party for each applicable Oaktree Charterparty (the "SME Guarantees") to Mark Lichtenstein and Adam Spears by email.  Each Guaranty Demand is addressed by mail to Holdings at its former office in Greece, which is still under the control of the Former D&Os and/or their agents, to the attention of Peter Kanelos and by email to the same address as the Notices of Default.  Each Guaranty Demand makes certain requests for documents and information and claims that Holdings is in default under the applicable SME Guarantee for (i) failing to provide details related to ongoing litigation in the United States concerning ownership and/or control of Holdings, (ii) failing to notify the Oaktree Parties of the events of default listed on the Notices of Default, (iii) and failing to obtain the Oaktree Parties' prior written consent to the change in the ownership structure of Holdings.

342.    The purported defaults alleged by the Oaktree Parties in the Purchase Option Response, the Notices of Default, and the Guaranty Demands are a direct result of the Defendants' conversion of the Converted Funds and continued efforts to obstruct implementation of the confirmed Plan.

**L.      Reed Smith and Solomon Aided and Abetted the Conversion**

343.    The above-described conversion of Plaintiffs' property has been substantially assisted by Reed Smith and Solomon, who have acted in violation of the Plan and Confirmation Order, among other orders, in order to sow doubt as to whether Holdings is under the new board's control and facilitate the conversion.

344.   Reed Smith and Solomon are aware of the Confirmation Order and that it requires the Former D&Os and their agents and "Related Parties" (among others) to "cooperate in good faith to implement and consummate the Plan."

345.   Reed Smith and Solomon are also aware that they (and their clients) are "Related Parties" under the Plan and, therefore, that the Confirmation Order "enjoins" them (and the Former D&Os and Former Shareholders, among others) from "taking any actions to interfere with the implementation or consummation of the Plan."

346.   Most importantly, the Confirmation Order specifically provides that the pre-Effective Date Debtors were "authorized and directed to take or not take any and all actions as instructed by the Petitioning Creditors and shall not take any actions inconsistent with the Plan and th[e] Confirmation Order or further order of the Court" in connection with the "actions required by the Plan and th[e] Confirmation Order."

347.   Similarly, the Consummation Order "authorized, required, and directed" Defendants "to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof."

348.   Despite their awareness of the Confirmation Order and the obligations that it places upon them and their clients, Reed Smith and Solomon have made various filings and arguments seeking to overturn the Confirmation Order and/or obstruct implementation of the Plan.

349.   Upon information and belief, Reed Smith, who claims to represent Holdings, has also been knowingly paid with the converted funds.  Indeed, to the extent Reed Smith's purported client has any funds at all to pay for the substantial legal assistance it has obtained over the past thirteen months since the Effective Date, those funds are rightfully the property of Holdings itself,

which the Bankruptcy Court and the District Court have recognized as the only legitimate version of Eletson Holdings Inc.

350.   Reed Smith and Solomon are also aware that the Former D&Os have unlawfully converted Holdings' property and have refused to turn the Converted Funds and/or the Converted Personal Property over to Holdings' true owners.  Through their efforts to help the Former D&Os in their quest to avoid the Confirmation Order's requirements and to obstruct implementation of the Plan, Reed Smith and Solomon have substantially assisted Former D&Os' conversion of Holdings' property.

351.   Furthermore, on August 19, 2025, Reed Smith and Solomon acted as "Escrow Holder" pursuant to an agreement entitled "Escrow Agreement" between an Oaktree entity called OCM Maritime Yangtze LLC ("OCM Yangtze") and the Former D&Os purporting to act on behalf of Gas.  The agreement was fraudulently signed by Kertsikoff and Karastamati who falsely stated they were directors of Gas.  This Escrow Agreement was not authorized by Gas, its board of directors, or any proper officer or director.  Nonetheless, OCM Yangtze deposited $4 million in an account which Reed Smith controlled.  Reed Smith knew that the Former D&Os did not control Gas, and yet it held the $4 million for the benefit of the Former D&Os, even though the funds rightfully belonged to Gas.  Holdings notified Reed Smith and Solomon of this improper act in a letter on September 26, 2025.  Reed Smith and Solomon have failed to respond or otherwise rectify their improper conduct.

**M.   Defendants' Lies Concerning the Occurrence of the Effective Date**

352.   The Effective Date of the Plan occurred on November 19, 2024, as both the Bankruptcy Court and the District Court have recognized, and as Defendants initially acknowledged.  Since that time, Defendants have come to invent an alternative version of events under which the Effective Date has not yet occurred, with Reed Smith and other Defendants

averring as much in pleadings filed with the Second Circuit. For instance, in a brief filed on September 30, 2025, Reed Smith asserted (on behalf of so-called Provisional Holdings) that "[t]he Plan has not taken effect because the conditions to the Effective Date have neither been validly 'satisfied' nor 'waived' in accordance with their terms." Similarly, in a brief filed on September 30, 2025, the Former Majority Shareholders asserted that "the Plan's effective date was stayed by the appeal [of the Plan]."

353.    While telling the Second Circuit one thing, however, the Defendants have acted to the contrary. Since the Effective Date, Defendants have not undertaken *any* of the duties of a debtor-in-possession or its managers, including failing to file requisite monthly operating reports and failing to pay statutory fees. Instead, Defendants have allowed Holdings, under new ownership and management, to shoulder such responsibilities, at substantial cost. Similarly, Reed Smith, which tells the Second Circuit that the Plan has not gone effective, nevertheless accepted payments from Holdings, to the tune of $3.8 million. These actions (and omissions) by Reed Smith and the Provisional Board are false and criminal in violation of 18 U.S.C. §§ 152(2), (3), & (5).

### N.    Disgorgement of Reed Smith's Fees

354.    On September 27, 2024, the United States Trustee filed the *Motion of the United States Trustee for Reed Smith LLP to Disgorge Fees and Expenses for Failure to Disclose Connection* which sought an order that would disgorge all fees and expenses previously awarded to Reed Smith to remedy Reed Smith's failure to adequately disclose connections with certain of the Shareholders and Officers of Holdings. Bankr. ECF 1166, at 1 (the "Disgorgement Motion"). Before the Disgorgement Motion was heard, Reed Smith and the United States Trustee engaged in negotiations to consensually resolve the United States Trustee's concerns.

355.    On November 6, 2024, the Stip*ulation Between the Office of United States Trustee and Reed Smith LLP* (the "Stipulation") was filed. Bankr. ECF 1228. The Stipulation resolved

the Disgorgement Motion and required Reed Smith to (i) file a supplemental declaration that disclosed and clarified Reed Smith's relationship with the Debtors' officers and directors; and (ii) reduce a holdback sought in a fee application by $200,000, waive fees associated with litigating the Disgorgement Motion, and reducing expenses and other fees by $150,000. *Id.* at 3-4. The supplemental declaration was filed on October 30, 2024, prior to the Stipulation. Bankr. ECF 1215.

356. On December 19, 2024, Reed Smith filed a "final" fee application, through which Reed Smith sought final approval of ***over \$18 million*** in fees and expenses for services rendered to Holdings and Corp. from September 25, 2023 through the Effective Date (November 19, 2024). Bankr. ECF 1325 (the "Fee Application"). On January 9, 2025, Holdings objected to the Fee Application because of Reed Smith's misconduct and lack of disinterestedness. Bankr ECF 1350.

## CAUSES OF ACTION

### COUNT I:
### CIVIL RICO (18 U.S.C. § 1962(c))
### (against the Former Principals, Andreoulakis, Solomon and Reed Smith)

357. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

### A.     The RICO Enterprise

358. The enterprise is an association-in-fact consisting of (i) the Former D&Os and Former Shareholders (*i.e.*, former Eletson insiders and owners who lack lawful authority with respect to Eletson post-confirmation of the Plan); (ii) the Cypriot Nominees (*i.e.*, three Cypriot entities purportedly nominated to receive misappropriated control of assets); and (iii) Solomon and Reed Smith, acting by and through its partners and associates under the management and directions of Solomon (collectively, the "Enterprise").

359.    The Eletson shipping business was formerly controlled by three first cousins who have held roles at multiple Eletson entities.  Dist. Ct. ECF 551-1, at 20:3–13.  Kertsikoff was, among other things, chairman, president, treasurer, and a director of Gas; vice president and a director of both Holdings and Corp.; vice president and a director of EMC; a director of Family Unity, a Former Majority Shareholder of Holdings; and an owner with two siblings of Apargo (until its recent acquisition by David Seas, Ltd., which he and the same two siblings also own).  Hadjieleftheriadis was among other things vice president, treasurer, and a director of both Holdings and Corp.; president, treasurer, and a director of EMC and vessel charterer SMEs; a director of Glafkos, a Former Majority Shareholder of Holdings; and a prior owner of Desimusco.  Karastamati was, among other things, the secretary and a director of Gas; president and a director of each of Holdings and Corp.; secretary and a director of EMC; vice president and a director of vessel charterer SMEs; a director of Lassia, a Former Majority Shareholder of Holdings; and a prior owner along with her sibling of Fentalon.

360.    Prior to the events at issue, Eletson was "a privately-held family [shipping] business" that operated informally and without corporate formalities.  Dist. Ct. ECF 131 ¶ 6; *see* Dist. Ct. ECF 67-58, at 31–32 ("Eletson witnesses viewed [Gas] as a family company" and "[i]n their day-to-day discussions they may not have spoken in corporate formalities"); Bankr. ECF 591-1, at 13–15 (Karastamati: Eletson is "one thing, it is Eletson Family.  It is—I mean, we didn't care … if it was Eletson Gas or Eletson company or Eletson Family.").

361.    Reed Smith served, and still serves, as the effective linchpin of the Enterprise, coordinating and aiding and abetting the fraudulent and criminal actions of the Enterprise through, *inter alia*, false, fraudulent filings in the arbitration, which continued in the Bankruptcy Court, District Court, and beyond.

99

362.     For several years, the Enterprise has engaged in a wide-reaching pattern of fraud, theft and abuse.  The Enterprise is unified by the common purpose of unlawfully retaining control of Eletson's assets, in particular Gas and the vessels owned and controlled by Gas, at all costs, including by fraudulently procuring (and protecting) an arbitration award (which was designed to divert key Eletson assets outside Eletson's estate), and working to obstruct the effects of Holdings' confirmed and unstayed Plan.

363.     The Enterprise—in particular the Former Principals—utilized Holdings as a personal piggy bank to fund a vendetta that had no commercial value to the corporate entity and retain for themselves control of the vessels within the Eletson fleet.  At no point did the Former Principals consider the solvency or long-term viability of Holdings; their sole objective was to extract maximum liquidity for personal use before the inevitable collapse.

364.     In fact, on information and belief, the Former Principals caused Eletson to pay expenses that were clearly personal to them and their families, including personal lawyers, personal travel, and debts entirely unrelated to Eletson's business.

365.     The fraudulent scheme did not extend Holdings' legitimate life; it merely deepened its in-solvency and increased its liabilities to the detriment of legitimate creditors.  Any short-term cash infusion or delay in judgment was not a 'benefit' to Holdings, but a mechanism to facilitate further looting of the company by the Former Shareholders.

366.     Plaintiffs bring this action to stop such conduct, which remains ongoing, and to remedy the injuries to their business caused by the Enterprise's pattern of racketeering activities. The Enterprise risks injuring other victims including but not limited to charterparties, employees (including shipping crews), Holdings' creditors (by impacting the value of Holdings' assets, including the common shares of Gas), and Levona (as holder of preferred shares of Gas).

100

**B.     The RICO Defendants**

367.    The Former Principals, Andreoulakis, Solomon and Reed Smith (collectively, the "RICO Defendants") have unlawfully attempted to retain control of Eletson, and in particular, the assets of Holdings and Gas, through a pattern of racketeering activity as set forth herein, each having participated in the operation or management of the criminal enterprise.

368.    The fraudulent campaign included the submission of false testimony and the withholding of key evidence to defraud an arbitrator into entering an arbitration award that purported to convey a highly valuable asset – the preferred, controlling shares of Gas – to "nominees" controlled by the Former D&Os and the Former Shareholders, and outside of the bankruptcy estate of Holdings.  The RICO Defendants used the fraudulently obtained arbitration award to unlawfully proclaim to the market and Eletson's commercial partners that the Cypriot Nominees controlled Gas and that any reorganization therefore was irrelevant.

369.    For the fraudulent scheme to succeed, however, ultimately the RICO Defendants had to continue in Holdings' bankruptcy proceedings the same fraud that they perpetrated in the arbitration.  That conduct crossed the line into behavior violating several criminal statutes, most obviously bankruptcy fraud and, in Reed Smith's case, aiding and abetting bankruptcy fraud, as well as wire fraud and obstruction of justice.

370.    Then, upon the reorganization of Holdings pursuant to the confirmed and unstayed Plan, the RICO Defendants continued the fraud yet further by various acts aimed at obstructing the Plan in violation of not only Bankruptcy Court Orders but criminal statutes as well.

371.    At least from the time the RICO Defendants realized that they were losing control of the common interests of Gas by reason of the bankruptcy proceeding, and potentially the preferred interests by reason of the arbitration, the RICO Defendants acted collectively to further the interests of the Enterprise, including under the guise of the so-called "Provisional Board" of

Holdings, to unlawfully attempt to maintain control of Gas and usurp the identity of Holdings and Corp. through multiple fraudulent and criminal actions as set forth in detail below, including:

- Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3), 152(5) and 152(9);

- Wire fraud in violation of 18 U.S.C. § 1343;

- Obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c); and

- As to Reed Smith, in addition, aiding and abetting the above criminal violations in further violation of 18 U.S.C. § 2.

372. Reed Smith exercised decision-making authority over the content, timing, and presentation of false factual narratives critical to the Enterprise's objectives, thereby directing the Enterprise's affairs rather than merely providing legal services. Reed Smith did not merely advise the Enterprise; it exercised decision-making authority over the content, timing, and execution of the fraudulent scheme.

373. Reed Smith's conduct did not consist of the provision of legal advice or advocacy based on facts supplied by its clients. Instead, Reed Smith knowingly participated in the fabrication, concealment, and coordination of false factual narratives, including by directing witnesses to conform testimony to a pre-selected outcome, withholding concededly responsive documents, and submitting factual representations Reed Smith knew to be false.

374. Reed Smith's conduct is not protected advocacy and instead constitutes participation in the affairs of the Enterprise within the meaning of 18 U.S.C. § 1962(c).

375. Moreover, Reed Smith's conduct is not protected by the *Noerr-Pennington* doctrine because it involved sham litigation, knowingly false factual submissions, and obstruction of judicial proceedings, including conduct undertaken after courts conclusively resolved issues of authority and ownership. Fraudulent misrepresentations to courts and third parties fall outside

petitioning immunity.  The creation and coordination of false facts, and concealment of the true facts, is not legal advocacy and is not protected conduct.

376.   Reed Smith's interest in protecting the arbitration award (that it helped the Former Principals procure by fraud) was not just in concealing its own misconduct.  In addition to the obvious reputational harm that would follow (and now, has followed) exposure of Reed Smith's fraudulent conduct, Reed Smith's incentives were financial.  At some point after commencement of the arbitration, Reed Smith negotiated a "success fee" whereby Reed Smith was paid an additional fee of over $1 million that Reed Smith would only "earn" if its clients prevailed in the arbitration.

377.   Reed Smith's conduct caused Plaintiffs significant harm.  But for Reed Smith's concealment of dispositive documents, fabrication of the nominee narrative, and post-Effective-Date obstruction, (i) the arbitration award would not have issued in its current form or employed by the Defendants to commercially harm Eletson, (ii) the Plan would have been implemented without obstruction, and (iii) Plaintiffs would not have suffered the diversion of revenues, loss of control, and massive litigation costs.  Reed Smith's conduct was not merely a contributing factor, but a proximate cause of Plaintiffs' injuries.  Plaintiffs' injuries flowed directly from Reed Smith's acts without the intervention of independent decision-makers.

378.   Reed Smith is also vicariously liable for Solomon's fraudulent conduct.  The management level of Reed Smith, which includes Solomon, were aware of and directly participated in the fraudulent scheme.  On information and belief, Reed Smith's management approved of Solomon's retention by Holdings and Corp., devoted significant firm resources by staffing a large litigation team on this matter, and continues to participate in the Enterprise by condoning Solomon's continuing actions.  Solomon, the Head of International Litigation for Reed

Smith and a key partner in their New York office, did not act alone in his representation of the Eletson entities and the Former D&Os, as his team included dozens of Reed Smith attorneys, including his partners Colin Underwood and Charles Weller.

379.    Holdings, through counsel at Goulston & Storrs PC, reached out to Peter Kennedy, the General Counsel of Reed Smith, multiple times since January 2024, raising concerns over and demanding the cessation of Solomon's and Reed Smith's representation of individuals and entities that are directly adverse to Eletson.  The management of Reed Smith ignored these demands and continued to condone Solomon's continued wrongful acts in the Bankruptcy Court, District Court, Second Circuit, and elsewhere, where Reed Smith has filed briefs purportedly on behalf of Holdings and Corp., but which take positions directly against their interests.  On information and belief, Reed Smith has directed other firms to make similar filings.

380.    All of those from Reed Smith who participated in the racketeering acts described herein did so in the course of their employment and to the benefit of Reed Smith.

381.    Reed Smith has received significant benefits from Solomon's participation in the Enterprise—its fee application in the bankruptcy case alone sought over $18 million.  Bankr. ECF 1325, at 1.  On information and belief, Reed Smith has accrued over $30 million in fees representing Eletson entities and the Former D&Os and Former Shareholders.

**C.    The RICO Defendants' Conduct Violated 18 U.S.C. § 1962(c)**

382.    18 U.S.C. § 1962(c) provides, in relevant part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

383.   Each of the RICO Defendants was and is a "person" within the meaning of 18 U.S.C. § 1961(3); that is, each of the RICO Defendants was and is an "individual or entity capable of holding a legal or beneficial interest in property."

384.   The Enterprise was and is an "enterprise" within the meaning of 18 U.S.C. § 1961(4), which defines "enterprise" in relevant part as "any group of individuals associated in fact although not a legal entity."

385.   As set forth above, each of the RICO Defendants was "employed by or associated with [the] [E]nterprise" within the meaning of 18 U.S.C. § 1962(c).

386.   The Enterprise was engaged in, and its activities affected, both interstate and foreign commerce. As to interstate commerce, on information and belief, a material number of the communications described herein were intentionally sent across state lines. On information and belief, certain payments made and received by Defendants were made to/from entities or individuals in New York, including payments made to Reed Smith (one "person" of or associated with the Enterprise). As to foreign commerce, the commercial activities of Eletson and Gas extend widely throughout the world and affect the United States as well, inasmuch as the RICO Defendants knowingly commenced the Arbitration in New York and engaged in the crimes set forth herein in, *inter alia*, the Bankruptcy Court. Moreover, on information and belief, Oaktree made a payment to Gas of approximately $4 million by first wiring the payment to Reed Smith's USD client account in London. Upon information and belief, those funds were intended for payment to the Families.

387.   Each of the RICO Defendants conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

388.    "Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include violations of

each of the federal statutes cited below in connection with the Enterprise's conducting its affairs

through a pattern of racketeering activity in this case.

389.    "Pattern of racketeering activity" is defined in 18 U.S.C. § 1961(5) as "at least two

acts of racketeering activity, one of which occurred after the effective date of this chapter [in 1970]

and the last of which occurred within ten years … after the commission of a prior act of

racketeering activity."

390.    The Enterprise's conduct of its affairs through a pattern of racketeering activity

included the following predicate acts constituting violations of statutes enumerated in 18 U.S.C. §

1961(1), all of which predicate acts occurred after 1970, and all of which occurred within ten years

of the first act of such racketeering activity:

### 1.    Bankruptcy fraud in violation of 18 U.S.C. § 152(2)

391.    A criminal violation of 18 U.S.C. § 152(2) occurs if a person "knowingly and

fraudulently makes a false oath or account in or in relation to any case under title 11."

392.    The RICO Defendants knowingly and fraudulently made a false oath in relation to

the Eletson bankruptcy on at least the following occasions:

- On March 13, 2023, Solomon submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that "Levona did not lawfully acquire any interest in Gas and has no actual or potential interest in Gas at all."  Bankr. ECF 7 at 2.

- On November 7, 2023, Reed Smith submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that "Reed Smith will at all times act at the sole direction of the Debtors and in the best interest of the Debtors…."  Bankr. ECF 261 at 4 (citation omitted).

- On March 22, 2024, Hadjieleftheriadis submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that "[t]he shareholders of Gas are Holdings, Fentalon Limited, Desimusco Trading Limited, and Apargo Limited."  Bankr. ECF 514 at 4 (definitions omitted).

- On March 22, 2024, Karastamati submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, declaring the entire false narrative that the Buyout Option had been exercised and that Levona was not the owner of the Preferred Shares.  Bankr. ECF 519, at 6.

- On April 11, 2024, Hadjieleftheriadis submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, declaring that:

  1. Levona did not own the preferred shares and the Cypriot Nominees did. *See, e.g.*, Bankr. ECF 579 at 4, 7, 15.

  2. "[T]he Preferred Shares were transferred from Levona to Gas *or a nominee*." *Id.* at 18; *Id.* at 20 (similar).

  3. The RICO Defendants had produced documents showing that "Levona transferred the Preferred Shares to the Preferred Nominees as part of the March 11, 2022 buy-out of Levona's interests in Gas." *Id.* at 18 (further falsely stating that he prepared a document in March 2022 memorializing the transfer).

  4. "[The RICO Defendants] told Levona before the BOL was executed that the Preferred Shares would go to nominees outside of the Gas."  Bankr. ECF 579 at 19.

- On April 11, 2024, Kertsikoff submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that "Eletson…did[] transfer the preferred shares to Gas's nominee," along with a long and false history of the preferred shares of Gas. Bankr. ECF 580 at 35.

- On April 11, 2024, Karastamati submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that "[f]rom their issuance to the present, the Preferred Shares of Gas have never been owned or controlled by Debtors." Bankr. ECF 581 at 15.

- On August 26, 2024, Hadjieleftheriadis submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that: "The shareholders of Gas are Holdings, Fentalon Limited, Desimusco Trading Limited, and Apargo Limited."  Bankr. ECF 1021 at 5 (definitions omitted).

- On December 10, 2024, Solomon submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that:

  1. "[A]ny purported direction of Reed Smith made by Reorganized Holdings, which had failed to adhere to the required corporate formalities under either Liberian or Greek law, was an invalid direction.  Actions purporting to adopt amended articles of incorporation or bylaws through a shareholder agreement effective as a result of the Confirmation Order were also null and

107

void for the same reason, and any such action would have no binding effect in Liberia or in Greece, Holding's principal place of business." Bankr. ECF 1288 at 13.

2.   "Further, Reed Smith represented that it 'is attempting to comply with all orders of this [Bankruptcy] Court…" Bankr. ECF 1288 at 14.

3.   "Reed Smith believes it took no action contrary to the terms of the Confirmation Order or otherwise refused or failed to cooperate with the consummation of the Plan." Bankr. ECF 1288 at 17.

• On December 10, 2024 Hadjieleftheriadis submitted a declaration to the Bankruptcy Court, signed under penalty of perjury, providing that: "Spears had no authority to make…changes" namely "revok[ing] bank authorizations for prior representatives" of the RICO Defendants, "designat[ing] Mark Lichtenstein as the new authorized representative," and "terminat[ing] Ms. Karastamati and Mr. Vassilis Kertsikoff as directors of Gas…and install[ing] Leonard J. Hoskin as CEO" of Gas. Bankr. ECF 1290 at 7 (internal citations omitted).

393.   The RICO Defendants knowingly and fraudulently made a false oath or account in the depositions in the District Court proceedings in the following instances:

• During his July 24, 2025 deposition, Solomon testified under oath that he and Reed Smith "did not know" whether there had been a nomination as of April 1, 2023. Dist. Ct. ECF 551-62, at 397:7–9, 13–15.

1.   When pressed on this issue with the question "So, in April, you suggested that there be a transfer. And I'm asking you at that moment who did you believe it was being transferred from?" Solomon responded that "[t]his issue hasn't arisen. I didn't have a view." *Id.*, at 403:10–22.

2.   Solomon continued to deny knowledge of the nomination by stating "I did not know that" when asked to confirm that "the one thing we know in this statement – in this sentence is that [the shares] were held by someone other than nominees, cause otherwise you wouldn't be transferring it to the nominees, the nominees already had it?" *Id.*, at 404:16–23.

• During the July 30, 2025 deposition, Kertsikoff testified under oath that the option had been timely exercised.

1.   He testified that "[y]es, we exercised in – we had exercised by March 11th." Dist. Ct. ECF 551-1, at 28:9–10.

2.   He confirmed that the date of option exercise took place on March 11, 2022: "[o]n March 11th, yeah, yeah. The two dates 10/11 were – certain documents were exchanged, but we exercised." *Id.*, at 28:13–16.

3.   In response the question "[y]ou talked a bit about your position – a lot a bit, I should say, about your position that the option under the BOL was exercised timely. That's your position, correct?"   Kertsikoff confirmed, "[t]hat's correct." *Id.*, at 474:5–10.

4.   Kertsikoff repeated his prior sworn testimony from November 17, 2022, including that "Mr. Spears' assertion that I stated on a call that I 'understood and stated on the Option had lapsed' is unequivocally false. At no point did I make such statement'" and that "'Eletson had exercised the buyout option – Lenova was out of the Company.'" *Id.*, at 153:5–19.

5.   In response to the question "[y]ou said the preferred nominees were in the process of being designated as the shareholders of the preferred – of Lenova. Do I have that right?"   Kertsikoff responded "No, Lenova – we exercised the BOL. Lenova was out of the company, not formally so, because there was a few things." *Id.*, at 32:11–19.

6.   When asked "[a]nd the next paragraph he says, 'On that call, Kertsikoff stated he understood and stated the Option had lapsed.' Did I read that correctly?"   Kertsikoff responded that "[y]ou do. But I don't think that's what the transcript says." *Id.*, at 150:7–13.

7.   Kertsikoff also testified that the intervenors already own the shares on March 11. *Id.*, at 290:9–13.

- Kertsikoff also testified in this deposition that Holdings is not the sole shareholder of Gas. To sustain this position, he rejected the validity of documents and emails Defendants produced, which was another false statement under oath.   See Allegations, *supra* C. 3 (describing Kertsikoff's deposition testimony that he would not have signed off on the organizational chart because it was clearly erroneous, when he did sign it).

394.   Each of the foregoing acts violated 18 U.S.C. § 152(2) and therefore constituted "[r]acketeering activity" is defined in 18 U.S.C. § 1961(1); and each was part of a "[p]attern of racketeering activity" is defined in 18 U.S.C. § 1961(5).

### 2.   Bankruptcy fraud in violation of 18 U.S.C. § 152(3)

395.   A criminal violation of 18 U.S.C. § 152(3) occurs if a person "knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11."

396. The RICO Defendants knowingly and fraudulently made false declarations and/or statements under penalty of perjury as set forth above.

397. Each of the foregoing acts violated 18 U.S.C. § 152(3) and therefore constituted "[r]acketeering activity" is defined in 18 U.S.C. § 1961(1); and each was part of a "[p]attern of racketeering activity" is defined in 18 U.S.C. § 1961(5).

### 3. Bankruptcy fraud in violation of 18 U.S.C. § 152(5)

398. A criminal violation of 18 U.S.C. § 152(5) occurs if a person "knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11."

399. The RICO Defendants knowingly and fraudulently received a material amount of property from Eletson after the filing of Holdings' Chapter 11 Cases, with intent to defeat the provisions of title 11, as set forth above and further articulated in Count III for Conversion of Property *infra*.

400. Each of the foregoing acts violated 18 U.S.C. § 152(5) and therefore constituted "[r]acketeering activity" is defined in 18 U.S.C. § 1961(1); and each was part of a "[p]attern of racketeering activity" is defined in 18 U.S.C. § 1961(5).

### 4. Bankruptcy fraud in violation of 18 U.S.C. § 152(9)

401. A criminal violation of 18 U.S.C. § 152(9) occurs if a person "after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court … entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor."

402. The RICO Defendants, after the filing of Holdings' Chapter 11 Cases, knowingly and fraudulently withheld from Holdings, Holdings' creditors, the Bankruptcy Court, and all officers of the court entitled to its possession, the following recorded information (including books,

documents, records, and papers) relating to the property or financial affairs of Eletson, including but not limited to (i) the books and records of Holdings and Corp., (ii) access to Eletson's Microsoft email server, and (iii) Eletson's client file, which Reed Smith has in its possession and has refused to turn over to Holdings.

403.    Each of the foregoing acts violated 18 U.S.C. § 152(9) and therefore constituted "[r]acketeering activity" is defined in 18 U.S.C. § 1961(1); and each was part of a "[p]attern of racketeering activity" is defined in 18 U.S.C. § 1961(5).

### 5.    Wire fraud in violation of 18 U.S.C. § 1343

404.    A criminal violation of 18 U.S.C. § 1343 occurs if a person "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … communication in interstate or foreign commerce, any writings … for the purpose of executing such scheme or artifice."

405.    As set forth above, the RICO Defendants knowingly and intentionally perpetuated a scheme both to defraud and obtain money and property of the Plaintiffs by means of false pretenses, representations, or promises and involved use of wire communications in interstate and foreign commerce, namely emails that crossed state and national borders, in violation of 18 U.S.C. § 1343.

406.    For purposes of executing that scheme, the RICO Defendants or their agents transmitted, or caused to be transmitted, numerous wire communications in interstate or foreign commerce, including but not limited to the following:

- On March 22, 2023, Solomon sent an email to many of the RICO Defendants including Karastamati, Hadjieleftheriadis, and Kertsikoff outlining the Enterprise's strategy to defraud Levona. Although the deadline to exercise the BOL option had passed, and Levona legally owned the Preferred Shares, Solomon contemplated— for the first time—using nominees as a way for the RICO Defendants to retain

control over the Preferred Shares. Solomon wrote "we need to make sure our testimony is consistent with the facts," strongly implying that the Enterprise was going to use any means possible, legal or not, to retain the Preferred Shares, and would testify truthfully or not to retain that control. This email used the wires to contemplate a strategy for how to execute the fraud. The Enterprise would later argue, fraudulently, that the Preferred Shares had been transferred to the Cypriot Nominees before the BOL option deadline expired, executing the strategy that was first contemplated by email.

- On November 15, 2024, the Former Principals caused to be sent an email to the United States seeking to change the banking details for a refund payment in connection with the KALOLIMNOS;

- On November 27, 2024, the Former Principals caused to be sent an email to the United States seeking to change the banking details for sub-charter hire payable in connection with the KITHNOS;

- On December 10, 2024, Kertsikoff used an eletson.com email address (which, on information and belief, is deemed sited in the United States) in furtherance of contacting Meerbaum regarding, on information and belief, the Former Principals' interest in having Holdings excluded from information concerning Eletson's fleet's financial affairs, namely debt payment status;

- On December 24, 2024, the Former Principals caused to be sent an email to the United States which again sought to change the banking details for sub-charter hire payable in connection with the KITHNOS;

- On January 3, 2025, the Former Principals caused to be sent an email seeking to change the banking details for sub-charter amounts payable in connection with the KITHIRA, namely a voyage on which that vessel called at a Texas port;

- In January 2025, on information and belief, the Former Principals used, or caused to be used, wire communications, in interstate or foreign commerce, to cause the KINAROS to wait outside United States waters and evade arrest;

- Beginning in February and March 2025, the Former Principals used, or caused to be used, wire communications, in interstate or foreign commerce, to instruct attorneys at the Royston Rayzor in Texas to make Electronic Case Filings asserting that they were appearing, and authorized to appear, on behalf of KITHNOS SME, KITHIRA SME, and ITHACKI SME;

- On or about June 27, 2025, the Former Principals sent, or caused to be sent, an email to the United States by which they, or persons acting on their behalf, used the false pretense of being Corp. to appoint Med Solutions International to conduct remote medical consultation of certain crew members. On information and belief, the Former Principals also arranged for the medical consultation reports to be provided to them and not to the concerned crew members;

112

- On information and belief, the Former Principals also used wire communications, in interstate or foreign commerce, to coordinate their litigation strategy regarding the KITHNOS Arrest Action with Meerbaum, including the use of purported termination as a nuclear attempt to prevail on the arrest action. The basis for that information and belief regarding coordination includes the February 12, 17, and June 3, 2025 United States Zoom meeting invitations (paralleling time periods of significance in the KITHNOS Arrest Action). It also includes the February 12, 2025 email which was sent to United States sited agents for charterers of the KITHNOS stating "[t]he innocent financial lessors/registered owners [*i.e.*, OCM Maritime Gas 4 and/or Meerbaum as agent] of the vessel are fully supportive of our efforts to set aside the issue." The grounds for information and belief regarding support for the eventual, purported termination of the bareboat charter, once the Former Principals' attempted interference had clearly failed, is that that is what happened – and the Defendants took no steps to oppose it.

### 6. Obstruction of justice in violation of 18 U.S.C. § 1503(a)

407. A criminal violation of 18 U.S.C. § 1503(a) occurs if a person "corruptly … by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice …."

408. Solomon and Reed Smith corruptly, by threatening letters and communications, obstructed, impeded, and endeavored to influence, obstruct and impede the due administration of justice, including by means of the following:

- On July 7, 2022, after counsel to Levona identified by bates number evidence withheld and asked Reed Smith to produce that document along with any other relevant documents, Solomon sent an email accusing Levona, its counsel and other "complicitors" of having engaged in "unlawful" and "doubly unpardonable" "violations" of the protective order. Bankr. ECF 148-6, at 4.

- On June 26, 2025, after Eletson obtained access to its email server pursuant to an unstayed order of the Bankruptcy Court, Solomon threatened Eletson and its counsel that it would seek disqualification of counsel and sanctions against any party or counsel who reviews or benefits from documents on Eletson's Microsoft email server. Bankr. ECF 1707 at 2.

- On July 2, 2025, Solomon again threatened that the review of *any* documents on Eletson's Microsoft email server was sanctionable and demanded that Eletson "delete all documents [it] received purportedly based on the Microsoft Order…." Dist. Ct. ECF 468, at 3.

113

409.   Solomon and Reed Smith's threatening communications were done knowingly, and were done corruptly, with the purpose of wrongfully impeding the due administration of justice in the Eletson bankruptcy and related District Court proceedings.

410.   Solomon and Reed Smith's threatening communications accordingly constituted obstruction of justice in violation of 18 U.S.C. § 1503(a).

### 7.   Obstruction of justice in violation of 18 U.S.C. §1512(c)

411.   A criminal violation of 18 U.S.C. §1512(c)(2) occurs if a person "corruptly … obstructs, influences, or impedes any official proceeding, or attempts to do so …" by, *inter alia*, "conceal[ing] a record, document, or other object, or attempts to do so, with the intent to impair the object's … availability for use in an official proceeding."

412.   Led and coordinated by Solomon and Reed Smith, the RICO Defendants have corruptly obstructed and impeded Holdings' Chapter 11 Cases and related District Court proceedings, and attempted to do so, by, *inter alia*, the following acts:

- The RICO Defendants knowingly and corruptly impeded the due administration of justice by misrepresenting to various tribunals, including the Bankruptcy Court and the District Court, the relevance of certain documents and refusing to produce said documents, in an effort to cover-up their wrongdoing; and

- The RICO Defendants knowingly and corruptly impeded the due administration of justice by undermining and obstructing the administration of the Plan.

413.   The RICO Defendants' acts of obstruction of justice were done knowingly, and were done corruptly, with the purpose of wrongfully impeding the due administration of justice in Holdings' Chapter 11 Cases and related District Court proceedings.

414.   The RICO Defendants' aforesaid acts accordingly constituted obstruction of justice in violation of 18 U.S.C. § 1512(c).

114

**8.    Aiding and abetting in violation of 18 U.S.C. § 2(a) and (b)**

415.    Pursuant to 18 U.S.C. § 2(a), "[w]hoever aids, abets, counsels, commands, induces or procures [the] commission [of a federal crime], is punishable as a principal; and pursuant to 18 U.S.C. § 2(b), "[w]hoever willfully causes an act to be done which if directly performed by him or another would be [a federal crime], is punishable as a principal."

416.    Reed Smith aided and abetted each of the acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), (3), (5) and (9) enumerated above, and each of the acts of obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c) enumerated above, by counseling the other participants in the Enterprise to commit bankruptcy fraud and obstruction of justice with the object of the Former D&Os and Former Shareholders unlawfully maintaining ownership and control of Gas, despite the facts that (i) the option for the Gas preferred shares was never exercised and (ii) even if it had been, the purported transfer of those shares to the "nominees" was fictitious and fraudulent, and the Gas shares would have been part of the Eletson bankruptcy estate.

417.    Given their clients' desperation to maintain control of Gas despite that doing so was unlawful, Reed Smith, and Solomon in particular, masterminded the criminal scheme set forth above, and directly implemented it in large part by knowingly filing in the Bankruptcy Court and the District Court declarations that were knowingly false and other court papers that were knowingly fraudulent, as well as providing "cover" for their clients' interference with the operations of Gas, described herein.

418.    Underlying crimes were committed by the RICO Defendants as set forth herein.

419.    Reed Smith, and Solomon in particular, acted with specific intent to bring about those crimes—indeed, conceived of, suggested and implemented those crimes—and provided substantial assistance, encouragement and participation in those crimes.

115

420.     Reed Smith's conduct went far beyond any ethical form of lawyering and crossed the line into the series of federal crimes enumerated above, joining with their clients – the Greek Eletson "family," which along with Reed Smith comprises the Enterprise – in knowingly defrauding and attempting to defraud the Bankruptcy Court and obstruct justice.

421.     Reed Smith acted with specific intent to defraud the Bankruptcy Court and obstruct justice in the Bankruptcy Court and the District Court.  Solomon, an experienced attorney, was well aware that he was counseling the other Enterprise participants to commit federal crimes.

422.     The acts of Solomon and other Reed Smith attorneys are attributable to Reed Smith. Solomon committed the predicate acts of bankruptcy fraud, aiding and abetting bankruptcy fraud, and obstruction of justice, in his capacity as a Reed Smith partner, in the course and scope of his employment as a Reed Smith partner.  His communications constituting bankruptcy fraud and obstruction of justice were on Reed Smith letterhead and/or from his Reed Smith email account, and his submissions to the Bankruptcy Court and District Court were on Reed Smith letterhead or in court papers bearing Reed Smith's name.

423.     Accordingly, pursuant to 18 U.S.C. § 2(a) and (b), Reed Smith is liable as a principal for the acts of bankruptcy fraud and obstruction of justice committed by the other RICO Defendants as set forth above.

### D.     Pattern of Racketeering Activity

424.     These repeated acts set forth above occurred over a period exceeding two years and constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

425.     The pattern of racketeering activity set forth above exhibits both closed-end continuity, in that it comprises a series of related criminal acts extending over a substantial period of time exceeding two years, and open-ended continuity, in that the Enterprise's ongoing criminal activities continue to damage Eletson and will do so in the future if not interdicted.

### E.    Causation and Damages

426.    Eletson has been injured as a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c).

427.    Plaintiffs' damages, caused directly and proximately by Defendants' conduct, including their racketeering activities and violations of 18 U.S.C. § 1962(c), include, without limitation, attorneys' fees and other amounts spent to rectify these harms, lost revenue from business operations, loss of goodwill (due to the confusion sown in the market place as a consequence of their usurping of Eletson's identity and relationships), reputational harm, decrease in the value of the common shares of Gas, and denial of the benefit of the bargain created by the confirmed and unstayed bankruptcy Plan.

428.    Reed Smith and Solomon caused Plaintiffs particular harm by orchestrating, facilitating and participating in the fraudulent scheme.  As described herein, but for Reed Smith's concealment of dispositive documents, fabrication of the nominee narrative, and post-Effective-Date obstruction, (i) the arbitration award would not have issued in its current form and not used by the RICO Defendants to commercially harm Eletson, (ii) the Plan would have been implemented without obstruction, and (iii) Plaintiffs would not have suffered the diversion of revenues, loss of control, and massive litigation costs.  Reed Smith's conduct was not merely a contributing factor, but a proximate cause of Plaintiffs' injuries.  Plaintiffs' injuries flowed directly from Reed Smith's acts without the intervention of independent decision-makers.

429.    While Plaintiffs' damages are still accruing and will be stated with specificity upon the trial of this matter, at present Plaintiffs' aggregate damages are not less than $200 million.

#### 1.    Joint and Several Liability

430.    To the extent particular RICO Defendants are not specifically identified in connection with particular statutory violations identified above, such RICO Defendants

117

nonetheless indirectly participated in the Enterprise's pattern of racketeering activity as they were part of the Enterprise, participated in the activities of the Enterprise, knew of the wrongful nature of the Enterprise's actions, and sought to benefit therefrom.  All the RICO Defendants are jointly and severally liable for the damages caused by the Enterprise.

### 2.      Treble Damages and Attorneys' Fees

431.    Pursuant to 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter … shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …."

432.    As set forth above, Plaintiffs have been injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962.

433.    Accordingly, Plaintiffs are entitled to recover from the RICO Defendants, jointly and severally, treble damages, that is, three times the actual damages Plaintiffs have suffered as set forth above, or not less than $600 million.

434.    Plaintiffs are also entitled to recover from the RICO Defendants, jointly and severally, their reasonable attorneys' fees incurred in connection with this action.

### COUNT II:
### RICO CONSPIRACY
### (18 U.S.C. § 1962(d))
### (against the Former Principals, Andreoulakis, Solomon and Reed Smith)

435.    Eletson repeats and realleges each and every allegation contained above as if fully set forth herein.

436.    As set forth above, the RICO Defendants agreed and conspired to commit the enumerated predicate acts constituting violations of federal law that formed a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

118

437.    Each of the RICO Defendants agreed to join in and knowingly participated in that conspiracy, as set forth in Count I, above.

438.    Each of the RICO Defendants acted in furtherance of that conspiracy, even if, as to certain RICO Defendants, they did not themselves directly commit predicate crimes.

439.    Each of the RICO Defendants agreed to pursue the same criminal objective of unlawfully maintaining control of Gas and Holdings in the "family" owned and controlled by the Former D&Os and/or Former Shareholders, even though each of the RICO Defendants knew that the option for the purchase of Gas preferred shares was never exercised for the benefit of the Cypriot Nominees.

440.    Each of the RICO Defendants intended for that goal of the racketeering scheme to be realized, all being aware and intending that specific criminal acts of bankruptcy fraud and obstruction of justice would be committed to attempt to achieve that goal, even if not every RICO Defendant committed particular criminal acts.

441.    Such conduct by the RICO Defendants constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

442.    Plaintiffs have been injured as a direct and proximate result of the RICO Defendants' conspiracy, in the manner set forth in Count I, above.

443.    While Plaintiffs' damages are still accruing and will be stated with specificity upon the trial of this matter, at present Plaintiffs' aggregate damages are not less than $200 million.

**F.    Treble Damages and Attorneys' Fees**

444.    Pursuant to 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter … shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …."

445.    As set forth above, Plaintiffs have been injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962.

446.    Accordingly, Plaintiffs are entitled to recover from the RICO Defendants, jointly and severally, treble damages, that is, three times the actual damages Plaintiffs have suffered as set forth above, or not less than $600 million.

447.    Plaintiffs are also entitled to recover from the RICO Defendants, jointly and severally, their reasonable attorneys' fees incurred in connection with this action.

## COUNT III:
## CONVERSION OF PROPERTY
### (against all the Former D&Os and the Former Shareholders)

448.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

449.    Since the Confirmation Order was entered, the Former D&Os and the Former Shareholders have taken affirmative and unauthorized actions in violation of the Confirmation Order intended to ensure that the Converted Personal Property, which is critical to Plaintiffs' ability to operate their businesses, was not turned over to the Plaintiffs.

450.    Specifically, the Former D&Os and the Former Shareholders have refused to provide the Converted Personal Property, which include, among other things, documents and information responsive to Holdings' requests, books and records from the Stamford office, and client files from counsel.

451.    Plaintiffs, upon the Effective Date and pursuant to the Plan and Confirmation Order, had legal ownership over the Converted Personal Property.

452.    The Former D&Os and the Former Shareholders have exercised dominion over the Converted Personal Property, and have treated the Converted Personal Property as if they were the

120

owners of the Converted Personal Property. Defendants have not complied with demands for the turnover or return of the converted property.

453.    Because of the foregoing, Plaintiffs have suffered damages.

**COUNT IV:**
**CONVERSION OF FUNDS**
**(against the Former D&Os and Former Shareholders)**

454.    455.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

455.    Since the Confirmation Order was entered, the Former D&Os and the Former Shareholders have taken affirmative and unauthorized actions in violation of the Confirmation Order intended to ensure that Plaintiffs' post-Effective Date property, including Charterparty Payments due under the Novum Charterparties, was improperly diverted into bank accounts under the dominion and control of one or more of the Former D&Os and not into accounts under the dominion and control of any of the Plaintiffs.

456.    Since the Effective Date, more than half a year's worth of revenue (the "Converted Funds") has been paid by Novum under the Kastos Charterparty and the Fourni Charterparty to bank accounts under the control of one or more Defendants and not into accounts under the control of any of the Plaintiffs, as a result of the Former D&Os' and the Former Shareholders' improper and unauthorized actions. Plaintiffs believe that the same is true for payments made by third parties under charterparty agreements for hire of the "Kimolos" and "Kinaros" vessels due to Kimolos and Kinaros.

457.    Plaintiffs, upon the Effective Date and pursuant to the Plan and Confirmation Order, had an immediate superior right of possession and interest to the Converted Funds.

458.    The Former D&Os and the Former Shareholders have exercised dominion over the Converted Funds, and have treated the Converted Funds as if they were the owners of the

Converted Funds. The Defendants have not complied with demands for the turnover or return of the converted property.

459. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to themselves and their insiders.

460. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to Reed Smith.

461. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to Eletson employees in inflated amounts in attempts to curry the employees' favor to further their obstruction of the Confirmation Order and its effects.

462. Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million.

### COUNT V:
### AIDING AND ABETTING CONVERSION
### (against Reed Smith and Solomon)

463. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

464. As described above, the Former D&Os and the Former Shareholders have improperly converted the Converted Funds and the Converted Personal Property, causing Plaintiffs damages.

465. At all relevant times, Reed Smith and Solomon have had actual knowledge of the Former D&Os' and the Former Shareholders' efforts to convert the Converted Funds and the Converted Personal Property, specifically including (i) the Former D&Os' and the Former Shareholders' efforts to divert Charterparty Payments into bank accounts under the dominion and control of one or more of the Former D&Os and not into accounts under the dominion and control of any of the Plaintiffs, and (ii) the Former D&Os' and the Former Shareholders' refusal to turn over the Converted Personal Property to Holdings.

466.    Reed Smith and Solomon have also had actual knowledge of the Former D&Os' and the Former Shareholders' conversion because, on information and belief, Reed Smith has received and kept the Converted Funds due to their continued representation of the Former D&Os and the Former Shareholders post-Effective Date, despite knowingly being terminated pursuant to the Plan and Confirmation Order.

467.    Reed Smith and Solomon have substantially assisted in the conversion of the Converted Funds and the Converted Personal Property by providing the appearance of legality and legitimacy to the rogue and unauthorized actions of the Former D&Os and the Former Shareholders.  In addition, by filing the various legal challenges to the legitimacy of existing ownership and management of Holdings, Reed Smith and Solomon have substantially assisted in the conversion of the Converted Funds and the Converted Personal Property by proximately causing such conversion.

### COUNT VI:
### BREACH OF CONTRACT
**(against all Defendants)**

468.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

469.    As described above, on November 4, 2024, the Bankruptcy Court entered an order confirming the Plan.  The Plan is a contract, which is binding on all parties in interest in the Chapter 11 Cases, including, specifically, the so-called "Related Parties" under the Plan.  The "Related Parties" include the Debtors and their current and former officers, directors, principals, direct and indirect equity holders, representatives, and other professionals (including, for the avoidance of doubt, each of the Defendants).

470.    As described above, the Plan required certain performance from all Related Parties, including, among other things, to cooperate in good faith to implement and consummate the Plan and to not take any actions inconsistent with the Plan or the Confirmation Order.

471.    Through their above-described intentional conduct, and as the Bankruptcy Court has repeatedly held in connection with the above-described sanctions opinions and orders, Defendants have not fulfilled their obligations under the Plan, which constitutes a breach.  Many of the Defendants' breaches (as described above) are separate and apart from the Former D&Os' and Former Shareholders' conversion of property and funds.  On the other hand, Plaintiffs have fulfilled their obligations under the Plan.

472.    Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million from the breach of contract.

## COUNT VII:
## TORTIOUS INTERFERENCE WITH CONTRACT
### (against all Defendants)

473.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

474.    As described above, Plaintiffs' subsidiaries, Kastos and Fourni, had valid contracts—the Novum Charterparties and their amendments and addenda—with Novum. Specifically, Novum agreed to make Charterparty Payments to the Berenberg Account under the First Charterparty Addenda.

475.    At all relevant times, Defendants have had actual knowledge of the existence of those contracts and had actual knowledge of the specific terms relating to the banking instructions.

476.    Defendants, through their wrongful conduct as described above, intentionally procured Novum's breaches of the contracts without justification by engaging in a wrongful scheme to have Novum change the banking instructions to remit Charterparty Payments to

accounts controlled by the Former D&Os.  Indeed, the Novum Charterparties were breached when Novum agreed to change the banking instructions to accounts controlled by the Former D&Os. Further, it was Defendants' objective, through their intentional conduct with Novum, to procure such a breach in order to have control over the Converted Funds.

477.  478.  Had Defendants not acted wrongfully in committing the above-referenced tortious acts of interference, the contracts would not have been breached.

478.  479.  Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million from the tortious interference.

**COUNT VIII:**
**BREACH OF FIDUCIARY DUTY**
**(Holdings and Corp. against Reed Smith and Solomon)**

479.  Holdings and Corp. repeat and reallege each and every allegation contained above as if fully set forth herein.

480.  As set forth herein, Reed Smith and Solomon breached their fiduciary duty to Holdings and Corp., their former clients, in various ways, including but not limited to, by (i) orchestrating the fraudulent theory Defendants advanced in the arbitration—subsequently repeated in the Bankruptcy Court, District Court, and beyond—that the Former D&Os exercised the Buyout Option for the benefit of the Cypriot Nominees, despite knowing this to be a lie, and despite being counsel to Holdings at the time, aiding the Former D&Os in causing commercial harm to Holdings and Corp., (ii) refusing to recognize and accept the consequences of the effectiveness of Holdings' reorganization pursuant to the confirmed and unstayed chapter 11 Plan, (iii) resisting its termination as counsel to Corp. following confirmation of Holdings' reorganization, (iv) refusing to turn over to Holdings and Corp. the Eletson client file in Reed Smith's possession following Reed Smith's termination as counsel to Holdings and Corp., and (v) purporting to represent various

Eletson entities, at the direction of the Former D&Os, Former Shareholders and/or the members of the purported Provisional Board, in ways that are directly adverse to Holdings and Corp.

481. Under New York law, breach of fiduciary duty is proven by showing that (i) a fiduciary duty existed between the plaintiff and the defendant, (ii) that the defendant breached that duty, and that damages resulted from the breach.

### A. Existence of a Fiduciary Duty

482. Reed Smith and Solomon represented Holdings and/or Corp. as counsel in various proceedings dating back several years (in the case of Reed Smith "more than thirty years" (Bankr. ECF 235, at p. 6)), including (i) as counsel to Holdings and Corp. in the arbitration before Justice Belen, (ii) as debtors' counsel to Holdings and two affiliate debtors in the Chapter 11 Cases, (iii) as counsel to Holdings and Corp. in the proceeding in the District Court concerning confirmation/vacatur of the Arbitration Award, Case No. 23.cv-7331 (LJL), and (iv) as purported counsel to Holdings in the appeal of the Confirmation Decision that Reed Smith filed in the name of Holdings to the District Court, Case No, 24-cv-8672 (LJL).

483. On November 19, 2024—the Effective Date—Reed Smith was automatically terminated as counsel to Holdings pursuant to the Plan. That same day, Holdings' new management confirmed in writing to Reed Smith that it has been terminated. Ever since the Effective Date, Holdings has been and remains Reed Smith's *former* client.

484. Following the Effective Date, Holdings' board appointed new management for Holdings and certain of its subsidiaries, including Corp. On November 27, 2024, Holdings and Corp., by and through their authorized counsel (Goulston & Storrs), confirmed in writing Reed Smith's termination in all matters. Ever since November 27, 2024, Corp. has been and remains Reed Smith's *former* client.

485.   Reed Smith and Solomon owed a fiduciary duty to Holdings and Corp. as their former clients and the confirmation of the Plan did not operate to abrogate that relationship.

**B.      The Breach of Fiduciary Duty**

486.   As described herein, after Reed Smith's termination as counsel for Holdings and Corp. in November 2024, Reed Smith has purported to represent various Eletson entities in proceedings in the United States and around the globe in ways that are directly adverse to Holdings and Corp.  This has included supporting and/or initiating proceedings in the United States, Liberia, Greece, the United Kingdom, and the Marshall Islands, all in violation of Reed Smith's continuing fiduciary duties owed to Holdings and Corp. as its former clients.

487.   Reed Smith has used various monikers to describe its clients, including "Old Eletson," "Provisional Holdings," Holdings (Greece)," and "Unreorganized Holdings."  *None* of these labels refer to real entities that exist anywhere in the world.  There is only one Holdings, which is one of the plaintiffs in this action and is Reed Smith's former client.

488.   On information and belief, in pursuing these actions adverse to their former clients, Reed Smith and Solomon have taken direction from the Former D&Os, Former Shareholders and/or the purported members of the Provisional Board.  However, *none* of these individuals or entities have authority to manage, direct or control Holdings or any of its subsidiaries, including Corp., and *none* of these individuals or entities have authority to retain or direct counsel on behalf of Holdings or any of its subsidiaries, including Corp.

489.   As described herein, the Provisional Board was not legitimate from its inception and never had the authority to act on behalf of Holdings.  In particular, the Provisional Board never had the authority to hire counsel to represent Holdings or any of its subsidiaries.

490.   By entering into a new engagement purportedly with Holdings but at the direction of the Provisional Board—which Reed Smith and Solomon knew lacked authority and was not

legitimate—Reed Smith and Solomon acted adverse to Holdings and Corp., their former clients, and breached their fiduciary duty.

491.   Then, purportedly at the direction of the Provisional Board, Reed Smith and Solomon took several actions adverse to Holdings and Corp., their former clients, including but not limited to (i) refusing to update or assist in updating LISCR, (ii) aiding Defendants' opposition of recognition of the Plan in Liberia, (iii) aiding Defendants' opposition of recognition of the Plan in Greece, (iv) aiding Defendants' opposition of recognition of the Plan in the United Kingdom, and (v) aiding Defendants' other obstructionist litigation around the globe, including in Liberia, the Marshall Islands, and Germany.  By taking these actions adverse to Holdings and Corp. (their former clients), Reed Smith and Solomon breached their fiduciary duty.

492.   Reed Smith's representation of parties adverse to Holdings has persisted for over a year—since at least November 19, 2024—during which time Reed Smith has refused to turn over to Eletson its client file and used Eletson's confidential information to Eletson's detriment.  By refusing to turn over the Eletson client file and improperly using Eletson's confidential information to Eletson's detriment, Reed Smith and Solomon breached their fiduciary duty.

493.   Reed Smith and Solomon knowingly structured their legal services to advance the joint personal goals they shared with the Former Principals at the direct expense of Holdings' corporate health.

494.   Reed Smith and Solomon never sought or obtained a waiver from Holdings or Corp. permitting them to pursue any engagements adverse to their former clients.

## C.   Damages

495.   Holdings and Corp. have suffered myriad of damages as a result of Reed Smith's and Solomon's breaches of fiduciary duty.

496.     Reed Smith and Solomon have facilitated hostile control of Eletson's property, including shares in Eletson's subsidiaries, which in turn own and operate assets of significant value.  Due to Reed Smith's and Solomon's breaches of fiduciary duty, Eletson has been deprived of operational control of its businesses and has been unable to realize the significant revenue that it would otherwise generate absent Reed Smith's and Solomon's breaches.

497.     Reed Smith caused Holdings to incur significant legal fees and expenses due to the constant and frivolous litigations brought and/or aided by Reed Smith and Solomon in the Bankruptcy Court, the District Court, and the Second Circuit, as well as proceedings abroad, including in the United Kingdom, Greece, Liberia, and the Marshall Islands.  The confirmation of Holdings' Chapter 11 Plan was supposed to be Holdings' fresh start, and instead, Holdings has had to spend time, money, and effort litigating issues that were settled upon plan confirmation and against attorneys who have knowledge of Holdings' confidential information.

**COUNT IX:**
**CONSPIRACY**
**(against all Defendants)**

498.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

499.     Under New York law, civil conspiracy is proven by showing the commission of a primary tort, a corrupt agreement between two or more persons, an overt act in furtherance of the agreement, the parties' intentional participation in the furtherance of the Plan or purpose, and the resulting injury.

500.     As set forth herein, Defendants conspired to commit numerous primary torts, including but not limited to (i) conversion of funds by the Former D&Os and Former Shareholders, (ii) conversion of property by the Former D&Os and Former Shareholders, (iii) tortious interference with contract by all Defendants, and (iv) breach of fiduciary duty by Reed Smith.

501.   Defendants made a corrupt agreement to hinder implementation of the Chapter 11 Plan and to work against Eletson's interests.  They knew they had a duty to carry out and enforce the Plan, and from the very beginning they worked to undermine the Plan and its effectiveness.

502.   Defendants took numerous affirmative actions in support of the conspiracy, including submitting false statements in the Bankruptcy Court and by working in various jurisdictions across the globe to hinder implementation of the Plan.

503.   As discussed above, Plaintiffs have suffered myriad damages because of Reed Smith's breach of its fiduciary duty.  Holdings has spent incredible sums of legal fees fighting the very claims that Reed Smith was prohibited from bringing, and it has had to counteract the damage done by Reed Smith and the Former D&Os to its business and relationships around the globe.

## PRAYER FOR RELIEF

**WHEREFORE**, for the above-stated reasons, Plaintiffs respectfully request that the Court (I) enter judgment against each of the Defendants in an amount not less than $200 million in compensatory damages, trebled pursuant to 18 U.S.C. § 1964(c) to not less than $600 million, plus attorneys' fees, (II) grant further relief in the form of punitive damages, and (III) grant such other relief as the Court deems just and proper.

DATED:   December 23, 2025
        New York, New York

HERBERT SMITH FREEHILLS
KRAMER (US) LLP
By:

*/s/ Kyle J. Ortiz*
Kyle J. Ortiz
Brian F. Shaughnessy
David E. Blabey Jr.
New York, New York 10036
(212) 715-9100

*Counsel for Plaintiffs as Against Defendants Other Than Reed Smith LLP and Louis M. Solomon*

GOULSTON & STORRS PC
By:

*Jennifer B. Furey*
Jennifer B. Furey (admitted *pro hac vice*)
Nathaniel R.B. Koslof (admitted *pro hac vice*)
Jaclyn Grodin
Rae Berger
Boston, MA 02109
(617) 574-3575

*Counsel for Plaintiffs as Against All Defendants*

131