**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re:

ELETSON HOLDINGS INC.,[1]

                  Debtor.

-----------------------------------------------------------------x

ELETSON HOLDINGS INC., ELETSON
CORPORATION, ELETSON CHARTERING
INC., EMC INVESTMENT CORPORATION,
KASTOS SPECIAL MARITIME ENTERPRISE,
FOURNI SPECIAL MARITIME ENTERPRISE,
KINAROS SPECIAL MARITIME ENTERPRISE,
KIMOLOS II SPECIAL MARITIME
ENTERPRISE,

                  Plaintiffs,

v.

VASSILIS KERTSIKOFF, VASILIS
HADJIELEFTHERIADIS, LASCARINA
KARASTAMATI, KONSTANTINOS
HADJIELEFTHERIADIS, IOANNIS ZILAKOS,
EMMANUEL ANDREOULAKIS, ADRIANOS
PSOMADAKIS, PANOS PAXINOS, ELENI
GIANNAKOPOULOU, NIKI ZILAKOU, LASSIA
INVESTMENT COMPANY, GLAFKOS TRUST
COMPANY, FAMILY UNITY TRUST
COMPANY, ELAFONISSOS SHIPPING
CORPORATION, KEROS SHIPPING
CORPORATION, REED SMITH LLP, LOUIS M.
SOLOMON, APARGO LIMITED, FENTALON

FOR PUBLICATION

Chapter 11

Case No. 23-10322 (JPM)

Adv. Pro. No. 25-01120 (JPM)

---

[1] Prior to November 19, 2024, the debtors in these cases were: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC (the "Debtors"). On March 5, 2025, the Court entered a final decree and order closing the Chapter 11 cases of Eletson Finance (US) LLC and Agathonissos Finance LLC. Commencing on March 5, 2025, all motions, notices, and other pleadings relating to any of the Debtors shall be filed in the Chapter 11 case of Eletson Holdings Inc. The Debtor's mailing address is c/o Herbert Smith Freehills Kramer (US) LLP, 1177 Avenue of the Americas, New York, New York 10036.

LIMITED, DESIMUSCO TRADING LIMITED,   :
                                      :
                          Defendants.   :
                                      :
-------------------------------------------------------------------x


**MEMORANDUM OPINION AND ORDER DENYING REED SMITH DEFENDANTS'
MOTION TO COMPEL ARBITRATION OR DISMISS AND FORMER
<u>SHAREHOLDERS' MOTION TO DISMISS</u>**

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.       INTRODUCTION

On December 23, 2025, plaintiffs Eletson Holdings Inc. ("Holdings"), Eletson Corporation ("Corp."), Eletson Chartering Inc., EMC Investment Corporation, Kastos Special Maritime Enterprise, Fourni Special Maritime Enterprise, Kinaros Special Maritime Enterprise, and Kimolos II Special Maritime Enterprise (collectively, "Plaintiffs") filed an amended complaint ("Amended Complaint").  Dkt. No. 59.[2]

The Amended Complaint names the following defendants (collectively, "Defendants"): 1) Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, and Lascarina Karastamati ("Former Principals"); 2) Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Emmanuel Andreoulakis, Adrianos Psomadakis, Panos Paxinos, Eleni Giannakopoulou, and Niki Zilakou (collectively with the Former Principals, the "Former D&Os"); 3) Lassia Investment Company, Glafkos Trust Company, and Family Unity Trust Company (collectively, the "Former Majority Shareholders"); 4) Elafonissos Shipping Corporation ("Elafonissos") and Keros Shipping Corporation ("Keros"), both former minority shareholders (Elafonissos and Keros, collectively with the Former Majority Shareholders, "Former Shareholders"); 5) Apargo Limited, Fentalon Limited, Desimusco Trading Limited (collectively, the "Cypriot Nominees"); and 6) Reed Smith LLP ("Reed Smith"), and Louis M. Solomon, Reed Smith's Head of International Litigation (with Reed Smith, the "Reed

---

[2] All references to "Dkt. No." refer to docket entries in the above captioned Adversary Proceeding, No. 25-01120.  Other references to "Dkt. No." prefixed with No. 23-10322 refer to docket entries in that docket number of this Court.  References to docket entries in cases in the Southern District of New York are made as follows: *Eletson Holdings Inc. et al v. Levona Holdings Ltd.*, No. 23-cv-7331 (S.D.N.Y.), Dkt. No. X.  References to docket entries in cases in the Second Circuit are similarly made as follows: *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 25-445 (2d Cir.), Dkt. No. Y.

3

Smith Defendants").

The Amended Complaint asserts claims for civil RICO, conspiracy, conversion, and breach of contract against the Former Principals, the Reed Smith Defendants (Plaintiffs' former outside counsel), and Andreoulakis (Plaintiffs' former in-house counsel). Dkt. No. 59 at 4. The Amended Complaint also asserts claims of breach of fiduciary duty against the Reed Smith Defendants, and further claims against the Former Shareholders and the Cypriot Nominees for their role in a purported fraud. *Id.*

Before the Court is the Reed Smith Defendants' motion to compel arbitration, or, in the alternative, to dismiss the Amended Complaint ("Reed Smith Defendants' Motion"), dated February 4, 2026. Dkt. No. 68-1. The Reed Smith Defendants' Motion is supported by the Declaration of Marshall R. King, also dated February 4, 2026. Dkt. No. 69.

Also before the Court is the Former Majority Shareholders' and Elafonissos' motion to dismiss the Amended Complaint ("Former Shareholders' Motion"),[3] dated February 4, 2026. Dkt. No. 71.

The Plaintiffs have submitted a response to the Former Shareholders' Motion ("Plaintiffs' Response to Former Shareholders"), dated March 11, 2026, Dkt. No. 82, as well as an opposition to the Reed Smith Defendants' Motion ("Plaintiffs' Opposition to Reed Smith"), dated March 11, 2026, Dkt. No. 84-1.

The Reed Smith Defendants have submitted a reply in support of the Reed Smith Defendants' Motion ("Reed Smith Defendants' Reply"), dated April 1, 2026. Dkt. No. 86. The Reed Smith Defendants' Reply is supported by the declaration of Marshall King, also dated April

---

[3] Keros, which "has not appeared" and is "not represented by . . . counsel" for the other Former Shareholders, does not join in bringing the motion. Dkt. No. 71 (Former Shareholders' Motion) at 24.

1, 2026.  Dkt. No. 87.

The Former Majority Shareholders and Elafonissos have submitted a reply in support of the Former Shareholders' Motion ("Former Shareholders' Reply"), dated April 1, 2026.  Dkt. No. 88.

The Court held a hearing on the Reed Smith Defendants' Motion and the Former Shareholders' Motion on April 30, 2026.

## II.   JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## III.   BACKGROUND

### A.  The Amended Complaint

The parties and events involved have been the subject of extensive litigation before this Court and other Courts in a multitude of proceedings, resulting in numerous other decisions and orders.  *See, e.g.,* No. 23-10322, Dkt. No. 1212 (Oct. 25, 2024 Memorandum Opinion and Order Confirming Petitioning Creditors' Amended Joint Chapter 11 Plan); No. 23-10322, Dkt. No. 1223 (Nov. 4, 2024 Findings of Fact, Conclusions of Law, and Order Confirming Petitioning Creditors' Amended Joint Chapter 11 Plan); No. 23-10322, Dkt. No. 1402 (Jan. 29, 2025 Order in Support of Confirmation and Consummation of the Court-Approved Plan of Reorganization); No. 23-10322, Dkt. No. 1495 (Feb. 27, 2025 Sanctions Order); No. 23-10322, Dkt. No. 1537 (Mar. 13, 2025 Sanctions Order); No. 23-10322, Dkt. No. 1716 (July 8, 2025 Sanctions Order); No. 23-10322, Dkt. No. 1971 (Mar. 12, 2026 Memorandum Opinion And Order Granting In Part Eletson Holdings Inc.'s Motion For Findings Of Contempt And Application For Bench Warrants); *Eletson*

*Holdings, Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2024 U.S. Dist. LEXIS 160367, at \*25

(S.D.N.Y. Sept. 6, 2024) (granting Levona Holdings, Ltd. leave to file amended answer alleging

fraud as a basis for vacating arbitral award where "newly-produced documents . . . tend[ed] to

show fraud in the arbitration proceeding"); *In re Eletson Holdings Inc.*, No. 25-cv-1312, 2025 U.S.

Dist. LEXIS 187947, at \*37, 43, 52–82 (S.D.N.Y. Sept. 22, 2025) (affirming sanctions and anti-

suit injunction against the Former Majority Shareholders and other violating parties and

concluding, inter alia, that "there is not now and never was a legitimate 'Provisional Holdings,'"

and "Provisional Holdings is not a legal entity with standing to sue in this Court"); *Eletson*

*Holdings, Inc. v. Levona Holdings, Ltd.*, No. 23-cv-7331, 2026 U.S. Dist. LEXIS 5528, at \*217

(S.D.N.Y. Jan. 12, 2026) (vacating arbitral award upon clear and convincing evidence of fraud in

the arbitration); *Eletson Holdings Inc. et al v. Levona Holdings Ltd.*, No. 23-cv-7331 (S.D.N.Y.),

Dkt. No. 748 (June 29, 2026 order granting $296,014.14 in discovery sanctions against the Cypriot

Nominees in favor of Levona Holdings, Ltd.); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No.

25-445 (2d Cir.), Dkt. No. 105 (Oct. 31, 2025 panel order denying motion for stay of District

Court's Aug. 26, 2026 order directing Reed Smith to produce documents from, inter alia, a

Microsoft server).  All prior decisions and orders provide much needed context for the motions

now before the Court.

    In the present adversary proceeding, Plaintiff Holdings is the ultimate parent company of

the Eletson family of companies (collectively, "Eletson"), an international gas shipping company,

which operated its fleet of gas tanker ships through wholly owned subsidiaries of Holdings (the

remaining plaintiffs are comprised of Holdings' wholly owned subsidiaries).  Dkt. No. 59

(Amended Complaint) at 5–9.  The Amended Complaint describes a "multi-year scheme by former

Eletson insiders and their lawyers to unlawfully seize control of Plaintiffs' most valuable assets,

6

siphon corporate revenues, and sabotage a court-approved Chapter 11 reorganization." *Id.* at 2. The Amended Complaint asserts that this scheme "was conceived, executed, and sustained through perjury, fabricated evidence, obstruction of justice, and the misuse of sham litigation across multiple jurisdictions worldwide." *Id.* The Amended Complaint states that the Defendants committed fraud, including in a 2022 arbitration ("Preferred Shares Arbitration") on the issue of whether a contractual buyout option had been exercised with Levona Holdings, Ltd. ("Levona") to control the preferred shares of Eletson Gas LLC ("Gas"), a non-party gas-shipping company whose common shares are 100% owned by Holdings, and that the Defendants then continued that fraud in this Court, and the United States District Court for the Southern District of New York, to undermine the subsequent bankruptcy reorganization of Holdings and to maintain control over Eletson and its assets. *Id.* at 2–3, 23.

The Amended Complaint alleges the following nine causes of action, *id.* at 98–130: Count One Civil Rico (18 U.S.C. § 1962(c)), against the Former Principals, Andreoulakis, and the Reed Smith Defendants (collectively, "RICO Defendants"), *id.* at 98–118; Count Two RICO Conspiracy (18 U.S.C. § 1962(d)), against the RICO Defendants, *id.* at 118–120; Count Three Conversion of Property, against the Former D&Os and the Former Shareholders, *id.* at 120–21; Count Four Conversion of Funds, against the Former D&Os and the Former Shareholders, *id.* at 121–22; Count Five Aiding and Abetting Conversion, against the Reed Smith Defendants, *id.* at 122–23; Count Six Breach of Contract, against all Defendants, *id.* at 123–24; Count Seven Tortious Interference with Contract, against all Defendants, *id.* at 124–25; Count Eight Breach of Fiduciary Duty, brought by Holdings and Corp. against the Reed Smith Defendants, *id.* at 125–29; and Count Nine Conspiracy, against all Defendants, *id.* at 129–30.

## B. **Reed Smith Defendants' Motion and Related Pleadings**

The Reed Smith Defendants' Motion makes two principal arguments: 1) all claims against the Reed Smith Defendants must be arbitrated, Dkt. No. 68-1 at 15–22; and 2) all claims against the Reed Smith Defendants should be dismissed with prejudice for failure to state a claim, *id.* at 22–56. The Plaintiffs' Opposition to Reed Smith, Dkt. No. 84-1, and the Reed Smith Defendants' Reply, Dkt. No. 86, both also principally address these two categories of arguments.

### i. Motion to compel arbitration

### 1. Reed Smith Defendants' Motion

The Reed Smith Defendants' Motion first argues that all claims against the Reed Smith Defendants must be arbitrated. Dkt. No. 68-1 at 15–22. The Reed Smith Defendants' Motion states that arbitration clauses found in each of two valid engagement agreements govern Reed Smith's representation of Holdings and Corp. in the matters giving rise to Plaintiffs' claims. *Id.* at 15. The Reed Smith Defendants' Motion states that the first arbitration clause is found in a 2022 agreement "pertain[ing] to Reed Smith's work on the [Preferred Shares Arbitration] and related matters," *id.* (citing Dkt. No. 69-2 ("2022 Agreement")), and the second arbitration clause is found in a 2023 agreement "pertain[ing] to Holdings' dispute with bondholders and the resulting bankruptcy," *id.* (citing Dkt. No. 69-3 ("2023 Agreement," and with the 2022 Agreement, the "Agreements")). The Reed Smith Defendants' Motion asserts that the arbitration clauses in both Agreements require arbitration for "[a]ny controversy, claim or dispute arising out of or relating to our agreement, or the breach thereof." *Id.* at 16 (quoting Dkt. No. 69-2 (2022 Agreement) at 12, Dkt. No. 69-3 (2023 Agreement) at 9). The Reed Smith Defendants' Motion states that Plaintiffs' claims "arise out of or relate to" the Reed Smith Defendants' representation of Holdings and Corp. in the disputes concerning Gas's preferred shares and Holdings' bankruptcy proceedings. *Id.*

8

The Reed Smith Defendants' Motion argues that Holdings and Corp., as signatories to the Agreements, are bound to arbitrate, and that the remaining plaintiffs, each a wholly-owned subsidiary of Holdings, also must arbitrate, based on the doctrine of estoppel and the fact that the Amended Complaint seeks the same relief as to all Plaintiffs. *Id.* at 16–19. The Reed Smith Defendants' Motion also claims that Solomon may enforce the arbitration clauses as an agent of Reed Smith and under the doctrine of estoppel. *Id.* at 19–20.

The Reed Smith Defendants' Motion next argues that this Court lacks discretion to refuse arbitration, as the relevant proceedings are not core proceedings, since Plaintiffs could have brought the Amended Complaint in state court absent a bankruptcy proceeding, and the outcome of this proceeding allegedly will not affect the allocation of assets or impact the ability to reorganize. *Id.* at 20–22. The Reed Smith Defendants' Motion argues in the alternative that this Court should exercise its discretion to compel arbitration, as Holdings' reorganization is complete and therefore Plaintiffs' claims cannot affect an ongoing reorganization and thus do not jeopardize the objectives of the Bankruptcy Code. *Id.* at 22.

### 2. Plaintiffs' Opposition to Reed Smith

The Plaintiffs' Opposition to Reed Smith advances five arguments as to why the Court should deny the motion to compel arbitration. Dkt. No. 84-1 at 6–18.

First, the Plaintiffs' Opposition to Reed Smith asserts that the arbitration clauses are unenforceable, because Reed Smith did not obtain each (or any) of Plaintiffs' informed consent to arbitrate. *Id.* at 8–11. The Plaintiffs' Opposition to Reed Smith first notes that "the relevant attachments purporting to contain clients' consent to the arbitration clauses are not signed by any of the Plaintiffs," even though the Agreements expressly require client signatures to the attachment ("Attachment 2") of each Agreement for the arbitration clauses to be effective or enforceable. *Id.*

9

at 8 (citing Dkt. No. 69-2 (2022 Agreement) at 12, 19; Dkt. No. 69-3 (2023 Agreement) at 10, 16).

Accordingly, the Plaintiffs' Opposition to Reed Smith argues that the arbitration clauses are not

enforceable against the Plaintiffs. *Id.* The Plaintiffs' Opposition to Reed Smith further argues that

the Agreements were not signed or received by, nor mention, the six plaintiffs apart from Holdings

and Corp., who bring claims against the Reed Smith Defendants not arising from the Agreements

but rather from the Reed Smith Defendants' interference with third-party charters and banking

relationships, and that accordingly the Agreements cannot be enforced against those six plaintiffs.

*Id.* at 9.

Further, the Plaintiffs' Opposition to Reed Smith argues that even had the Attachment 2's

been signed, Reed Smith could still not enforce the arbitration clauses against the Plaintiffs,

because Reed Smith failed to obtain Plaintiffs' informed consent to arbitrate. *Id.* at 9–10. Rather,

the Plaintiffs' Opposition to Reed Smith argues, "Reed Smith attempted to utilized (sic) fee-

dispute waiver forms . . . to obtain consents to arbitrate a far broader set of claims," which is

"unethical and unenforceable." *Id.* at 10. The Plaintiffs' Opposition to Reed Smith notes that the

arbitration clauses are "introduced as part of a discussion of fee and service disputes," and that,

"[r]ead in context," the broad language of the arbitration clauses "cannot bear the weight Reed

Smith places on it." *Id.* at 10 n.11. Similarly, the Plaintiffs' Opposition to Reed Smith states that

"Reed Smith cannot extract blanket informed consent from broad words embedded in a disclosure

framed around a fundamentally different category of disputes." *Id.* The Plaintiffs' Opposition to

Reed Smith concludes that "[b]y burying this purported waiver of important rights inside a

misleading fee-dispute wrapper," Reed Smith failed to obtain its clients' fully informed consent.

*Id.* at 10–11.

Second, the Plaintiffs' Opposition to Reed Smith argues that Reed Smith failed to comply

10

with the requirements of 22 New York Codes Rules and Regulations ("N.Y.C.R.R.") Part 137,[4] as the Agreements do not contain a clear statement that a client has an absolute right to proceed under Part 137, and the "arbitration clauses invoke Part 137 without disclosing that the client protections central to Part 137 are being waived," rendering the clauses unenforceable. *Id.* at 11–12. Further, the Plaintiffs' Opposition to Reed Smith asserts, the arbitration clause in the 2022 Agreement requires the client to pay, in advance, Reed Smith's fees in the arbitration, win or lose, which is unethical and unenforceable. *Id.* at 12 (citing Dkt. No. 69-2 (2022 Agreement) at 12).[5]

Third, the Plaintiffs' Opposition to Reed Smith argues that this Court's Retention Order supersedes the prior Agreements and places jurisdiction over Plaintiffs' claims in this Court. *Id.* at 12–13 (citing No. 23-10322, Dkt. No. 350 ("Retention Order")). The Plaintiffs' Opposition to Reed Smith notes that the Retention Order states that "[n]otwithstanding any provision to the contrary in the Application [to retain Reed Smith] or in any engagement letter, the Court shall retain jurisdiction to hear and to determine all matters arising from or related to the Application or the implementation of this Order." *Id.* (quoting No. 23-10322, Dkt. No. 350 (Retention Order) at 4). The Plaintiffs' Opposition to Reed Smith states that the claims in the Amended Complaint arose after the Retention Order. *Id.* at 17–18.

Fourth, the Plaintiffs' Opposition to Reed Smith argues that the bankruptcy plan reorganizing Holdings and this Court's order confirming that plan explicitly provide that this Court

---

[4] "This Part establishes the New York State Fee Dispute Resolution Program, which provides for the informal and expeditious resolution of fee disputes between attorneys and clients through arbitration and mediation." 22 N.Y.C.R.R. § 137.0.

[5] While the Plaintiffs' Opposition to Reed Smith only makes this argument as to the 2022 Agreement, the 2023 Agreement contains a similar requirement. Dkt. No. 69-3 (2023 Agreement) at 10 ("Client agrees that, immediately upon commencement of any arbitration by either party, it will escrow the full amount of any fees or expenses that we claim are due . . . . All Reed Smith fees and expenses incurred in connection with the arbitration shall be paid by you as incurred.").

retains exclusive jurisdiction to resolve all claims related to the purported transfer of Gas's preferred shares to the Cypriot Nominees, as well as controversies related to the plan's implementation. *Id.* at 14–15 (citing No. 23-10322, Dkt. No. 1132 ("Plan") § 11.1(1), 11(e), 11(i) & No. 23-10322, Dkt. No. 1223 ("Confirmation Order") § WW). Further, the Plaintiffs' Opposition to Reed Smith asserts that this Court has discretion to retain jurisdiction over Plaintiffs' claims because they are either core claims, or non-core claims so intertwined with core bankruptcy functions that severance would jeopardize those functions. *Id.* at 14–15.

Fifth, the Plaintiffs' Opposition to Reed Smith argues that the arbitration clauses do not apply because the Amended Complaint does not arise out of the Agreements. *Id.* at 15. Rather, the Plaintiffs' Opposition to Reed Smith claims that the 2023 Agreement is expressly limited to bondholder litigation with Wilmington Savings Fund Society, FSB (and does not, as the Reed Smith Defendants argue, also cover any resulting bankruptcy proceeding), and none of the alleged misconduct in the Amended Complaint pertains to the bondholder litigation. *Id.* at 15–16. The Plaintiffs' Opposition to Reed Smith similarly argues that the 2022 Agreement covers "disputes with Levona . . . and 'Unigas' arising out of the Eletson Gas LLC Agreement and the Binding Offer Letter." *Id.* at 17 (quoting Dkt. No. 69-2 (2022 Agreement) at 3). The Plaintiffs' Opposition to Reed Smith asserts that the Amended Complaint, although discussing "the background of the [Preferred Shares Arbitration] between Levona and Holdings over control over Gas," only raises claims related to the Preferred Shares Arbitration "to the extent that some of the predicate acts for Plaintiffs' RICO claim concern subsequent court declarations containing false statements about the [Preferred Shares Arbitration]." *Id.*

### 3. Reed Smith Defendants' Reply

First, the Reed Smith Defendants' Reply argues that the Agreements are valid. Dkt. No.

86 at 2–7. The Reed Smith Defendants' Reply asserts that 22 N.Y.C.R.R. Part 137 – which covers only certain specified fee disputes between attorneys and clients (those between $1,000 and $50,000), and which excludes claims involving substantial legal questions, including professional malpractice or misconduct, or claims against an attorney for damages – "has no applicability," and that Plaintiffs' claims are subject to arbitration because "the relevant arbitration clause in both Agreements . . . covers a broader range of disputes than 'fee dispute[s] which would otherwise be subject to Part 137.'" *Id.* at 2 (quoting Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 9). The Reed Smith Defendants' Reply argues that, in any event, Reed Smith did comply with the requirements of 22 N.Y.C.R.R. Part 137. *Id.* at 3–4.

Next, the Reed Smith Defendants' Reply claims that Plaintiffs do not contest that Holdings and Corp. signed the Agreements themselves, "where the relevant arbitration clauses actually appear." *Id.* at 4. The Reed Smith Defendants' Reply then states that, in any event, "[b]oth Attachment 2s *are* signed," stating further that "Attachment 2 to the 2022 Agreement is initialed by Lascarina Karastamati and Vasilis Hadjeleftheriadis, who signed the Agreement on behalf of Holdings and Corp., and Attachment 2 to the 2023 Agreement is signed by Vasilis Hadjeleftheriadis, Lascarina Karastamati, and Vassilis Kertsikoff, who represented in the body of the Agreement that they 'have full authority to bind Eletson and all Defendants to the terms of this Agreement.'" *Id.* at 4–6 (citing Dkt. No. 69-2 (2022 Agreement) at 20; Dkt. No 69-3 (2023 Agreement) at 4, 16). Further, the Reed Smith Defendants' Reply argues that this Court's Retention Order does not supersede the arbitration clauses in the Agreements, because the Retention Order uses only "generic jurisdictional" language and does not specifically mention arbitration. *Id.* at 6–7.

Second, the Reed Smith Defendants' Reply asserts that Plaintiffs' claims are covered by

the Agreements, which "broadly require arbitration for '[a]ny controversy, claim or dispute arising out of or relating to our agreement, or the breach thereof.'" *Id.* at 7–9 (quoting Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 9). The Reed Smith Defendants' Reply states that the Amended Complaint arises from the Preferred Shares Arbitration and the Reed Smith Defendants' purported conduct in the Preferred Shares Arbitration, notwithstanding Plaintiffs' argument in the Plaintiffs' Opposition to Reed Smith that their claims arose only after the Retention Order. *Id.* at 7–8. Further, the Reed Smith Defendants' Reply argues that Plaintiffs' claims "touch matters" covered by the Agreements, even if the Amended Complaint was not based on conduct in the Preferred Shares Arbitration. *Id.* at 8. The Reed Smith Defendants' Reply argues that the 2023 Agreement is not just limited to bondholder litigation, and encompasses the bankruptcy proceeding. *Id.* at 8–9.

Third, the Reed Smith Defendants' Reply asserts that all Plaintiffs are bound by the Agreements, noting that Plaintiffs do not contest that Soloman can enforce the Agreements. *Id.* at 9–10. The Reed Smith Defendants' Reply argues that all Plaintiffs are required to arbitrate because they all seek the same relief based on the same attorney-client relationship, and that the Plaintiffs' Opposition to Reed Smith has abandoned this issue by failing to oppose the argument. *Id.* at 9. Further, the Reed Smith Defendants' Reply claims that the non-signatory Plaintiffs are bound because they are seeking to vindicate benefits deriving from the Agreements. *Id.* at 10.

Lastly, the Reed Smith Defendants' Reply argues that arbitration of non-core claims does not jeopardize the objectives of the Bankruptcy Code, and that Plaintiffs cite no authority for their claim that the Plan or Confirmation Order nullifies the Agreements. *Id.* at 10–11. The Reed Smith Defendants' Reply also asserts that Plaintiffs' claims are not core, as they do not depend on Bankruptcy law for their existence. *Id.* at 11.

14

### ii. Motion to dismiss the amended complaint as to the Reed Smith Defendants for failure to state a claim

The Reed Smith Defendants' Motion argues in the alternative to arbitration that the claims against the Reed Smith Defendants must be dismissed with prejudice for failure to state a claim. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 22–56. The Reed Smith Defendants first argue that all claims should be dismissed against them pursuant to the *Noerr-Pennington* doctrine. *Id.* at 22–24. The Reed Smith Defendants then assert that each of the seven counts alleged against them fail to state a claim. *Id.* at 24–56.

### 1. Reed Smith Defendants' Motion

### a. *Noerr-Pennington* doctrine

The Reed Smith Defendants first argue that all claims must be dismissed against them pursuant to the *Noerr-Pennington* doctrine, which "immunizes the [Reed Smith] Defendants from all of Plaintiffs' claims that rely on their petitioning activities." *Id.* at 22–24. The Reed Smith Defendants claim that that doctrine's sham litigation exception does not apply, as the Plaintiffs are mischaracterizing disputed legal issues as misrepresentations by the Reed Smith Defendants, and the Plaintiffs cannot show that the Reed Smith Defendants' actions were objectively baseless. *Id.* at 23–24. Further, the Reed Smith Defendants argue that the Plaintiffs cannot establish the Reed Smith Defendants' intent to misuse the legal process to cause harm. *Id.* at 24.

### b. Count One Civil Rico (18 U.S.C. § 1962(c))

### i. Domestic injury

The Reed Smith Defendants assert that the Plaintiffs fail to allege a domestic injury. *Id.* at 25–28. The Reed Smith Defendants argue that the Amended Complaint alleges foreign injuries only, including any purported lost revenues (as all Plaintiffs were foreign entities before April

2025), and any purported decrease in the value to the common shares of Gas (as Gas and Holdings are both foreign entities). *Id.* at 26. The Reed Smith Defendants state that "while [they] allegedly furthered [a] scheme by committing 'fraud' and 'obstruction' in the U.S. in advocating legal positions," that "the alleged injury-producing conduct and effect were centered abroad." *Id.* at 26–27. The Reed Smith Defendants acknowledge that Corp. was "allegedly" domesticated in Delaware in April 2025, but argue that this "does not transform their *prior* foreign injuries into domestic ones . . . nor does it establish that the other Plaintiffs, all of which are foreign entities, suffered domestic injuries." *Id.* at 27.

### ii.  Racketeering Activity

#### 1.  Litigation conduct as racketeering activity

The Reed Smith Defendants next assert that litigation activities cannot form the basis for RICO predicate acts, and that "Plaintiffs here assert a RICO claim against the [Reed Smith] Defendants based entirely on litigation activities." *Id.* at 28–30.

#### 2.  Bankruptcy fraud

The Reed Smith Defendants then argue that the Plaintiffs have inadequately pled bankruptcy fraud. *Id.* at 30–35.

The Reed Smith Defendants first argue that the Plaintiffs have failed to plead fraudulent intent, as they have "fail[ed] to allege any benefit either Reed Smith or Mr. Solomon could have attained specifically from filing the purportedly false sworn declarations," stating that Reed Smith's fees for services do not suffice, and that Plaintiffs' "allegations depict nothing more than lawyers advocating for their clients." *Id.* at 31–32.

Next, the Reed Smith Defendants claim that Plaintiffs have failed to plead how each purported false statement was false, and that it would be impossible for Plaintiffs to do so because

16

"the statements in question are assertions of legal interpretation that *cannot* be demonstrably 'false.'" *Id.* at 32–33. Further, the Reed Smith Defendants argue that the Plaintiffs have failed to plead that the Reed Smith Defendants knew their statements were false. *Id.* at 33.

As to claims under 18 U.S.C. § 152(5),[6] the Reed Smith Defendants assert that Plaintiffs offer no specific allegations, including what property the Reed Smith Defendants are alleged to have received. *Id.* at 33–34.

Next, as to claims under 18 U.S.C. § 152(9),[7] the Reed Smith Defendants argue that Plaintiffs "offer only one allegation, and only against Reed Smith (not Mr. Solomon): that the firm supposedly has 'in its possession and has refused to turn over to Holdings' Eletson's client file." *Id.* at 34 (citing Dkt. No. 59 (Amended Complaint) at ¶ 402). The Reed Smith Defendants argue that while the District Court ordered that file to be handed over, the Second Circuit stayed that order. *Id.* Further, the Reed Smith Defendants claim that Holdings, post-confirmation, was not a "custodian, trustee, marshal, or other officer of the court." *Id.* The Reed Smith Defendants also argue that the claim is essentially one for civil contempt, which is not a separate cause of action apart from the original proceeding. *Id.* at 34–35.

### 3. Wire Fraud

The Reed Smith Defendants argue that Plaintiffs "make no specific allegations as to Reed Smith's conduct," and allege as to Solomon only that he sent an email saying "we need to make

---

[6] 18 U.S.C. § 152(5) covers "[a] person who . . . knowingly and fraudulently receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11[.]"

[7] 18 U.S.C. § 152(9) covers "[a] person who . . . after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor[.]"

17

sure our testimony is consistent with the facts," which was simply the provision of legal advice. *Id.* at 35–36.

### 4. Obstruction of justice

As to a claim under 18 U.S.C. § 1503(a),[8] the Reed Smith Defendants argue that Plaintiffs "insufficiently allege obstruction based on . . . litigation positions." *Id.* at 36.

As to a claim under 18 U.S.C. § 1512(c)(2),[9] the Reed Smith Defendants assert that "Plaintiffs do nothing more than recite the elements of the statute, and allege no specific facts with respect to Reed Smith or Mr. Solomon." *Id.* at 36–37.

### 5. Aiding and abetting fraud and obstruction of justice

The Reed Smith Defendants again argue that their litigation-related activity cannot form the basis of a RICO claim, as such conduct did not further the alleged scheme, and that Plaintiffs fail to plead the Reed Smith Defendants' intent to facilitate the commission of an offense. *Id.* at 37–38.

### iii. Pattern

The Reed Smith Defendants argue that the Plaintiffs have failed to establish either open-

---

[8] 18 U.S.C. § 1503(a) covers "[w]hoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice[.]"

[9] 18 U.S.C. § 1512(c)(2) covers "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so[.]"

or closed-ended continuity. *Id.* at 38–39. The Reed Smith Defendants acknowledge that the Plaintiffs allege underlying acts spanning a period of over two years, but argue that those allegations "can be distilled to one 'scheme' relating to [the Reed Smith Defendants'] advocacy in support of the arbitration award (and so do not constitute closed-ended continuity)." *Id.* at 39. Further, the Reed Smith Defendants argue that "there is no plausible threat of continuing activity beyond this period (and so does not constitute open-ended continuity)." *Id.*

### iv.  Proximate Causation

The Reed Smith Defendants assert that Plaintiffs fail to establish causation, as the allegations concern litigation activity rather than any claim that the Reed Smith Defendants "directly control[ed] or execut[ed] the transfers that allegedly caused Plaintiffs' losses." *Id.* at 39–41. The Reed Smith Defendants argue that there are "countless intervening acts" between the allegations against them and Plaintiffs' injuries. *Id.* at 40.

### c.  Count Two RICO Conspiracy (18 U.S.C. § 1962(d))

The Reed Smith Defendants claim that the Plaintiffs only state in conclusory fashion the existence of an agreement or a conspiracy, and that the allegation in the Amended Complaint as to a conspiracy does not even name the Reed Smith Defendants. *Id.* at 41. The Reed Smith Defendants also argue that the Plaintiffs fail to allege the Reed Smith Defendants' knowing participation in the conspiracy, and fail to discuss Solomon at all. *Id.* at 42.

### d.  Count Five Aiding and Abetting Conversion

The Reed Smith Defendants assert that this Court lacks subject matter jurisdiction over a post-confirmation cause of action, as the claim arises out of allegations concerning charterparty payments allegedly diverted by Eletson's former shareholders and managers after Holdings emerged from bankruptcy, and those same parties' failure to turn over Holdings' documents and

information post-confirmation. *Id.* at 42. The Reed Smith Defendants argue that the claim lacks a "close nexus" to the bankruptcy case, does not "relate back to the effectuation of the Chapter 11 proceeding," "does not require the Court to interpret the Plan," and "would not have any impact on the estate." *Id.* at 43–44. The Reed Smith Defendants further assert that "insofar as the claim is also brought by Plaintiffs that were not Debtors, there is no argument whatsoever for jurisdiction over post-confirmation claims by non-debtors against other non-debtors." *Id.* at 44.

The Reed Smith Defendants also argue that, even assuming jurisdiction, Plaintiffs fail to plead that the Reed Smith Defendants had actual knowledge of any conversion, *id.* at 44–46, or that they provided substantial assistance for such conversion (which requires more than mere legal representation, and Plaintiffs fail to allege the Reed Smith Defendants "were involved in or even provided legal advice regarding any changes to the payment instructions"), *id.* at 46–47.

### e.   Count Six Breach of Contract

The Reed Smith Defendants claim that Plaintiffs fail to establish the existence of a contract, *id.* at 47–48, or that the Reed Smith Defendants were in breach of such a contract, *id.* at 48–49. The Reed Smith Defendants argue that the claim "is premised on the existence of a contract supposedly created by the Court's November 4, 2024 order confirming the Plan," but that "[a] court order does not create a contract." *Id.* at 47. Further, the Reed Smith Defendants assert that even if the Plan were a contract, only the debtor and its creditors would be parties to the contract. *Id.* at 48.

As to breach, the Reed Smith Defendants argue that the Amended Complaint fails to mention them, and that their "advocacy in the face of conflicting interpretations cannot amount to a deviation from the duties imposed by the Plan" (to cooperate in good faith). *Id.* at 48–49.

### f.   Count Seven Tortious Interference with Contract

The Reed Smith Defendants first argue that this Court lacks jurisdiction over this claim, as it "is based entirely on post-confirmation conduct and lacks a close nexus to the Plan for the reasons" stated above. *Id.* at 49.

Assuming jurisdiction, the Reed Smith Defendants assert that Plaintiffs fail to establish that the Reed Smith Defendants had knowledge of the contracts between Plaintiffs and the Novum Charterparties.[10]  *Id.* at 49–50.  Further, the Reed Smith Defendants argue that Plaintiffs fail to establish that the Reed Smith Defendants "wrongfully acted to procure Novum's alleged breach." *Id.* at 50–52.  Lastly, the Reed Smith Defendants claim that because "Plaintiffs have failed to allege that the [Reed Smith] Defendants procured a breach, it necessarily follows that Plaintiffs have also failed to meet their higher burden of alleging proximate causation." *Id.* at 52.

### g.  Count Eight Breach of Fiduciary Duty

The Reed Smith Defendants argue that the Plaintiffs fail to establish their knowing breach of a fiduciary duty.  *Id.* at 53–55.

### h.  Count Nine Conspiracy

The Reed Smith Defendants argue that New York law does not recognize an independent tort of conspiracy, and that this claim fails for the same reasons argued as to the RICO Conspiracy. *Id.* at 55–56.

### 2.  Plaintiffs' Opposition to Reed Smith

#### a.  *Noerr-Pennington* doctrine

---

[10] As alleged in the Amended Complaint, "on or about January 12, 2023, Novum Energy Trading Corp. ("Novum") entered into charterparty contracts with [Eletson Chartering Inc.] providing for Novum's hires of the vessels 'Kastos' and 'Fourni' for a period of 3 years at a rate of $24,400 per day per vessel pro-rata, commencing from the date of delivery of the 'Kastos' and 'Fourni' on January 12 and January 15, 2023, respectively (the "Kastos Charterparty" and "Fourni Charterparty" and, collectively, the "Novum Charterparties")."  Dkt. No. 59 at ¶ 272.

The Plaintiffs first argue that the *Noerr-Pennington* doctrine is not a basis to grant the motion to dismiss, because Plaintiffs do not allege liability stemming from petitioning activity, but rather "fabrication, concealment and sworn false statements that corrupted multiple judicial proceedings," including that the Reed Smith Defendants knowingly fabricated the false theory that the preferred shares of Gas were purchased and transferred to the Cypriot Nominees.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 18–21 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 82–92, 95–100, 103–106, 260–65, 392–93, 406–08).  The Plaintiffs also assert that the sham litigation exception applies, as the Amended Complaint alleges objective baselessness and misuse of process, and it is a factual question inappropriate for a motion to dismiss whether the Reed Smith Defendants' conduct was genuine or a sham.  *Id.* at 19–21 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 2–4, 6,  59–92, 96–107, 110–23, 143–83, 219–20, 260–71, 335–36, 343–56, 368, 392–93, 408, 411–23).

### b.  Count One Civil Rico (18 U.S.C. § 1962(c))

### i.  Domestic Injury

Plaintiffs claim that they have alleged a domestic injury.  *Id.* at 22–25.  The Plaintiffs state that the Amended Complaint alleges U.S.-based injuries, including impairment of rights created in this Court, "interference with court-ordered asset transfers," obstruction of proceedings in the Southern District of New York, and "deprivation of property interests in the U.S."  *Id.* at 22–23 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 126–47, 222–36, 259–69, 348–56, 392–97).  As to "concrete U.S.-based property injuries," the Plaintiffs cite interference with access to company records in Connecticut, preventing vessels from entering U.S. ports, and evading and otherwise challenging Southern District of Texas vessel arrest orders.  *Id.* at 23 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 222–25, 228–30, 232, 264).

22

### ii.  Racketeering Activity

#### 1.  Litigation conduct as racketeering activity

Plaintiffs argue that the Amended Complaint alleges fraudulent activity that goes beyond zealous advocacy, and that there is no blanket immunity in the Second Circuit from RICO claims for conduct in litigation.  *Id.* at 25–28.

#### 2.  Bankruptcy fraud

Next, the Plaintiffs argue that the Amended Complaint alleges fraudulent intent by alleging that the Reed Smith Defendants "persist[ed] in sworn representations contradicted by contemporaneous knowledge and conceal[ed] material information from the court."  *Id.* at 29–30. Plaintiffs also assert that the Reed Smith Defendants' "economic interests were inseparable from the fraudulent effort to prolong the dispute over control of Gas," including the benefit they derived from legal fees.  *Id.* at 30.

The Plaintiffs then argue that they have alleged that the Reed Smith Defendants knew that their statements were false.  *Id.* at 31.

The Plaintiffs also claim that the Amended Complaint alleges that the RICO Defendants (which includes the Reed Smith Defendants) received and maintained property of the bankruptcy estate, including diverted charter revenues, and that they purported to transfer control of vessels outside of the estate.  *Id.*  As to the Reed Smith Defendants specifically, Plaintiffs argue that the Amended Complaint alleges that they "controlled and retained $4 million deposited into an escrow account post-petition despite knowing the Former D&Os lacked authority and that the funds belonged to Gas."  *Id.* at 31–32.

As to withholding of information, the Plaintiffs' claim that the Reed Smith Defendants knowingly and fraudulently withheld Eletson's files despite the "*immediate* obligations imposed

23

by the confirmed Plan and Confirmation Order," that accordingly the Reed Smith Defendants cannot rely on the Second Circuit's stay order as their "obligation does not arise solely from the District Court's turnover order," and that "[w]hether the [Reed Smith] Defendants ultimately prevail on appeal regarding their turnover obligations also goes to the merits, not to the sufficiency of the pleadings." *Id.* at 32.

### 3.  Wire Fraud

Plaintiffs assert that they need not provide the temporal or geographic particulars of each mailing or wire transmission; rather, they need only state with particularity the overall fraudulent scheme, which the Amended Complaint has done. *Id.* at 33–34.  Plaintiffs note that the Amended Complaint alleges several fraudulent communications, internal and external, sent by the Reed Smith Defendants in furtherance of the fraudulent scheme, including submissions to the arbitrator, this Court, the Southern District of New York, and the Second Circuit. *Id.* at 34.  Plaintiffs argue that these wire transmissions were not legal advocacy and were knowingly made in furtherance of the fraudulent scheme. *Id.* at 34–35.

### 4.  Obstruction of justice

Plaintiffs argue that the Amended Complaint alleges that the Reed Smith Defendants "engaged in corrupt efforts to obstruct and impede the due administration of justice through a pattern of intimidation and interference with evidence," including attempting to impede access to files at Eletson's Stamford, Connecticut offices and threatening sanctions for reviewing documents on the Microsoft server (which this Court allowed the review of by order). *Id.* at 36.[11]  Plaintiffs

---

[11] On June 11, 2025, this Court ordered Microsoft Corporation to provide administrator level account access to Holdings and its designee. No. 23-10322, Dkt. No. 1691 (June 11, 2025 Order Authorizing and Directing Microsoft Corporation to Provide Administrator Level Account Access to Eletson Holdings, Inc. and Its Designee) ("Microsoft Order").  The District Court subsequently dismissed the appeal of the Microsoft Order filed by Louis Solomon on behalf of Reed Smith. *In*

assert that this was not "lawyers being lawyers," but efforts to deter the use of lawfully obtained evidence. *Id.* at 36–37. Plaintiffs also argue that the Amended Complaint alleges that the Reed Smith Defendants "refused to turn over estate books and records, facilitate access to Eletson's email server, or turn over the client file," in both this Court and the Preferred Shares Arbitration. *Id.* at 37–38.

### 5. Aiding and abetting fraud and obstruction of justice

Plaintiffs argue that the Amended Complaint alleges, inter alia, that the Reed Smith Defendants devised and transmitted the nominee theory despite knowing that the buyout option had lapsed, which was done in cooperation and concert with the other RICO Defendants to fabricate evidence to advance that fraudulent legal theory. *Id.* at 38–39.

### iii. Pattern

Plaintiffs claim that the Amended Complaint has established both open- and closed-ended continuity. *Id.* at 39–40. As to closed-ended continuity, Plaintiffs argue that "the predicate acts span at least from March 2023 to July 2025, over two years." *Id.* at 40. Further, Plaintiffs argue that "the [Reed Smith] Defendants engaged in a sustained and coordinated course of racketeering

---

*re Eletson Holdings Inc.*, No. 25-cv-5753, 2025 U.S. Dist. LEXIS 202761, at *3–4 (S.D.N.Y. Oct. 14, 2025) (dismissing appeal of Microsoft Order and finding that "[t]hough the lawyers who filed this appeal are real, the entity on whose behalf they purport to speak is not . . . 'Provisional Eletson Holdings' has no legal existence and no standing to appeal orders of the Bankruptcy Court"); *see also Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 165962, at *18 (S.D.N.Y. Aug. 26, 2025) (granting Levona's motion to compel production of, inter alia, documents obtained pursuant to the Microsoft Order). Reed Smith subsequently stipulated before the Second Circuit to withdraw its appeal of the District Court's dismissal. *In Re: Eletson Holdings Inc.*, No. 25-2673 (2d Cir.), Dkt. No. 47; *see also Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 25-445 (2d Cir.), Dkt. No. 105 (Oct. 31, 2025 panel order denying Reed Smith's motion for (1) an injunction barring Holdings and others from accessing certain documents from the Microsoft server and (2) a stay of the District Court's Aug. 26, 2025 order compelling production pursuant to the Microsoft Order).

conduct across multiple proceedings and years," and did not engage simply in a "single, isolated event." *Id.* Plaintiffs argue that the Amended Complaint alleges not only "separate predicate acts," but also "distinct schemes," as opposed to "subparts of a single transactional event." *Id.* at 41 & n.42.

As to open-ended continuity, Plaintiffs assert this requirement is "satisfied by the ongoing nature of the enterprise's activities and the continuing threat posed by the Defendants' control over corporate assets and information, which shows no sign of voluntary cessation." *Id.* at 41–42.

### iv.  Proximate Causation

Plaintiffs argue that the "acts by Reed Smith were not ancillary to the Enterprise or Eletson's injuries; they were the mechanisms by which control over Eletson's property and assets were diverted to and retained by the Enterprise outside the structure created by the Plan, directly (and repeatedly) causing economic injuries to Eletson." *Id.* at 42–45.

### c.  Count Two RICO Conspiracy (18 U.S.C. § 1962(d))

Plaintiffs assert that the Amended Complaint establishes both direct and circumstantial evidence of the conspiracy, including coordinated, multi-year conduct that could not have plausibly occurred absent an agreement, and a pattern of communication showing mutual understanding among the conspirators. *Id.* at 45–47. Plaintiffs argue that a "RICO conspiracy claim may be based on the same factual allegations supporting the substantive RICO violation and need not repeat each defendant's role in a separate section concerning conspiracy," and thus that the Amended Complaint has addressed Solomon's conduct. *Id.* at 46.

### d.  Count Five Aiding and Abetting Conversion

Plaintiffs argue this Court has "arising in" jurisdiction over this claim as "it implicates the enforcement or construction of . . . the confirmation order, and a bankruptcy court always has

26

jurisdiction to interpret its own orders." *Id.* at 47.

Plaintiffs next assert that this Court has "related to" jurisdiction, and that the matter has a close nexus to the bankruptcy Plan and proceedings, as the claim concerns a scheme to subvert the Plan. *Id.* at 47–48. Further, plaintiffs argue that the Reed Smith Defendants "cannot have it both ways," arguing here that this Court lacks subject matter jurisdiction over the claim because the effective date has occurred, but arguing before the Second Circuit that the effective date has not occurred. *Id.* at 48.

Moreover, Plaintiffs argue this Court has supplemental jurisdiction, because the claim arises from the same nucleus of operative facts and is part of the same case or controversy. *Id.* at 49.

As to the sufficiency of the pleadings, Plaintiffs claim that the Amended Complaint alleges actual knowledge and substantial assistance. *Id.* at 49–51.

### e. Count Six Breach of Contract

Plaintiffs argue that a confirmed Chapter 11 Plan is a contract between the parties, and the binding effect extends to parties in interest. *Id.* at 51–52. Plaintiffs thus assert that the Plan binds the Reed Smith Defendants, who are defined to be included in the Plan. *Id.* at 52.

### f. Count Seven Tortious Interference with Contract

Plaintiffs argue this court has "related to" and supplemental jurisdiction over the claim. *Id.* at 53.

Plaintiffs argue that the Amended Complaint "alleges that the [Reed Smith] Defendants had actual knowledge of the Novum Charterparty Contracts and that the [Reed Smith] Defendants aided in the intentional procurement of the breach thereof, thereby damaging Plaintiffs." *Id.* at 54. Plaintiffs also note that "even without the benefit of discovery, Plaintiffs have already uncovered

additional evidence substantiating these allegations." *Id.*

### g. Count Eight Breach of Fiduciary Duty

Plaintiffs assert that the Reed Smith Defendants "are actively working for the Former D&Os against the interests of their former clients (i.e., Holdings and Corp.)," that they fail to challenge several allegations in the Amended Complaint that state such a breach, and that, as to allegations they do challenge, they "completely ignore the factual allegations throughout the [Amended Complaint] that support their knowing breaches of fiduciary duty." *Id.* at 54–59.

### h. Count Nine Conspiracy

Plaintiffs argue the Amended Complaint "alleges specific underlying torts and statutory violations and pleads coordinated conduct, shared objectives, and separate predicate acts by the [Reed Smith] Defendants demonstrating knowing participation in the conspiracy in furtherance of the scheme." *Id.* at 60.

### 3. Reed Smith Defendants' Reply

### a. *Noerr-Pennington* doctrine

The Reed Smith Defendants assert that the *Noerr-Pennington* doctrine is a basis to dismiss, as, notwithstanding Plaintiffs' citations to the Amended Complaint, they have failed to plausibly allege or plead non-conclusory facts that the Reed Smith Defendants intended to cause harm or had a specific intent to misuse the bankruptcy litigation. Dkt. No. 86 (Reed Smith Defendants' Reply) at 12–13. The Reed Smith Defendants also argue that the Plaintiffs have failed to adequately allege that the Reed Smith Defendants' conduct was objectively baseless. *Id.*

### b. Count One Civil Rico (18 U.S.C. § 1962(c))

### i. Domestic Injury

The Reed Smith Defendants argue that if Plaintiffs' theory as to domestic injury were

28

correct, "any foreign dispute that generated U.S. litigation would automatically satisfy RICO's domestic-injury requirement." *Id.* at 13. The Reed Smith Defendants state that the Amended Complaint complains of injuries to "assets and operations . . . located outside the United States," namely the foreign-entity plaintiffs and Eletson's fleet of vessels. *Id.* at 14. The Reed Smith Defendants also state that the alleged racketeering activity – such as the purported transfer of the preferred shares and other efforts to control "maritime assets" – is primarily foreign. *Id.* at 14–15.

### ii. Racketeering Activity

#### 1. Litigation conduct as racketeering activity

The Reed Smith Defendants repeat their argument that litigation activity cannot form a predicate act for RICO, and argue that the caselaw cited by the Plaintiffs is distinguishable. *Id.* at 15–17.

#### 2. Bankruptcy fraud

As to intent, the Reed Smith Defendants assert that "none of the filings at issue here . . . included false statements," and maintain their position that their fees for services do not establish fraudulent intent. *Id.* at 17–18. The Reed Smith Defendants argue that the Plaintiffs have failed to respond to their argument concerning whether the Reed Smith Defendants knowingly made false statements. *Id.* at 18.

The Reed Smith Defendants next argue that the Plaintiffs only point to the alleged receipt of funds belonging to Gas, which was not a debtor. *Id.* at 17 n.14, 18.

As to withholding of information, the Reed Smith Defendant claim that the Plaintiffs have failed to respond to their argument that Holdings is not a "custodian, trustee, marshal, or other officer of the court," and repeat their argument that the Second Circuit stay order negates any entitlement Plaintiffs' had to the Eletson files at issue. *Id.* at 18–19.

### 3.   Wire Fraud

The Reed Smith Defendants claim that the Plaintiffs "do not meaningfully engage with the fact that each of their allegations involves legal advice or legal positions, not wire fraud."  *Id.* at 19–20.  The Reed Smith Defendants also argue that Plaintiffs rely on "dozens of documents in multiple courts" that were allegedly fraudulent that were not cited in the Amended Complaint and cannot be asserted for the first time in the Plaintiffs' Opposition to Reed Smith.  *Id.* at 20 n.16.

### 4.   Obstruction of justice

The Reed Smith Defendants repeat their argument that "zealous legal advocacy cannot be a basis for a RICO predicate act of obstruction of justice."  *Id.* at 20–21.  The Reed Smith Defendants also argue that Plaintiffs do not explain how the Reed Smith Defendants held ownership of the "estate books and records," and that Reed Smith did not commit obstruction by having a "genuine dispute of legal interpretation" and "a different reading of this Court's orders." *Id.* at 21.

### 5.   Aiding and abetting fraud and obstruction

### of justice

The Reed Smith Defendants argue that the Plaintiffs have "fail[ed] to argue the requisite intent element at all," and argue again that the allegations "involve only litigation activity."  *Id.* at 21–22.

### iii.   Pattern

As to open-ended continuity, the Reed Smith Defendants claim that Plaintiffs only speculate that the alleged past conduct may continue in the future.  *Id.* at 22.  As to close-ended continuity, the Reed Smith Defendants argue that Plaintiffs allege acts that fall short of two years, and repeat their argument that a single commercial dispute is not a RICO pattern.  *Id.* at 22–23.

### iv.  Proximate Causation

The Reed Smith Defendants argue that there are no specific allegations as to their actions causing Plaintiffs' injuries, and that Plaintiffs have not established their right to control Gas.  *Id.* at 23–24.

### c.  Count Two Rico Conspiracy (18 U.S.C. § 1962(d))

The Reed Smith Defendants repeat their arguments that the Plaintiffs have not established an agreement or the Reed Smith Defendants' knowing participation.  *Id.* at 24–25.

### d.  Count Five Aiding and Abetting Conversion

The Reed Smith Defendants assert that "Plaintiffs do not explain how there can be jurisdiction over post-confirmation claims by non-debtors against other non-debtors."  *Id.* at 25. The Reed Smith Defendants repeat their argument that the "claim does not in any way implicate enforcement of this Court's orders, require interpretation of the Plan, or impact the estate."  *Id.* The Reed Smith Defendants argue that the claim "*presumes* the effectiveness of the Plan," and that it is therefore not inconsistent of them to assume in this Court that the Plan is effective (as opposed to their position before the Second Circuit).  *Id.*  Lastly, the Reed Smith Defendants assert that "the Court should decline to exercise supplemental jurisdiction, given Plaintiffs' failure to plead a claim under federal law."  *Id.*

The Reed Smith Defendants repeat their argument that the Amended Complaint fails to "identify[] facts showing that Reed Smith knew specific funds or property belonged to Plaintiffs and were being wrongfully converted," and that their "ordinary legal services" do not constitute substantial assistance.  *Id.* at 26.

### e.  Count Six Breach of Contract

The Reed Smith Defendants repeat their argument that the Plan is not a contract, and that

31

the proper remedy for violations of the Plan is a sanctions motion. *Id.* at 26–27.

### f.  Count Seven Tortious Interference with Contract

The Reed Smith Defendants repeat their argument that this Court lacks jurisdiction over the claim. *Id.* at 27. The Reed Smith Defendants assert that the Amended Complaint fails to "show[] that the [Red Smith] Defendants knew about the Novum Charterparty Contracts, let alone that the [Reed Smith] Defendants wrongfully acted to procure Novum's alleged breach." *Id.* at 27–28. The Reed Smith Defendants argue that "[t]he 'additional evidence' that the Plaintiffs 'uncovered' and submitted for the first time in their opposition . . . must be ignored as outside the pleadings" (and that, "[i]n any event, those assertions at most suggest that Reed Smith was advised *after the fact* about *other defendants'* procurement of breach"). *Id.* at 28. The Reed Smith Defendants assert that the Plaintiffs have failed to respond to the argument that they have not established proximate causation (by failing to establish procurement of breach). *Id.*

### g.  Count Eight Breach of Fiduciary Duty

The Reed Smith Defendants claim that the allegations the Plaintiffs argue that the Reed Smith Defendants failed to address are "mere variations" on those that the Reed Smith Defendants did address, and fail for the same reasons. *Id.* at 28–29.

### h.  Count Nine Conspiracy

The Reed Smith Defendants assert that the Plaintiffs have "effectively abandon[ed]" this claim by not responding to the Reed Smith Defendants' argument that New York does not recognize an independent tort of conspiracy, and Plaintiffs allegedly do not "cite any allegations to establish that the [Reed Smith] Defendants: (a) entered into an agreement to join a conspiracy; (b) engaged in an overt act in furtherance of such a conspiracy; and (c) knowingly participated in the conspiracy." *Id.* at 30.

### C. Former Shareholders' Motion and Related Pleadings

#### i. Former Shareholders' Motion

The Former Shareholders' Motion seeks to dismiss all claims with prejudice.  Dkt. No. 71 (Former Shareholders' Motion) at 30.

#### 1. Personal Jurisdiction over Elafonissos

The Former Shareholders' Motion first argues that this Court lacks personal jurisdiction over Elafonissos.  *Id.* at 8–14.

The Former Shareholders' Motion asserts that exercising jurisdiction over Elafonissos would violate due process, as Elafonissos, "a foreign entity with no presence in the [United States]," has not had sufficient minimum contacts with the United States.  *Id.* at 9–12.  The Former Shareholders' Motion also states that "Plaintiffs do not allege Elafonissos has taken any specific action in, or directed any specific action at, the [United States] relating to the subject matter of the action," such as to confer specific jurisdiction, including stating that "the Complaint never articulates how Elafonissos participated" in the Chapter 11 bankruptcy.  *Id.*[12]

The Former Shareholders' Motion also argues that exercising personal jurisdiction over Elafonissos would be unreasonable, as the burden on Elafonissos to litigate here would be high, and "Plaintiffs and the Court have little to no interest in adjudicating [the] claims against Defendants like Elafonissos, which the [Amended Complaint] ropes into this controversy primarily through group-pleading."  *Id.* at 12–14.

#### 2. Forum Non Conveniens

The Former Shareholders' Motion next argues that this Court should dismiss because

---

[12] The Former Shareholders' Motion notes that this Court "did find Elafonissos subject to its jurisdiction in that related, but different, proceeding [the Chapter 11 bankruptcy], but that issue is on appeal."  Dkt. No. 71 (Former Shareholders' Motion) at 12 n.5.

Greece is a more appropriate forum. *Id.* at 14–15. The Former Shareholders' Motion states that

Plaintiffs' "choice of forum is due little weight," as their "choice to file here is gamesmanship,"

and this Court "appears to **FAVOR** their cause." *Id.* at 14 (emphasis in original). The Former

Shareholders' Motion states that litigating here would cause them "oppressive hardships." *Id.* at

15.

### 3.  Count Six Breach of Contract

The Former Shareholders' Motion then argues that Plaintiffs fail to state a claim for breach

of contract. *Id.* at 15–20. The Former Shareholders' Motion first asserts, as did the Reed Smith

Defendants, that Plaintiffs have failed to allege the existence of a contract and complain only of

violations of this Court's order confirming the Plan (the proper remedy for which is a sanctions

motion). *Id.* at 16–18. The Former Shareholders' Motion argues next that the Plan is not effective

and not binding on the Former Shareholders, as the appeal of the Plan is still pending in the Second

Circuit, there has not been "Greek recognition" of the Plan, and these conditions precedent were

not waivable. *Id.* at 18–20.

### 4.  Counts Three, Four, Seven, and Nine

#### a.  Group pleading

The Former Shareholders' Motion argues that all of Plaintiffs' tort claims improperly

"group plead," and thus fail to satisfy Rule 8's pleading requirements. *Id.* at 20–24. The Former

Shareholders' Motion claims that the Amended Complaint "refers to all twenty Defendants as a

whole or, in rare cases, to the five 'Former Shareholders' as a whole, without alleging any facts at

all that distinguish the conduct of Elafonissos or any of the Majority Shareholders." *Id.* at 21.

#### b.  *Noerr-Pennington* doctrine

Next, the Former Shareholders' Motion argues, as did the Reed Smith Defendants, that the

34

tort claims against them allege only litigation conduct and thus should be dismissed pursuant to the *Noerr-Pennington* doctrine. *Id.* at 24–26.

### c. **All tort claims insufficiently pled for failure to state a claim**

Lastly, the Former Shareholders' Motion asserts that all tort claims are insufficiently pled (over and above the alleged improper group pleading). *Id.* at 26–30.

The Former Shareholders' Motion argues that, as to the conversion claims, the Amended Complaint "asserts conclusions" that "utterly lack support," and that "the property belonged to Defendants" as the "Plan is not yet in effect." *Id.* at 26–28. The Former Shareholders' Motion argues that "Plaintiffs do not allege facts that suggest Glafkos, Lassia, Family Unity, or Elafonissos possessed or exercised any rights over the purported converted property after Plaintiffs purportedly became its new owner." *Id.* at 27.

The Former Shareholders' Motion argues, as to the tortious interference with contract claim, that "only general, conclusory allegations suggest that any of the Majority Shareholders or Elafonissos knew about the contracts or tried to induce breaches." *Id.* at 28–29. Next, the Former Shareholders' Motion argues that "because the Plan is not yet in effect, Reorganized Holdings does not exist, and the charterparty contracts are as they were," and that, "in this context, Defendants' alleged revision of the contracts' banking terms merely represents an agreed-on amendment between contracting parties, rather than [a] breach." *Id.* at 28.

Lastly, the Former Shareholders' Motion argues that the conspiracy claims are insufficiently pled: 1) as to a conspiracy for breach of fiduciary duty by Reed Smith, the Former Shareholders did not owe such a duty to Plaintiffs; 2) as to conspiracies to convert property and tortiously interfere with contracts, "cross-border litigation is the only specific conduct the

[Amended Complaint] alleges in support of any its claims, and such duplicative claims of civil conspiracy" should be dismissed; and 3) to the extent the Amended Complaint alleges an agreement, "it does so in a bare, group-pled conclusory fashion." *Id.* at 29–30.

### ii.   Plaintiffs' Response to Former Shareholders

### 1.   Not improper group pleading

Plaintiffs first assert that the Amended Complaint satisfies Rule 8, and does not engage in improper group-pleading, as it gives notice to the Former Shareholders that identical claims are asserted against each of them.  Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 3–7. Plaintiffs argue that the Amended Complaint defines the Former Shareholders as well as the Former D&Os, and explains, inter alia, how the latter "control each of the Former Shareholders." *Id.* at 4.  Plaintiffs also argue the Amended Complaint "alleges specific misconduct by the Former Shareholders . . . including actively obstructing and frustrating Plaintiffs' reorganization and control of company assets," exemplified by their petitioning for the appointment of the provisional board. *Id.*

Plaintiffs then claim that the Former Shareholders acted jointly with the Former D&Os and that each is liable for each tort.  *Id.* at 5–7.  Plaintiffs argue that the Amended Complaint specifies extensive allegations concerning the Former D&Os, and "give[s] rise to . . . a reasonable inference that the Former D&Os and Former Shareholders . . . acted collectively and jointly in opposing the Plan." *Id.* at 5–6.  Plaintiffs further state that "this Court and the District Court have repeatedly found . . . that the Former D&Os and Former Shareholders in this case are so intertwined that they cannot be easily distinguished." *Id.* at 7.

### 2.   Personal Jurisdiction over Elafonissos

Next, Plaintiffs argue that this Court has personal jurisdiction over Elafonissos. *Id.* at 8–

10. Plaintiffs first assert that that this Court's prior determination of the issue in the main case is "law of the case" that applies to an adversary proceeding filed within the main case. *Id.* at 8. Plaintiffs also argue that Elafonissos has had sufficient minimum contacts with the forum, stating that Elafonissos's foreign actions are directed at this forum and the implementation of the Confirmation Order, and Elafonissos has participated meaningfully in the Chapter 11 case (by submitting a ballot on the proposed plan) and has purposefully availed itself of the forum. *Id.* at 8–9. Lastly, Plaintiffs argue that Elafonissos has not presented a compelling case that exercising jurisdiction would be unreasonable. *Id.* at 10.

### 3. Forum Non Conveniens

Plaintiffs next argue that the Former Shareholders have failed to meet their burden regarding forum non conveniens. *Id.* at 10–14. Plaintiffs first claim that their choice of forum is entitled to substantial deference. *Id.* at 11. Plaintiffs then assert that the Former Shareholders have failed to demonstrate the availability of an adequate alternative forum, stating only that "Greece is a more appropriate forum" without making a showing that Greece permits litigation of the subject matter of this dispute. *Id.* Plaintiffs also argue that public and private interests weigh in their favor, stating that: all of their claims are pursuant to United States law; litigation in Greece would pose issues of conflicts of laws and application of foreign law; this lawsuit has a bona fide connection to the United States and specifically to this forum; and "[r]emaining in this forum permits an efficient resolution and avoids duplicative litigation across the globe." *Id.* at 11–13. Plaintiffs argue further that the Former Shareholders have demonstrated their capacity to litigate in this forum. *Id.* at 13–14.

### 4. Count Six Breach of Contract

Plaintiffs argue that the Amended Complaint identifies the Plan as the agreement on which

37

the contract claim is based, the specific provisions breached, that Plaintiffs performed their obligations under the Plan, and that the Former Shareholders engaged in bad faith, obstructionist activity resulting in damages. *Id.* at 14–15. Plaintiffs assert that the Amended Complaint plausibly alleges that the confirmed Plan was a binding contract, and that the Former Shareholders' argument that the Plan was not a contract is a factual determination not ripe for a motion to dismiss. *Id.* at 15. Plaintiffs claim that the Former Shareholders' position is in any event false, as a confirmed Plan is a contract (Plaintiffs state that the Former Shareholders in a separate part of their motion argue that the confirmed Plan is "a contract that binds 'the Debtor, its creditors and its equity holders'"). *Id.* at 15–16. Plaintiffs note that, while sanctions are available for violating a court order, "Plaintiffs are also within their rights to bring this breach of contract claim for breaches of the confirmed Plan, a contract." *Id.* at 16 n.6.

Plaintiffs then argue that the Amended Complaint alleges "a breach of section 10.4 of the Plan" (which enjoins "commencing or continuing in any manner any action or other proceeding of any kind with respect to any equity interest"), in addition to a breach of the Confirmation Order, and that "Defendants' actions across the globe" have violated this "contractual commitment." *Id.* at 16–17. Plaintiffs assert that the Amended Complaint separately alleges breaches of the Confirmation Order, particularly its good faith conduct requirement. *Id.* at 17–18.

Next, Plaintiffs argue there are no unfulfilled conditions precedent, and the Plan is binding. *Id.* at 18–20. Plaintiffs first argue that the Amended Complaint alleges that all conditions precedent were satisfied or waived, which suffices to state a claim. *Id.* at 18. Plaintiffs then argue that each of the conditions precedent were in fact satisfied or waived (and that Plaintiffs, as the Plan Proponents, were empowered to waive all conditions precedent and exercised that power). *Id.* at 18–20.

38

### 5. Counts Three, Four, Seven, and Nine

Plaintiffs first assert that the Noerr-Pennington doctrine is not a basis for dismissal, as the tort claims are not based solely on litigation activity. *Id.* at 20–21. Plaintiffs then argue that the Former Shareholders' "petitions and post-confirmation litigation qualif[y] as 'sham litigation,'" which is, in any event, a question of fact not suitable for a motion to dismiss. *Id.* at 21–23.

Plaintiffs then argue that they have stated a claim for conversion, because, as argued earlier, the Amended Complaint does not improperly group plead, and the Amended Complaint alleges that the Former D&Os and Former Shareholders "acted without authorization over the Converted Property and Funds" ("i.e., charterparty proceeds, corporate books and records, etc."), exercised dominion or a right of ownership over that property, and that Plaintiffs demanded the property and were refused. *Id.* at 23–26.

Plaintiffs then assert that they have stated a claim for tortious interference with a contract. *Id.* at 26–28. Plaintiffs argue, as above, that the Plan was effective, and thus Plaintiffs control Holdings and there is a contract between Holdings and Novum. *Id.* at 27. Plaintiffs then argue that the Amended Complaint alleges the Former Shareholders' knowledge of the contract (providing examples of communications by the Former D&Os). *Id.* Plaintiffs state that it is "reasonable to infer that the knowledge of the Former D&Os . . . can be imputed to the Former Shareholders they owned and controlled." *Id.* at 28. Lastly, Plaintiffs claim that the Amended Complaint "sufficiently alleges that the Former Shareholders intentionally and improperly procured Novum's breach of the Novum Charterparties by participating in the Defendants' joint fraudulent scheme to have Novum change the banking instructions and remit Charterparty Payments to accounts controlled by the former Eletson insiders, including the Former Shareholders." *Id.*

Next, Plaintiffs argue that the Amended Complaint has alleged a conspiracy, as the Amended Complaint alleges an "agreement among the Former Shareholders and the other Defendants to hinder and obstruct implementation of the Plan and regain control of Eletson," including multiple (non-litigation based) actions to further that end. *Id.* at 28–30.

### iii.    Former Shareholders' Reply

#### 1.    Personal Jurisdiction over Elafonissos

The Former Shareholders' Reply repeats the argument that the Court lacks jurisdiction over Elafonissos, arguing that the Amended Complaint fails to make a prima facie case, and that the allegations in support of jurisdiction are either improperly group-pled, conclusory, or based on foreign conduct not directed towards the United States. Dkt. No. 88 (Former Shareholders' Reply) at 1–3. The Former Shareholders' Reply asserts that this Court's determination of personal jurisdiction in the main bankruptcy case is not "law of this case," as the Court "did not decide personal jurisdiction for all purposes," but just the sanctions motion, and "the vastly different context require[s] a different legal standard." *Id.* at 3–4. The Former Shareholders' Reply argues that the ballot submitted in the bankruptcy case is insufficient to confer personal jurisdiction here. *Id.* at 4–5.

#### 2.    Forum Non Conveniens

The Former Shareholders' Reply argues that only a domestic plaintiff's choice of forum is subject to deference, and that here only one plaintiff is based in the United States, whereas the others are based in Greece and the Marshall Islands. *Id.* at 6–7. The Former Shareholders' Reply also argues that Greece is an adequate alternative forum. *Id.* at 7. And lastly, the Former Shareholders' Reply asserts that the balance of public and private interests weighs towards Greece, as the Former Shareholders, their officers, operations, and alleged conduct are primarily in Greece

40

(and noting that "the burden is wholly untenable now that the alleged officers and former officers of Glafkos, Lassia, and Elafonissos are all subject to arrest and incarceration should they ever enter this forum for discovery or trial"). *Id.* at 7–9.

### 3. Count Six Breach of Contract

The Former Shareholders' Reply repeats their argument that a court order cannot form the basis of a breach of contract claim. *Id.* at 9–10. The Former Shareholders' Reply claims that the Plan is not yet effective and not binding on the Defendants. *Id.* at 10–11.

### 4. Counts Three, Four, Seven, and Nine

The Former Shareholders' Reply first argues that the Amended Complaint "relies on [grouping Defendants] to obscure the absence of Shareholder-specific conduct sufficient to state a claim for the tort at issue." *Id.* at 11–12. The Former Shareholders' Reply argues that Plaintiffs point to the Defendants' close ties, but do not "suggest[] any facts undermining the 'legal separateness' of the Shareholders (as opposed to Holdings)." *Id.* at 12–13.

The Former Shareholders' Reply then repeats the argument that the *Noerr-Pennington* doctrine bars the tort claims, as the alleged non-litigation conduct did not contribute to any of the alleged torts, and the "sham litigation" exception does not apply. *Id.* at 13–14. The Former Shareholders' Reply states that their "fundamental goal" was to "recover[] the Holdings' equity the Plan 'cancelled' upon taking effect." *Id.* at 14–15.

## IV.   LEGAL ANALYSIS

### A. MOTION TO COMPEL ARBITRATION

"Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., parties may contract to arbitrate their disputes, and such agreements are 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Doctor's Assocs. v.*

*Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (quoting 9 U.S.C. § 2). "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Id.* (citation modified). "The Act was intended to place arbitration agreements upon the same footing as other contracts." *Id.* (citation modified).

"The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." *Id.* (citation modified). Although federal policy generally favors arbitration, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 192 (2d Cir. 2013) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). "It is a basic tenet of contract law that, in order to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citation modified). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289.

"In deciding motions to compel [arbitration], courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation modified). "In doing so, the court must draw all reasonable inferences in favor of the non-moving party." *Id.*

For the reasons discussed below, the Court agrees with Plaintiffs that the parties have not agreed to arbitrate the claims underlying this adversary proceeding in the Agreements, and therefore the Reed Smith Defendants' Motion to compel arbitration is DENIED.

The Court begins by noting that the parties dispute whether the Agreements are indeed signed in relevant parts by Holdings and Corp. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed

42

Smith) at 8; Dkt. No. 86 (Reed Smith Defendants' Reply) at 4–6.  The main bodies of both Agreements are signed.   Dkt. No. 69-2 (2022 Agreement) at 6 (signatures of Lascarina Karastamati, on behalf of herself and Holdings, and Vasiilis Hadjieleftheriadis, on behalf of himself and Corp.); Dkt. No. 69-3 (2023 Agreement) at 2, 4 (addressed to, inter alia, Corp. and Holdings, defined internally as "Eletson," and bearing signatures of Vasilis Hadjieleftheriadis, Lascarina Karastamati, and Vassilis Kertsikoff, below a statement that "[y]ou have represented to us that you have full authority to bind Eletson . . . to the terms of this Agreement").

Plaintiffs, however, argue that the Agreements by their express terms require signatures on the accompanying Attachment 2's for the arbitration clauses to be effectuated.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 8 (citing Dkt. No. 69-2 (2022 Agreement) at 12 ("New York law requires that, in order to effectuate an agreement to arbitrate in the manner provided above . . . you sign the consent annexed as Attachment 2 to this Statement of Standard Terms and Conditions."), 19 (2022 Attachment 2); Dkt. No. 69-3 (2023 Agreement) at 10 (same signature requirement), 16 (2023 Attachment 2)).  Plaintiffs argue that the Attachment 2's are unsigned, thus rendering the arbitration clauses un-effectuated.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 8 nn. 6–7.  Plaintiffs argue that Attachment 2 to the 2022 Agreement is entirely unsigned, and that Attachment 2 to the 2023 Agreement is signed by Hadjieleftheriadis, Karastamati, and Kertsikoff in their individual capacities only, and that Reed Smith also did not sign Attachment 2 to the 2023 Agreement.  *Id.*  The Reed Smith Defendants argue, on the other hand, that both Attachment 2's are indeed signed.  Dkt. No. 86 (Reed Smith Defendants' Reply) at 4–6.

For the reasons discussed below, the Court need not resolve the issue.  However, the Court does note that the signatures on the relevant attachments are at best unclear, especially as to the 2022 Agreement.  Dkt. No. 69-2 (2022 Agreement) at 19; Dkt. No. 69-3 (2023 Agreement) at 16.

43

The Court agrees with Plaintiffs that both Agreements by their express terms require signatures on the Attachment 2's for the arbitration clauses to be effectuated. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 8; Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 10. The Reed Smith Defendants do not contest this requirement. Attachment 2 to the 2022 Agreement, however, while signed by Solomon, is not dated. Dkt. No. 69-2 (2022 Agreement) at 19. And the initials of Lascarina Karastamati and Vasilis Hadjeleftheriadis – what the Reed Smith Defendants argue are valid and binding signatures, Dkt. No. 86 (Reed Smith Defendants' Reply) at 4–5 – do not appear on the same page as Attachment 2, or next to Solomon's undated signature, but instead on the bottom righthand corner of the next page, which is otherwise entirely blank. The same initials also appear, in the same fashion, on the bottom righthand corner of every other alternating page of the 2022 Agreement. Dkt. No. 69-2 (2022 Agreement) at 20. It is thus, at minimum, unclear whether Attachment 2 to the 2022 Agreement was properly signed, and whether "the agreement to arbitrate" was ever "effectuate[d]." Dkt. No. 69-2 (2022 Agreement) at 12, 19.

Attachment 2 to the 2023 Agreement, while faring better, also suffers from its own lack of clarity. While signed by Vasilis Hadjeleftheriadis, Lascarina Karastamati, and Vassilis Kertsikoff, Attachment 2 to the 2023 Agreement is not signed by Reed Smith. Dkt. No. 69-3 (2023 Agreement) at 16. The Court, however, does not find convincing Plaintiffs' argument that the signatories signed in their own individual capacities, as opposed to on behalf of Holdings and Corp. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 8 n.7; *see Pentech Int'l, Inc. v. Wall Street Clearing Co.*, 983 F.2d 441, 448 (2d Cir. 1993) ("A signature of an individual who is an incorporator, officer, director, or agent of a corporation, which is intended to be an individual signature, or which is not shown to be made on behalf of the corporation, suffices as an individual

44

signature, but not as a corporate signature, within the meaning of the statute of frauds" (citation modified)).  As the Reed Smith Defendants argue, these same signatories signed the main body of the 2023 Agreement, below a statement that they have represented that they have full authority to bind Eletson, there defined to include Holdings and Corp.  Dkt. No. 86 (Reed Smith Defendants' Reply) at 4; Dkt. No. 69-3 (2023 Agreement) at 2, 4.  While the 2023 Agreement is also addressed to Vasilis Hadjeleftheriadis, Lascarina Karastamati, and Vassilis Kertsikoff individually, the 2023 Agreement read in full does not seem to purport to provide legal services to those three as individuals.  Dkt. No. 69-3 (2023 Agreement) at 2.  And thus, while the signatures on Attachment 2 could have been clearer to evince the intent to sign on behalf of Holdings and Corp. – as was done in the 2022 Agreement, Dkt. No. 69-2 (2022 Agreement) at 6 – the Court is not persuaded that those signatures were intended to sign on behalf of the three officers as individuals.  *Israel v. Chabra*, 537 F.3d 86, 96–98 (2d Cir. 2008) ("[W]here individual responsibility is demanded the nearly universal practice is that the officer signs twice – once as an officer and again as an individual." (citation modified)).

Regardless, assuming arguendo that both Attachment 2's to the Agreements were properly signed and effectuated and that the arbitration clauses are otherwise valid, the Court concludes that, read in context, as Plaintiffs argue, a reasonable inference exists that the arbitration clauses apply only to disputes over fees, and are not reasonably read so broadly as to encompass the claims in the Amended Complaint.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 10–11.  As the Court is bound to draw such an inference in favor of the non-moving party, the Court denies the Reed Smith Defendants' Motion insofar as it seeks to compel arbitration.  *Nicosia*, 834 F.3d at 229.

Both arbitration clauses at issue are found within the Standard Terms and Conditions of

45

Engagement following the main bodies of the Agreements. Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 9. Both are contained under a bolded heading, "New York Arbitration Clause." *Id.* Both begin with an identical paragraph, giving notice that the potential client "may have a right to elect to resolve a fee dispute with us under Part 137," and stating that Attachment 1 provides a copy of Part 137. *Id.*[13] Both then continue with the identical language that Reed Smith does "not anticipate having any disagreement with you about the quality, costs, or appropriateness of our services," but that "[i]f for some reason we are not able to resolve any dispute ourselves, then we believe it would be preferable to resolve such dispute (including any fee dispute which would otherwise be subject to Part 137) by arbitration in the manner set forth herein, rather than under Part 137." *Id.* The express purpose of this section, then, is to address fee disputes, "including any fee dispute which would otherwise be subject to Part 137," *id.*, but also including other fee disputes that are not subject to Part 137 – for example, fee disputes for less than $1,000 or greater than $50,000.[14] The only language that suggests an alternative reading to encompass disagreements other than fee disputes is the phrase referencing a "disagreement . . . about the quality, costs, or appropriateness of our services," which could be taken to include disagreements over and above fee disputes. But read in context, a reasonable inference exists that this language itself is also referencing possible disputes over fees – namely that the quality of services did not warrant the price charged for them, or the services provided were not appropriate for the legal services contracted, i.e., that they should not be charged at all. *Nicosia*, 834 F.3d at 229. Otherwise, there is no language that suggests that the parties are negotiating rights as to any

---

[13] As noted, *supra* n. 4, Part 137 establishes the New York State Fee Dispute Resolution Program.

[14] "[Part 137] shall not apply to any of the following . . . amounts in dispute involving a sum of less than $1,000 or more than $50,000, except that an arbitral body may hear disputes involving other amounts if the parties have consented." 22 N.Y.C.R.R. § 137.1(b)(2).

other claims apart from disputes over fees, whether those subject to Part 137 or those that are not.

Both Agreements then state that "[y]ou and we agree to do so" – namely, "arbitrat[e] in the manner set forth herein, rather than under Part 137," as to disputes over fees – "as follows." Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 9. Only then does the language appear that the Reed Smith Defendants rely on, indented from the main text, that "[a]ny controversy, claim or dispute arising out of or relating to our agreement, or the breach thereof," shall be settled by binding arbitration administered by JAMS in New York City. *Id.* Lastly, both provisions conclude with the language discussed earlier, that "New York law requires that, in order to effectuate an agreement to arbitrate in the manner provided above, which includes fee disputes that would otherwise be arbitrated under Part 137, you sign the consent annexed as Attachment 2 to this Statement of Standard Terms and Conditions." Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 10.

The Court finds that this context is indispensable to understanding what the parties actually agreed to arbitrate. Thus, while the Court agrees with the Reed Smith Defendants that the language they cite is broad, Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 16 (citing *Cardali v. Gentile (In re Cardali)*, No. 10-11185, 2010 Bankr. LEXIS 4113, at *17 (Bankr. S.D.N.Y. Nov. 18, 2010) ("[A] clause referring to arbitration any controversy or claim between [the parties] arising out of or relating to an agreement" is "broad, justifying a presumption of arbitrability" (citation modified)); Dkt. No. 86 (Reed Smith Defendants' Reply) at 2, 7–8 (citing *Legal Recovery Assocs. LLC v. Brenes Law Grp., P.C.*, No. 22-CV-1778, 2023 U.S. Dist. LEXIS 16414, at *9–10 (S.D.N.Y. Jan. 31, 2023) (noting the "heavy" burden for the party opposing arbitrability pursuant to a "broad" arbitration clause, and looking to "the conduct alleged, rather than the characterization of that conduct in the pleadings" to determine whether such conduct is within the scope of the

47

arbitration clause) (citation modified)), the Court nonetheless agrees with Plaintiffs that, read in context, the Reed Smith Defendants are now attempting to arbitrate "a far broader set of claims" by "burying this purported waiver of important rights inside a misleading fee-dispute wrapper," Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 10.

The Reed Smith Defendants do not explicitly address Plaintiffs' argument that "Reed Smith cannot extract blanket informed consent from broad words embedded in a disclosure framed around a fundamentally different category of disputes." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 10 n.11. The Reed Smith Defendants cite to *Am. E Grp. LLC v. Livewire Ergogenics, Inc.*, 432 F. Supp. 3d 390, 399 (S.D.N.Y. 2020), which the Reed Smith Defendants purport reviewed a "similar arbitration provision," noting that that court compelled a variety of claims against a law firm to arbitration by determining that the "New York Fee Dispute Resolution Program [Part 137] supplies the rules for arbitration of a subset of attorney-client fee disputes, but that does not alter the underlying rule that all disputes are subject to arbitration." Dkt. No. 86 (Reed Smith Defendants' Reply) at 2–4. While the case quotation is accurate, the arbitration provision at issue is distinguishable, and sheds light on why the motion to compel here should be denied.

The arbitration provision at issue in *Am. E Grp. LLC* was found in an engagement letter under the generalized heading, "Resolution of Disputes – Mediation and Arbitration." No. 18-cv-03969-GHW, Dkt. No. 140-1 (Engagement Letter) at 4 (S.D.N.Y. filed May 3, 2018). As the District Court noted in *Am. E Grp. LLC*, the first sentence of the arbitration provision then stated that "[a]ny dispute, shall be resolved by confidential arbitration as follows." 432 F. Supp. 3d at 398. Thus, already unlike the arbitration clause at issue here, the framing of the arbitration clause focused on the manner by which *all* disputes would be arbitrated – not, as here, framing the

48

agreement around arbitrating a narrow set of claims as to fee disputes. The arbitration provision then read in full:

> (1) If and to the extent that the New York Fee Dispute Resolution Program (Part 137 of 22 NYCRR) providing for the informal and expeditious resolution of fee disputes between attorneys and clients is applicable, then the rules and procedures of such Fee Dispute Resolution Program shall apply. (2) If such Fee Dispute Resolution Program is not applicable to any such dispute, controversy or claim, then the arbitration shall be conducted in New York City in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and any award issued in such arbitration shall be enforceable in any court with jurisdiction. A copy of the New York Fee Dispute Resolution Program is available upon request.

No. 18-cv-03969-GHW, Dkt. No. 140-1 (Engagement Letter) at 4 (S.D.N.Y. filed May 3, 2018).

Thus, while the topic of fee disputes and Part 137 also arose in *Am. E Grp. LLC,* unlike the arbitration clause at issue here, the arbitration clause there quite clearly began with the general proposition that all claims between the parties were subject to arbitration, before proceeding to identify a subset of claims – fee disputes subject to Part 137 – that would proceed under the terms of that program, whereas all other claims would proceed by the Commercial Arbitration Rules of the American Arbitration Association. The Reed Smith Defendants here purport to do the reverse: the arbitration clauses in the Agreements start and focus on a narrow category of claims – fee disputes – yet contain language that the Reed Smith Defendants are attempting to encompass all claims against them found in the Amended Complaint.[15] Given this context, the Court cannot

---

[15] The Court also notes that if the arbitration clauses in the Agreements were indeed intended by the parties to encompass claims so broadly so as to include those found in the Amended Complaint – claims that the parties agree would never be subject to Part 137, *see* 22 N.Y.C.R.R. § 137.1(b)(3), (4) ("[Part 137] shall not apply to. . . claims involving substantial legal questions, including professional malpractice or misconduct . . . claims against an attorney for damages or affirmative relief other than adjustment of the fee"); Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 11; Dkt. No. 86 (Reed Smith Defendants' Reply) at 2 – that it would be at minimum odd to predicate the effectuation of those clauses on the signatures to Attachment 2. The Attachment 2's are titled "Consent to Final and Binding Arbitration in an Arbitral Forum Outside Part 137 Under § 137.2(d) of the Rules of the Chief Administrator." Dkt. No. 69-2 (2022 Agreement) at 19; Dkt. No. 69-3 (2023 Agreement) at 16. And both Agreements indeed do predicate the effectuation of

49

conclude that the Plaintiffs and the Reed Smith Defendants came to "a meeting of the minds and a manifestation of mutual assent" to arbitrate the claims in the Amended Complaint through the arbitration clauses in the Agreements, which focus so heavily on fee disputes. *Starke,* 913 F.3d at 288.[16]

In sum, the Court finds that a reasonable inference exists that the arbitration clauses at issue apply only to disputes over fees, and cannot be so broadly read so as to encompass the claims in the Amended Complaint. *Nicosia,* 834 F.3d at 229. Accordingly, faced with the threshold question of whether the parties have indeed agreed to arbitrate the claims in the Amended Complaint, the Court must conclude that the parties have not so agreed. *Doctor's Assocs.,* 934 F.3d at 250. The Reed Smith Defendants' Motion to compel arbitration is thus denied. *Id.* Having

---

the arbitration clauses on signatures to the Attachment 2's (which the Reed Smith Defendants do not dispute). Dkt. No. 69-2 (2022 Agreement) at 12; Dkt. No. 69-3 (2023 Agreement) at 10.

[16] The Reed Smith Defendants also cite to *Krys v. Sugrue (In re Refco Secs. Litig.)*, No. 07-MDL-1902, 2010 U.S. Dist. LEXIS 6273, at *28–29 (S.D.N.Y. Jan. 21, 2010), in which the District Court adopted the Report and Recommendation of a Special Master to grant a motion to compel based on a broad arbitration clause. Dkt. No. 86 (Reed Smith Defendants' Reply) at 3 n.1. That case is distinguishable in the same manner as *Am. E Grp. LLC*, and supports denying the motion to compel here. *Krys v. Sugrue (In re REFCO Inc.)*, No. 07-MDL-1902, 2009 U.S. Dist. LEXIS 134692, at *54–55, 84 (S.D.N.Y. Nov. 20, 2009). The arbitration clause at issue in *Krys* began with the broad statement that "you agree to binding arbitration in New York City of any dispute, claim or controversy," before going on to specify that this "includ[ed] any dispute as to the fees for our services, which you might otherwise have the right to arbitrate under Part 137." *Id.* at *54–55. The Special Master concluded that the arbitration clause "evince[d] an intention by the parties to arbitrate all disputes," *id.* at *55, and that "[p]lainly, the point of including the phrase 'which [Plaintiffs] might otherwise have the right to arbitrate under [the] Part 137 [Program]' was to ensure that fee disputes in particular would be subject to binding private arbitration — not Part 137 arbitration — in the same manner as any other disputes," *id.* at *84. As quoted by the Reed Smith Defendants, the Special Master also stated that "[t]here was no reason to include a similar phrase with respect to legal malpractice or other claims because such claims were not subject to the Part 137 Program arbitration procedures in the first place." *Id.* at *84. Here, on the other hand, as discussed in the text, the relevant provisions do not begin with the broad proposition that all claims are subject to arbitration, before going on to specify that this included or did not include fee disputes. Rather, the provisions at issue here are framed around resolving fee disputes, not broadly all claims.

50

so concluded, the Court need not reach the parties' remaining arguments. *Immigration & Naturalization Serv. v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts . . . are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

### B. <u>MOTIONS TO DISMISS</u>

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Two working principles underlie" this holding: first, "that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," such that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"; and second, "only a complaint that states a plausible claim for relief survives a motion to dismiss," and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 678–79 (quoting Fed. R. Civ. P. 8(a)(2)). The Court "draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### i. Reed Smith Defendants' Motion to Dismiss

### 1. *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine is "a body of caselaw constituting a limitation upon the

25-01120-jpm    Doc 130    Filed 08/03/26    Entered 08/03/26 14:52:40    Main Document
Pg 52 of 96

scope of the Sherman Act."[17] *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 99 (2d Cir. 2000). "The doctrine was first established in the context of concerted petitions for anti-competitive legislation." *Id.* "[T]he Supreme Court later made explicit its reliance on First Amendment principles . . . in extending *Noerr* to apply to concerted actions before courts and administrative agencies." *Id.* (citing *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972)). "Litigation . . . therefore falls within the protection of the *Noerr-Pennington* doctrine." *Id.* at 100.

The parties here principally dispute whether this doctrine's "sham litigation" exception applies to the present case. Dkt. No. 59 (Amended Complaint) at ¶ 375; Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 22–24; Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 19–21; Dkt. No. 86 (Reed Smith Defendants' Reply) at 12–13 ("Plaintiffs unsuccessfully attempt to sidestep the *Noerr-Pennington* doctrine *solely* by invoking the doctrine's sham litigation exception." (emphasis added)); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993) ("We now outline a two-part definition of 'sham' litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . [S]econd . . . , the court should focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon." (citations omitted)). Plaintiffs, however, also argue that the doctrine is inapplicable in the first instance because Plaintiffs "do not seek liability for petitioning activity."

---

[17] "In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources." *NCAA v. Alston*, 594 U.S. 69, 73 (2021) (quoting *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n. 27 (1984)).

Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 18–19.

The Court agrees with Plaintiffs that the conduct alleged in the Amended Complaint is not protected petitioning activity, and that therefore the Court need not decide whether the sham exception to the *Noerr-Pennington* doctrine applies.[18]

"[T]his Court accepts that litigation is a constitutionally protected right in the United States and assumes it should be afforded ample scope even when conducted abroad." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 383–84, 580 (S.D.N.Y. 2013), *aff'd* 833 F.3d 74 (2d Cir. 2016). However, the Court concludes that it is not really Plaintiffs' claim that the Reed Smith Defendants engaged in an objectively baseless lawsuit (as required by the "sham litigation" exception). Rather, the Amended Complaint alleges that the Reed Smith Defendants knowingly fabricated a fraudulent legal theory in advance of and during the Preferred Shares Arbitration, and then perpetuated that fraud in this Court and the Southern District of New York (with the ultimate goal and distinct possibility of prevailing, i.e., the lawsuits were not objectively baseless). *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–92, 95–100, 103–106, 260–65, 392–93, 406–08; *Chevron Corp.*, 974 F. Supp. 2d at 581 ("[Plaintiff's] claim with respect to the [purported baseless litigation] case itself, insofar as it pertains to the predicate acts of attempted extortion, is not that the case was entirely baseless. Rather, it is that [Defendant] and others corrupted the case by bribing the judge and by other corrupt and fraudulent means."). "It is clear from cases in the

---

[18] Plaintiffs also argue that the Reed Smith Defendants' Motion to dismiss should be denied as the determination of "whether a party's conduct is a genuine attempt to avail itself of the judicial process or is merely a sham is a question of fact that is inappropriate for a motion to dismiss." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 19–20 (citation omitted). The Reed Smith Defendants argue that "courts regularly decide the applicability of Noerr-Pennington on a motion to dismiss." Dkt. No. 86 (Reed Smith Defendants' Reply) at 12. Having determined that the conduct alleged in the Amended Complaint is not protected petitioning activity, and that therefore the Court need not decide whether the sham exception to the Noerr-Pennington doctrine applies, the Court also need not decide whether this issue is inappropriate for a motion to dismiss.

*Noerr-Pennington* area that corruption of an adjudicative process removes any shield that the First Amendment otherwise would provide." *Chevron Corp.*, 974 F. Supp. 2d at 581 (citing *California Motor Transp. Co.*, 404 U.S. at 513 (there are "many . . . forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations" because "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process");[19] *R.A.V. v. City of St. Paul*, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) (While "the First Amendment broadly protects speech, it does not protect the right to fix prices, breach contracts, make false warranties, place bets with bookies, threaten, or extort." (citation modified))); *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud."); *see also In re Payne*, 707 F.3d 195, 206 (2d Cir. 2013) (per curiam) ("[I]t is an elementary fact and expectation of legal practice that an attorney who fails to abide by a court rule or order may be subject to sanctions or other adverse consequences.").

In arguing that their conduct is protected petitioning activity, the Reed Smith Defendants assert that they engaged in litigation, and that the Plaintiffs cannot recast disputed legal issues as misrepresentations on the Court. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 23–24; Dkt. No. 86 (Reed Smith Defendants' Reply) at 12–13. But the cases the Reed Smith Defendants cite in their favor, many outside of this Circuit, largely concern whether the sham-litigation exception applies, and do not concern whether the Reed Smith Defendants' alleged fraudulent activity is

---

[19] The Court notes that the Supreme Court, in citing the same language from *California Motor Transp. Co.*, has explicitly declined to decide "whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 61 n.6.

protected petitioning activity in the first instance. *Id.*[20]  As reasoned above, the Court concludes

that it is not, and that the *Noerr-Pennington* doctrine is not a basis to dismiss the claims against

the Reed Smith Defendants.

### 2. Count One Civil Rico (18 U.S.C. § 1962(c))

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18

U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the

violation of Section 1962." *Cruz v. Fxdirectdealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013)

---

[20] The sole exception is *Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P.*, 129 F. Supp. 2d 578, 593 (W.D.N.Y. 2000), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) (decision without published opinion); Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 23–24.  That case too concerned the application of the sham litigation doctrine.  *Bath Petroleum Storage, Inc.*, 129 F. Supp. 2d at 593. But that court considered whether "a party's misrepresentations to a court can constitute a sham, for purposes of *Noerr[-]Pennington*, where a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Id.* (citation modified). That court stated that "a plaintiff should not be allowed to invoke the sham exception . . . by 'simply recasting disputed issues from the underlying litigation as 'misrepresentations' by the other party.'" *Id.* (quoting *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 536 (9th Cir. 1991)).  As reasoned in the text, while the Plaintiffs here do invoke the sham exception, the Court concludes that the more logical approach is to conclude, as Plaintiffs argue in the alternative, that the Amended Complaint alleges activity that is not protected in the first instance by the *Noerr-Pennington* doctrine – as the First Amendment does not protect fraud – rather than concluding that such activity is protected and potentially subject to the sham litigation exception.  *Illinois, ex rel. Madigan*, 538 U.S. at 612; *Chevron Corp.*, 974 F. Supp. 2d at 581.  Moreover, the Amended Complaint does not simply recast disputed legal issues.  *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–92, 95–100, 103–106, 260–65, 392–93, 406–08.  Indeed, in granting vacatur of the Preferred Shares Arbitration award, the District Court has found that Solomon – in a letter to J. Belen in the Preferred Shares Arbitration, stating that "there can't be . . . anything important" about a July 25, 2022 email (an email which demonstrated that the Gas preferred shares were not purchased in March 2022 as alleged by the Reed Smith Defendants and their alleged co-conspirators, which was necessary to transfer those shares to the Cypriot Nominees) – crossed the "line between aggressive advocacy and false statements," rejecting Solomon's defense that "arguments with lawyers don't fall into the true and false category" and the Cypriot Nominees' similar argument that Solomon was engaging in "proper legal advocacy." *Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, No. 23-cv-7331, 2026 U.S. Dist. LEXIS 5528, at *195–202 (S.D.N.Y. Jan 12, 2026).  Without deciding the issue of Reed Smith's complicity, the District Court stated that "[a]t a minimum, [Reed Smith] was the vehicle through which a fraud was committed." *Id.* at *172–73.

(citation modified). "To establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* (citation modified).

Moreover, "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "To do so, a plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 167 (2d Cir. 2021) (citation modified). "[A]ll allegations of fraudulent predicate acts . . . are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004). However, RICO complaints alleging an element of fraud "must only satisfy the notice pleading requirements of Rule 8(a) in alleging the existence of the enterprise, the pattern of racketeering activity and the defendants' interest or participation in the enterprise." *State Farm Mut. Auto. Ins. Co. v. Kalika*, No. 04-cv-4631, 2006 U.S. Dist. LEXIS 97454, at *44 (E.D.N.Y. Mar. 16, 2006).

### a. Domestic Injury

Private civil RICO suits must allege a domestic injury. *Yegiazaryan v. Smagin*, 599 U.S. 533, 541 (2023) (citing *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 334 (2016)). "[D]etermining whether a plaintiff has alleged a domestic injury for purposes of RICO is a context-specific inquiry that turns largely on the particular facts alleged in a complaint." *Id.* at 543 (citation modified). "Specifically, courts should look to the circumstances surrounding the alleged injury to assess whether it arose in the United States." *Id.* at 543–44. "[A]pplication of the domestic-injury rule in any given case will not always be self-evident, as disputes may arise as to whether a

56

particular alleged injury is foreign or domestic." *Id.* at 544 (citation modified).

The Court begins by acknowledging the accuracy of the Reed Smith Defendants' argument that the Amended Complaint alleges, inter alia, foreign conduct, with foreign entities, in foreign proceedings. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 26–27; Dkt. No. 86 (Reed Smith Defendants' Reply) at 14. "Zooming out," however, the Court concludes that the Amended Complaint also contains sufficient factual matter, accepted as true, to state a plausible claim of domestic injury. *Yegiazaryan*, 599 U.S. at 545; *Ashcroft*, 556 U.S. at 678.

In *Yegiazaryan*, the Supreme Court affirmed the Ninth Circuit's reversal of the United States District Court for the Central District of California's determination that Vitaly Smagin, a resident of Russia, had failed to allege a domestic injury in his civil RICO suit (which the District Court accordingly dismissed). 599 U.S. at 536–37. Smagin alleged that he was the victim of a multi-yearslong fraud concerning a Moscow-based real estate venture by Ashot Yegiazaryan, who fled to California to avoid criminal prosecution in Russia. *Id.* at 537. Smagin subsequently won an arbitral award against Yegiazaryan in London, and Smagin filed suit in the Central District of California to enforce and collect on the award. *Id.* The District Court then entered a preliminary injunction to freeze Yegiazaryan's assets. *Id.* Yegiazaryan was then granted a substantial settlement in satisfaction of an arbitral award in an unrelated proceeding, and engaged in a series of actions to insulate those funds from the District Court's asset freeze, including creating a "a system of 'shell companies' owned by family members." *Id.* at 538.

The District Court entered judgment in Smagin's favor, and "also issued several postjudgment orders barring Yegiazaryan and those acting at his direction from preventing collection on the judgment." *Id.* Yegiazaryan failed to comply with those orders, and the District Court held him in contempt. *Id.* "To avoid having to comply with the contempt order, however,

57

Yegiazaryan falsely claimed he was too ill, and submitted a forged doctor's note to the District Court." *Id.* at 538–39. Smagin sought to depose the doctor, and Yegiazaryan "used intimidation, threats, or corrupt persuasion to get the doctor to avoid service of the subpoena." *Id.* at 539 (citation omitted).

In affirming the Ninth Circuit's determination that Smagin had alleged a domestic injury, the Supreme Court reasoned that "Smagin allege[d] that he ha[d] been injured in his inability to collect [his] massive judgment," *id.* at 545, and that the "central purpose" of the alleged racketeering activity was "frustrating enforcement of [the] California judgment," *id.* at 546. This was the case even though "components of the scheme occurred abroad," whereas "[m]uch of the alleged racketeering activity" occurred in the U.S., including the creation of shell companies and the submission of the forged doctor's note to the District Court (in furtherance of avoiding compliance with that court's contempt orders). *Id.* at 545. The "components" that occurred abroad were "devised, initiated, and carried out . . . through acts and communications initiated in and directed towards Los Angeles County, California." *Id.* at 545–46. This was the case even though Smagin was a resident of Russia, his injury originated in a purported criminal fraud in Russia concerning "shares in a joint real estate venture in Moscow," and he sought enforcement of an arbitration award granted in London. *Id.* at 537–38.

Here, the Amended Complaint essentially complains of injuries beginning in fraudulent activity in the Preferred Shares Arbitration – a U.S. based proceeding – and subsequent efforts in and directed towards this Court and the District Court of the Southern District of New York to stymie the reorganization of Holdings and thereby control Eletson's assets and property of the bankruptcy estate. *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–92, 95–100, 103–106, 126–47, 217–36, 259–69, 348–56, 392–97. The Court finds these claims analogous to those in

58

*Yegiazaryan*, where the "central purpose" of the alleged racketeering activity was to avoid collection of a U.S.-based judgment, and where the domestic injury was the inability to collect on that judgment as the result of activities "directed towards" the locale of that judgment. 599 U.S. at 545–46. While the Court acknowledges that the balance of activity in this case may lean further abroad than the activity at issue in *Yegiazaryan*, the Plaintiffs at this stage need only plead sufficient factual matter, accepted as true, to state a plausible claim of domestic injury. *Ashcroft*, 556 U.S. at 678. And the *Yegiazaryan* Court determined that Smagin's allegations "suffice[d] to state a domestic injury." 599 U.S. at 546. That Court did not purport to set a minimum standard for what constitutes a domestic injury. *Id.* As stated in the Amended Complaint, the Plaintiffs do so-plausibly plead as to an injury originating in U.S. proceedings and rights and entitlements there-created, caused by activities, some abroad and some domestic, that were directed towards the U.S-based Preferred Shares Arbitration, this Court, and the District Court. Dkt. No. 59 (Amended Complaint) at ¶¶ 82–92, 95–100, 103–106, 126–47, 217–36, 259–69, 348–56, 392–97.

### b.  Racketeering Activity

"'Racketeering activity' is defined to include any 'act' indictable under various specified federal statutes." *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting 18 U.S.C. § 1961(1)). As relevant here, predicate acts include bankruptcy fraud, wire fraud, obstruction of justice, and aiding and abetting any of those.  18 U.S.C. § 1961(1); 18 U.S.C. § 152(2), (3), (5), & (9) (bankruptcy fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1503(a), 1512(c) (obstruction of justice); 18 U.S.C. § 2(a),(b) (aiding and abetting).

### i.  Litigation conduct as racketeering activity

The Reed Smith Defendants argue that litigation activities cannot form the basis for RICO predicate acts.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 28–30 (citing *Kim*, 884 F.3d

98); Dkt. No. 86 (Reed Smith Defendants' Reply) at 15–17.

In *Kim*, the plaintiff brought a civil RICO suit alleging that the defendants "engaged in a scheme to fraudulently bring suit against him for, inter alia, trademark infringement."  884 F.3d at 100.  The Second Circuit affirmed the district court's dismissal of the suit, as "the alleged litigation activities d[id] not constitute RICO predicate acts."  *Id.* at 101.  In the RICO action, the plaintiff alleged that the original trademark lawsuit "was nothing more than an ill-conceived scheme or artifice designed to extort . . . him," and that "the defendants completed false paperwork to pose as the owners of a trademark" in order to "mislead the district court," which the plaintiff alleged "were predicate acts of obstruction of justice, mail fraud, and wire fraud that constituted a pattern of racketeering activity."  *Id.* (citation modified).  This included preparing and submitting declarations "with full knowledge that they contained fraudulent representations intended to persuade the district court to find in favor of" the defendants.  *Id.* at 103.  The Second Circuit "conclude[d] that allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act."  *Id.* at 104.  The Court reasoned that "the entire alleged scheme involved the creation of fraudulent court documents," as opposed to "us[ing] litigation to carry out [a] scheme" while "also engag[ing] in a variety of other out-of-court actions to further this activity."  *Id.* at 105.  The Court concluded that:

> We decline to reach the issue of whether all RICO actions based on litigation activity are categorically meritless. We conclude only that where, as here, a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act.

*Id.*

The Reed Smith Defendants argue that this precedent merits dismissal of all counts against them.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 28–30; Dkt. No. 86 (Reed Smith Defendants' Reply) at 15–17.  The Plaintiffs argue that the Second Circuit has made clear that

"*Kim* is narrow and has no application here." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 25 (citing *State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical Practice P.C.*, 120 F.4th 59, 98 n.14 (2d Cir. 2024) ("Because the plaintiff [in *Kim*] had alleged that the defendant 'engaged in a *single* frivolous, fraudulent, or baseless lawsuit,' we determined that 'such litigation activity *alone* cannot constitute a viable RICO predicate act.'" (quoting 884 F.3d at 105) (emphasis added in *State Farm Mutual Automobile Insurance Co.*)). Plaintiffs argue that the Amended Complaint "alleges more than a single frivolous lawsuit," rather "a coordinated, multi-year scheme in which litigation filings and sworn submissions were used as instruments of fraud, as well as out-of-court actions to further this activity." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 27 (citing *United States v. Eisen*, 974 F.2d 246, 253–54 (2d Cir. 1992) & *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015)[21]).

The Court finds that *Kim*, 884 F.3d 98, 105, which explicitly declined to reach the issue of "whether all RICO actions based on litigation activity are categorically meritless," does not provide a basis to grant the Reed Smith Defendants' Motion to dismiss.

The Court recognizes that the present case falls somewhere between the various precedents cited by the parties. On the one hand, the Amended Complaint alleges litigation activity that encompasses more than a single lawsuit, unlike in *Kim*, 884 F.3d 98. *See e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 67–112 (allegations concerning Preferred Shares Arbitration), 113–

---

[21] The Reed Smith Defendants are correct that Plaintiffs incorrectly state that "[i]n *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015), the Second Circuit affirmed the district court's finding of RICO liability." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 26; Dkt. No. 86 (Reed Smith Defendants' Reply) at 16 n.12. That decision "addressed whether the district court abused its discretion by certifying class actions" and "did not review the district court's denial of the defendants' motion to dismiss." *Kim*, 884 F.3d at 105. Nor did the district court in *Sykes* make a finding of RICO liability – it merely ruled on the defendants' motions to dismiss. *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010).

20, 146–48 (allegations concerning activities to obstruct this Court's orders, including actions taken in the District Court), 150–236 (allegations concerning actions taken in numerous foreign proceedings).   And as Plaintiffs argue, the allegations in the Amended Complaint encompass behavior – by the Reed Smith Defendants – that extends beyond mere litigation conduct.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 27–28.

The Court also agrees with the Reed Smith Defendants, on the other hand, that *Sykes* concerned "massive fraud" of a scale seemingly not present here (at least by one measure: volume of possible victims).  Dkt. No. 86 (Reed Smith Defendants' Reply) at 16; *Kim*, 884 F.3d at 105 ("The plaintiffs in *Sykes* alleged that the defendants engaged in a 'massive scheme,' in which a debt-buying company, a law firm, a process-serving company, and others conspired with one another by buying consumer debt, initiating actions against the debtors and improperly serving them, and then filing fraudulent documents in state court to obtain default judgments." (citing *Sykes*, 757 F. Supp. at 418–20)); *Sykes*, 757 F. Supp. at 418 ("[P]laintiffs allege that [defendants] engaged in a 'massive scheme' to fraudulently obtain default judgments against them and more than 100,000 other consumers in state court."); *see also State Farm Mutual Automobile Insurance Co.*, 120 F.4th at 98 ("We thus conclude that state litigation of the kind alleged here — involving hundreds of baseless state-court proceedings that are part of a massive fraudulent scheme — may itself further a RICO violation.").  *Eisen* was much less extensive in scope than *Sykes*, but still was potentially more expansive than that present here.  *Eisen*, 974 F.2d at 251 ("The racketeering acts considered by the jury related to the defendants' conduct with regard to 18 fraudulent personal injury lawsuits").   Nonetheless, on the whole, the Court concludes that the Plaintiffs have sufficiently pled racketeering activity to survive the Reed Smith Defendants' Motion to dismiss. As stated above, the allegations in the Amended complaint extend beyond "a single frivolous,

fraudulent, or baseless lawsuit," and alleges activity beyond conduct in litigation. *Kim*, 884 F.3d at 105.[22]

### ii.  Bankruptcy fraud

A person violates Title 18 by "knowingly and fraudulently mak[ing] a false oath or account," 18 U.S.C. § 152(2), or "a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11," *id.* at (3).  A person also violates title 18 by "knowingly and fraudulently receiv[ing] any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11," *id.* at (5), or "after the filing of a case under title 11," by "knowingly and fraudulently withhold[ing] from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor," *id.* at (9).

### 1.  Fraudulent intent

"[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation modified).  This can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

---

[22] The Court also finds unpersuasive the Reed Smith Defendants' argument that reaching this holding would conflict with the rationale discussed in *Kim* that permitting RICO claims based (at least in part) on litigation conduct would "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts."  884 F.3d at 104; Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 29–30.  To the contrary, the Court's ruling here does not foreclose future courts from dismissing inadequately pled RICO claims alleging in bare terms fraudulent court submissions as a basis for a lawsuit.  This is a unique situation where the District Court has already concluded that fraud was committed in the Preferred Shares Arbitration, and that the Reed Smith Defendants' conduct crossed the line between aggressive advocacy and false statements. *See supra* n. 20.

misbehavior or recklessness." *Id.* (citation modified).

The Reed Smith Defendants argue that the Plaintiffs have failed to make a strong showing of fraudulent intent. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 31–32; Dkt. No. 86 (Reed Smith Defendants' Reply) at 17–18. Plaintiffs argue that the Amended Complaint alleges that the Reed Smith Defendants "persist[ed] in sworn representations contradicted by contemporaneous knowledge and conceal[ed] material information from the court." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 29–30. Plaintiffs also argue that the Reed Smith Defendants' "economic interests were inseparable from the fraudulent effort to prolong the dispute over control of Gas," including the benefit they derived from legal fees. *Id.* at 30.

The Court agrees with Plaintiffs that the Amended Complaint adequately alleges that the Reed Smith Defendants "had both motive and opportunity to commit fraud," and "strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290. The Amended Complaint alleges that the Reed Smith Defendants orchestrated the repeated submission of false legal documents in order to further a legal theory in the Preferred Shares Arbitration, this Court, and the District Court that they knew relied on facts that had not occurred (that the preferred shares were purchased and transferred to the Cypriot Nominees in March 2022). *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–100, 115–16, 145–265, 376, 381, 392–93. As Judge Liman has already found, "the 'transfer' to the Nominees was an after-the-fact contrivance designed to keep control of Eletson Gas from Holdings and, in turn, from Holdings' creditors, after Holdings had been put in involuntary bankruptcy proceedings." *Eletson Holdings, Inc. v. Levona Holdings, Ltd.*, No. 23-cv-7331, 2026 U.S. Dist. LEXIS 5528, at *56 (S.D.N.Y. Jan. 12, 2026); *see also Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 184584, at *4–6 (S.D.N.Y. Sept. 19, 2025) (concluding that there is "probable cause to believe that Eletson,

64

under its prior management, contrived an after-the-fact and false story that the [the Cypriot Nominees] had been nominated to receive the Preferred Shares of Eletson Gas in order to keep those shares remote from an involuntary bankruptcy proceeding").    The non-conclusory allegations in the Amended Complaint are that the Reed Smith Defendants "had both motive and opportunity to commit fraud," as well as "strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290.[23]

### 2.    Knowing falsity

The Court rejects the Reed Smith Defendants' argument that the Amended Complaint fails to allege that the Reed Smith Defendants knowingly made false statements.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 32–33; Dkt. No. 86 (Reed Smith Defendants' Reply) at 18; *see also* Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 31; Dkt. No. 59 (Amended Complaint) at ¶ 392.  Contrary to the Reed Smith Defendants' argument, the Amended Complaint alleges both that false statements were made, and that the Reed Smith Defendants knew that those statements were false.  *See, e.g*, Dkt. No. 59 (Amended Complaint) at ¶¶ 82–100, 115–16, 145–265, 376, 381, 392–93.  The Court is unpersuaded by the argument the Reed Smith Defendants advance here that the statements cannot be shown to be false because they concern legal interpretation.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 33.  The Amended Complaint alleges that the Reed Smith Defendants knew at all relevant times that the option to buy the preferred shares had not been

---

[23] The Court thus does not agree with the Reed Smith Defendants' argument that an allegation of "receipt of ordinary fees for professional services does not, by itself, support a motive for fraud." Dkt. No. 68 (Reed Smith Defendants' Motion) at 31 (citing *Aquino v. Trupin*, 833 F. Supp. 336, 341 (S.D.N.Y. 1993)).  The Amended Complaint does not simply allege the ordinary receipt of fees for professional services by itself – it alleges that the Reed Smith Defendants knowingly fabricated a legal theory that they knew relied on a factual basis that was false, and that the Reed Smith Defendants profited from that work. *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–100, 115–16, 145–265, 376, 381, 392–93.

exercised, that their legal theory concerning the Cypriot Nominees relied on facts that had not occurred (and that they knew had not occurred), and that they knowingly submitted false statements in this Court and the District Court. *See, e.g,* Dkt. No. 59 (Amended Complaint) at ¶¶ 82–100, 115–16, 145–265, 376, 381, 392–93; *see also Eletson Holdings, Inc.*, 2026 U.S. Dist. LEXIS 5528, at *200–202 ("At his deposition for this proceeding, Solomon attempted to defend the letter discounting the importance of the July 25 email as an argument to the Arbitrator, going so far as to state that 'arguments with lawyers don't fall into the true and false category.' . . . The Court rejects that argument. There is an important line between aggressive advocacy and false statements. The letter crossed that line."); *id.* at *56 ("Eletson [under its pre-bankruptcy plan management] and its counsel understood the Purchase Option had not been exercised and that . . . Eletson had not nominated [the Cypriot Nominees] to receive the Preferred Interests, and that Intervenors purposefully presented false testimony at the arbitration and withheld from Levona and the Arbitrator the documents necessary to show that such testimony was false and to reveal the truth.").

### 3.  Receipt of Property

The Reed Smith Defendants are correct that 18 U.S.C. § 152(5) states that a person violates title 18 by "knowingly and fraudulently receiv[ing] any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11."  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 33–34; Dkt. No. 86 (Reed Smith Defendants' Reply) at 18.  The Reed Smith Defendants are also correct that Plaintiffs point to one specific allegation against the Reed Smith Defendants exclusively, that the Amended Complaint "alleges that Reed Smith controlled and retained $4 million deposited into an escrow account post-petition despite knowing the former D&Os lacked authority and that the funds belonged to Gas."  Dkt. No. 84-1

66

(Plaintiffs' Opposition to Reed Smith) at 31–32; Dkt. No. 86 (Reed Smith Defendants' Reply) at

18.  The Reed Smith Defendants argue that Gas is not a debtor and that this allegation is thus

insufficient to plead a claim under 18 U.S.C. § 152(5).  Dkt. No. 86 (Reed Smith Defendants'

Reply) at 18.  Plaintiffs, on the other hand, refer to "other allegations," and state that the Reed

Smith Defendants (a subset of the RICO Defendants) received and maintained property of the

bankruptcy estate, including diverted charter revenues, and that they purported to transfer control

of vessels outside of the estate.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 31 (citing

Dkt. No. 59 (Amended Complaint) at ¶¶ 149, 220, 259–265, 335, 336–51, 399).

The Court rejects the Reed Smith Defendants' argument.  As the District Court has

already stated:

> The identification of the [Cypriot Nominees] as the recipients of the Preferred
> [Shares] was a ruse intended to avoid the impact of the bankruptcy and the likely
> transfer of the economic value represented by the Preferred [Shares] to the creditors
> of Eletson, including Levona's affiliate Pach Shemen, through the bankruptcy
> proceeding.

*Eletson Holdings, Inc.*, 2026 U.S. Dist. LEXIS 5528, at *166.  The position the former Eletson

owners "consistently stated" "after March 22, 2022, when the nomination allegedly occurred, and

prior to May 5, 2023, when Eletson first argued that the Preferred Interests had been exercised in

the interest of the Cypriot nominees," was that the preferred shares "were held by Holdings and

not by the Nominees." *Id.* at *167.  Absent nomination to the Cypriot Nominees, "the only equity

interests that would remain in Eletson Gas would be the common shares held by Holdings." *Id.* at

*169.  This would also mean that all of the equity in Gas was property of the bankruptcy estate.

Dkt. No. 59 (Amended Complaint) at ¶ 88 ("An exercise of the Buyout Option in favor of

Holdings—as Eletson had until then consistently argued had occurred—would trigger the

cancellation of the preferred shares and leave Holdings (and hence its creditors), as the sole owner

67

of Gas."); *see, e.g., Eletson Holdings Inc. et al v. Levona Holdings Ltd.*, No. 23-cv-7331 (S.D.N.Y.), Dkt. No. 270 at 114:17–18 ("Property of the estate includes the estate of each of the debtors, and debtors would include wholly owned subsidiaries.").

Having pled not only that the Reed Smith Defendants were aware of this set of facts, but also that the Reed Smith Defendants actively created the Cypriot Nominee theory (and the necessary alternative set of facts) in order to avoid the "grave threat" that "[t]he bankruptcy proceeding presented . . . to the strategy of Holdings' former owners," *Eletson Holdings, Inc.*, 2026 U.S. Dist. LEXIS 5528, at *168, the Plaintiffs have sufficiently pled that the Reed Smith Defendants received property – $4 million deposited into an escrow account post-petition despite knowing that the funds belonged to Gas (and thus were property of the bankruptcy estate) – from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11. 18 U.S.C. § 152(5); Dkt. No. 59 (Amended Complaint) at ¶ 351.

### 4. Withholding of information

The Reed Smith Defendants argue that the withholding of information claim should be dismissed because the Reed Smith Defendants cannot be held liable for complying with the Second Circuit, which has stayed the District Court's February 14th, 2025 order directing the Reed Smith Defendants to turn over Eletson's client file. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 34 (citing *Eletson Holdings Inc. et al v. Levona Holdings Ltd.*, No. 23-cv-7331 (S.D.N.Y.), Dkt. No. 270 at 107:19–23; *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 25-445 (2d Cir.), Dkt. No. 66); Dkt. No. 86 (Reed Smith Defendants' Reply) at 18–19.

As an initial matter, the Court agrees with Plaintiffs that the Amended Complaint alleges that the Reed Smith Defendants' obligation to turn over the files at issue began upon the effective date of the confirmed Plan, and that the obligation did not arise solely from the District Court's

68

February 14th, 2025 turnover order.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 32 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 259–65, 402).  Accordingly, at a minimum, the Amended Complaint states a claim sufficient to survive a motion to dismiss as from the period running from the as-alleged effective date of the plan (November 19, 2024) until the District Court's February 14th, 2025 turnover order. *Eletson Holdings Inc. et al v. Levona Holdings Ltd.*, No. 23-cv-7331 (S.D.N.Y.), Dkt. No. 295 (Mar. 24, 2026 opinion and order granting temporary stay of Feb. 14th, 2025 turnover order for Reed Smith to seek a stay from the Second Circuit); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 25-445 (2d Cir.), Dkt. No. 66 (June 25, 2025 order granting stay of District Court's Feb. 14th, 2025 turnover order).  Further, the Amended Complaint does not limit the withholding of information claim to the Reed Smith client file, and alleges that the Reed Smith Defendants withheld, inter alia, insurance information as to Eletson and its directors and officers, information identifying IT personnel in order to provide access to Eletson's email platform and website, employees who would be responsible to assist the petitioning creditors and their counsel with consummating the Plan and transitioning the ownership and management of the company, and books and records from Eletson's Stamford, Connecticut offices. *See* Dkt. No. 59 (Amended Complaint) at ¶¶ 259–65, 402.

The Reed Smith Defendants also argue that Holdings, post-confirmation, was not a "custodian, trustee, marshal, or other officer of the court" within the meaning of 18 U.S.C. § 152(9).  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 34 (citing *United States v. Whiting Pools, Inc.*, 674 F.2d 144, 148 n.6 (2d Cir. 1982) ("The definition of custodian [in 11 U.S.C. § 101] to include a receiver or trustee is descriptive, and not meant to be limited to court officers with those titles. The definition is intended to include other officers of the court if their functions are substantially similar to those of a receiver or trustee.")); Dkt. No. 86 (Reed Smith Defendants'

69

Reply) at 18–19. The Amended Complaint, however, alleges that:

> The RICO Defendants [including the Reed Smith Defendants], after the filing of Holdings' Chapter 11 Cases, knowingly and fraudulently withheld from Holdings, *Holdings' creditors, the Bankruptcy Court, and all officers of the court entitled to its possession*, the following recorded information (including books, documents, records, and papers) relating to the property or financial affairs of Eletson, including but not limited to (i) the books and records of Holdings and Corp., (ii) access to Eletson's Microsoft email server, and (iii) Eletson's client file, which Reed Smith has in its possession and has refused to turn over to Holdings.

Dkt. No. 59 (Amended Complaint) at ¶ 402 (emphasis added). Accordingly, the Court rejects the

Reed Smith Defendants' argument.[24]

### iii. Wire fraud

A person violates title 18 by:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice[.]

18 U.S.C. § 1343.

The Reed Smith Defendants argue that Plaintiffs only make allegations involving the Reed

Smith Defendants' legal advice or legal positions, which are not actionable as wire fraud. Dkt.

No. 68-1 (Reed Smith Defendants' Motion) at 35–36; Dkt. No. 86 (Reed Smith Defendants' Reply)

at 19–20. The Reed Smith Defendants also argue that Plaintiffs rely on "dozens of documents in

multiple courts" that were allegedly fraudulent that were not cited in the Amended Complaint and

---

[24] The Reed Smith Defendants also argue that the withholding of information claim should be dismissed because it is effectively a claim for civil contempt, which is properly sought via sanctions in the original proceeding. Dkt. No. 68 (Reed Smith Defendants' Motion) at 34–35. The Court does not agree with the Reed Smith Defendants' argument, as the remedies provided in the Bankruptcy Code are not exclusive. *See infra* pp. 82–83; *Paul v. Monts*, 906 F.2d 1468, 1474–76 (10th Cir. 1990) (per curiam).

cannot be asserted for the first time in Plaintiffs' Opposition to Reed Smith. Dkt. No. 86 (Reed Smith Defendants' Reply) at 20 n.16.

Contrary to the Reed Smith Defendants' argument, the Plaintiffs' Opposition to Reed Smith cites to several wire transmissions included in the Amended Complaint. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 33–35 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 84–90, 100, 103–07, 110–12, 115–16, 406). The Court agrees with Plaintiffs that the Amended Complaint has sufficiently pled the overall scheme and that these transmissions were made in furtherance of that scheme. *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145–46 (S.D.N.Y. 2014) ("In . . . complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. Instead, Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.").

Accordingly, and for reasons similar to those discussed above, the Court rejects the Reed Smith Defendants' argument that these submissions and communications were legitimate legal advocacy or opinions about the law – rather, the Amended Complaint alleges that the Reed Smith Defendants knowingly fabricated a legal theory based on facts that they knew had not occurred, and transmitted false communications and legal submissions in furtherance of that scheme. *Eletson Holdings, Inc.,* 2026 U.S. Dist. LEXIS 5528, at \*177–78 ("The inference is overwhelming and undisputed on this record that . . . false testimony was given with the intent to mislead the Arbitrator regarding the nomination of the Cypriot entities . . . [M]ost tellingly, Eletson [under its pre-bankruptcy plan management] told its own lawyers that there had been no nomination, and instead worked with or through them post-Bankruptcy filing to create the fabricated backstory they

71

then told to the Arbitrator."); *id.* at 172–73 ("The Court need not decide here whether Reed Smith was complicit in its clients' perjury either directly or through a wink and a nod or instead was incredulous and was its clients' innocent dupe. . . . At a minimum, it was the vehicle through which a fraud was committed.").

### iv.  Obstruction of justice

18 U.S.C. § 1503(a) "prohibit[s] persons from endeavoring to influence, obstruct, or impede the due administration of justice." *United States v. Aguilar*, 515 U.S. 593, 598 (1995).  To bring a claim under this provision:

> the [plaintiff] must establish (1) that there is a pending judicial or grand jury proceeding constituting the administration of justice, (2) that the defendant knew or had notice of the proceeding, and (3) that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so – that is, that the defendant corruptly intended to impede the administration of that judicial proceeding.

*United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006).

18 U.S.C. § 1512(c)(2) prohibits "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so."  Under § 1512(c)(2), "the [plaintiff] must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or . . . other things used in the proceeding [such as witness testimony or intangible information], or attempted to do so." *Fischer v. United States*, 603 U.S. 480, 491, 498 (2024).  "[I]t is possible to violate (c)(2) by creating false evidence—rather than altering incriminating evidence." *Id.* at 491.

The Reed Smith Defendants again argue that the allegations against them are not sufficiently specific, and that the Plaintiffs rely on the Reed Smith Defendants' litigation conduct, which cannot serve as a predicate RICO act.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 36–37; Dkt. No. 86 (Reed Smith Defendants' Reply) at 20–21.  Plaintiffs, however, allege that the

72

Reed Smith Defendants impeded access to files at Eletson's Stamford, Connecticut offices, threatened sanctions for reviewing documents on the Microsoft server (which this Court ordered turned over), knowingly filed documents in multiple courts purporting to represent entities that the Reed Smith Defendants knew they had no authority to represent, and refused to turn over bankruptcy estate records, facilitate access to Eletson's email server, and turn over the Eletson client file.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 36–38 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 94–100, 146, 165–68, 259–69, 407–14).  The Court again rejects the Reed Smith Defendants' argument that the Plaintiffs improperly rely on the Reed Smith Defendants' zealous legal advocacy.

### v. Aiding and abetting fraud and obstruction of justice

18 U.S.C. § 2(a) prohibits "aid[ing], abet[ing], counsel[ing], command[ing], induc[ing] or procur[ing] [an offense against the United States's] commission."  "[A] person is liable under §2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."  *Rosemond v. United States*, 572 U.S. 65, 71 (2014).

The Court disagrees with the Reed Smith Defendants' argument that the Plaintiffs have insufficiently pled the above two requirements.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 37–38; Dkt. No. 86 (Reed Smith Defendants' Reply) at 21–22.  As Plaintiffs claim, the Amended Complaint alleges, inter alia, that the Reed Smith Defendants devised and transmitted the nominee theory despite knowing that the buyout option had lapsed, which was done in cooperation and concert with the other RICO Defendants to fabricate evidence to advance that fraudulent legal theory.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 38–39 (citing Dkt. No. 59

73

(Amended Complaint) at ¶¶ 67–107, 110–12, 351, 392–93, 408).    These allegations are of

affirmative acts taken in furtherance of the purported bankruptcy fraud and obstruction of justice.

*Rosemond*, 572 U.S. at 71.    And contrary to the Reed Smith Defendants' arguments, Dkt. No. 86

(Reed Smith Defendants' Reply) at 22, the Amended Complaint adequately alleges that the Reed

Smith Defendants knowingly participated in the fraud and obstruction of justice, including their

intent to facilitate those violations, Dkt. No. 59 (Amended Complaint) at ¶¶ 67–107, 110–12, 351,

392–93, 408.

### c.    Pattern

A pattern of racketeering activity requires "at least two acts of racketeering activity" within

a ten-year period.  18 U.S.C. § 1961(5).  "The Supreme Court has interpreted that phrase to require

both that the RICO predicates pose a threat of continuous . . . activity and that they be related to

each other." *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (citing *H.J. Inc. v. Nw. Bell Tel. Co.*,

492 U.S. 229, 239 (1989)).  A plaintiff "can mix-and-match predicate acts in an attempt to identify

a pattern of racketeering activity that has both 'continuity' and 'relatedness.'" *Id.*  The continuity

requirement "can be closed-ended or open-ended." *Id.* at 60.

"[A]ctivity that occurred over a long period of time in the past has closed-ended continuity,

regardless of whether it may extend into the future." *Id.*  "[C]losed-ended continuity . . . requires

that the predicate [acts] extend over a substantial period of time." *Id.* (citations omitted).  The

Second Circuit "generally requires that the [acts] extend over at least two years." *Id.*  "On the

other hand, . . . activity that by its nature projects into the future with a threat of repetition possesses

open-ended continuity." *Id.* (citation modified).

The parties dispute whether either form of continuity has been established.  Dkt. No. 68-1

(Reed Smith Defendants' Motion) at 38–39; Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith)

74

at 39–42; Dkt. No. 86 (Reed Smith Defendants' Reply) at 22–23.

As to closed-ended continuity, the parties agree that the Amended Complaint alleges predicate acts spanning a period of over two years. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 39; Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 40.[25] The Reed Smith Defendants argue, however, that these allegations "can be distilled to one 'scheme'" or a "single commercial dispute." Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 39 (citing *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.")); Dkt. No. 86 (Reed Smith Defendants' Reply) at 23. Plaintiffs argue that a single scheme can satisfy the continuity requirement. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 40–41 (citing *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989) (en banc) ("We doubt that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because . . . they further but a single scheme.")).

The Court finds that *Schlaifer Nance & Co.*, 119 F.3d at 98, is distinguishable, and that the Plaintiffs have adequately pled closed-ended continuity, *Reich*, 858 F.3d at 60. In *Schlaifer*, the

---

[25] Contrary to the position taken in the Reed Smith Defendants' Motion (that "Plaintiffs allege underlying acts by the [Reed Smith] Defendants that range from March 2023 until July 2025," Dkt. No. 68 (Reed Smith Defendants' Motion) at 39), the Reed Smith Defendants in their Reply state that Plaintiffs' Opposition to Reed Smith "point[s] to allegations . . . that range from April 20, 2023 . . . to January 16, 2025" which "fall[s] short of the two years required," Dkt. No. 86 (Reed Smith Defendants' Reply) at 22–23. As an initial matter, the "general require[ment]" in this Circuit that the activity span over at least two years is not a brightline rule. *Reich*, 858 F.3d at 60. In any event, the Court finds that the Amended Complaint alleges actions taking place over a sufficient period of time. *See, e.g.*, Dkt. No. 59 (Amended Complaint) at ¶¶ 82 (April 2023 first time public assertion of nominee theory), 408 ("Solomon and Reed Smith corruptly, by threatening letters and communications, obstructed, impeded, and endeavored to influence, obstruct and impede the due administration of justice, including by means of the following . . . On July 2, 2025, Solomon again threatened that the review of any documents on Eletson's Microsoft email server was sanctionable and demanded that Eletson 'delete all documents [it] received purportedly based on the Microsoft Order[.]'").

Second Circuit held that there was "one purportedly fraudulent act: the negotiation of" a licensing agreement, which granted a licensing company certain rights to license Andy Warhol's artworks. 119 F.3d at 93–94, 98. The essential nature of the fraudulent act was representing to the licensing company the exclusive rights to certain artworks. *Id.* at 94–96, 98. The licensing company complained that the defendants fraudulently transferred the company's rights under the agreement to others; accepted advance payments from sublicensees knowing the company would not approve; called the company to enlist sublicensees, knowing the company would not approve; fabricated bases for the disapproval of the licensing of many products; threatened to allege a known false claim of fraud against the company; and revised history through misrepresentation, deceit, and perjury, to cover up a pattern of racketeering activity. *Id.* at 96–97. The Court reasoned that "[t]he acts complained of" were "subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose." *Id.* at 98. The Court finds that in the present case, the acts alleged are not merely subparts of one purportedly fraudulent act, but a pattern of separate acts with an alleged underlying purpose (to stymie the reorganization of Holdings, and fraudulently maintain control of Eletson and its assets, including Gas and its vessels).

As to open-ended continuity, the Reed Smith Defendants argue that "there is no plausible threat of continuing activity," and that Plaintiffs only speculate that the alleged past conduct may continue in the future. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 39; Dkt. No. 86 (Reed Smith Defendants' Reply) at 22. Plaintiffs argue this requirement is "satisfied by the ongoing nature of the enterprise's activities and the continuing threat posed by the Defendants' control over corporate assets and information, which shows no sign of voluntary cessation." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 41–42. The Court agrees with Plaintiffs that the Amended Complaint adequately alleges a threat of continuing activity. *Id.*

76

**d. Proximate Causation**

The Reed Smith Defendants argue that Plaintiffs fail to establish causation, as the allegations concern litigation activity rather than that the Reed Smith Defendants "directly control[ed] or execut[ed] the transfers that allegedly caused Plaintiffs' losses." Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 39–41; Dkt. No. 86 (Reed Smith Defendants' Reply) at 23–24. The Reed Smith Defendants argue that there are "countless intervening acts" between the allegations against them and Plaintiffs' injuries. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 40. Plaintiffs argue that the "acts by Reed Smith were not ancillary to the Enterprise or Eletson's injuries; they were the mechanisms by which control over Eletson's property and assets were diverted to and retained by the Enterprise outside the structure created by the Plan, directly (and repeatedly) causing economic injuries to Eletson." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 42–45.

The Court agrees with Plaintiffs. At a minimum, Plaintiffs have adequately alleged that the Reed Smith Defendants invented and orchestrated a fraudulent legal theory whereby the other RICO Defendants maintained control over the assets of Gas and thereby stripped Plaintiffs of Gas and its assets. These allegations are sufficient to state that the Reed Smith Defendants proximately caused Plaintiffs' injuries.

**3. Count Two RICO Conspiracy (18 U.S.C. § 1962(d))**

18 U.S.C. § 1962(d) prohibits "any person to conspire to violate any" of the provisions of the RICO statute. "RICO's conspiracy provision . . . proscribes an agreement to conduct or to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity." *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009). "Just as the evidence used to establish the enterprise and pattern elements may in particular cases coalesce, so too may the evidence used

77

to prove those elements and a conspiratorial agreement to engage in racketeering." *Id.* at 463 (citations omitted). "The concepts of racketeering conspiracy, enterprise, and pattern, however, are not interchangeable." *Id.*

> In short, a RICO conspiracy is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering. Nor is it merely an agreement to join in a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs <u>through</u> a pattern of racketeering.

*Id.* at 464.

The Reed Smith Defendants argue that the Amended Complaint fails to specifically allege the existence of an agreement or the Reed Smith Defendants' knowing participation in any purported conspiracy. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 41–42; Dkt. No. 86 (Reed Smith Defendants' Reply) at 24–25; *see Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."). Unlike the complaint reviewed in *Hecht*, however, which did "not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts," 897 F.2d at 25, here the Amended Complaint alleges that the Reed Smith Defendants consciously devised the nomination theory in favor of the Cypriot Nominees, which as alleged was a scheme to deprive this Court of authority over assets that were within the bankruptcy estate. *See, e.g.,* Dkt. No. 59 (Amended Complaint) at ¶¶ 53, 67–123, 145, 260–65, 343–51, 392–93. The Court agrees with Plaintiffs that in this particular case the allegations underlying the enterprise and pattern elements coalesce with the conspiratorial agreement, and that therefore, on the same basis discussed as to the first RICO count, the Amended Complaint does not fail to state a claim as to a RICO conspiracy, including as against Solomon specifically. *Id.*; *Pizzonia*, 577 F.3d at 463.

### 4.  Count Five Aiding and Abetting Conversion

#### a.  Jurisdiction

The Reed Smith Defendants argue that this Court lacks subject matter jurisdiction over this claim as a post-confirmation cause of action.  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 42–44; Dkt. No. 86 (Reed Smith Defendants' Reply) at 25.  The Reed Smith Defendants argue that the claim lacks a "close nexus" to the bankruptcy case, does not "relate back to the effectuation of the Chapter 11 proceeding," "does not require the Court to interpret the Plan," and "would not have any impact on the estate."  No. 68 (Reed Smith Defendants' Motion) at 43–44.  The Reed Smith Defendants further argue that "insofar as the claim is also brought by Plaintiffs that were not Debtors, there is no argument whatsoever for jurisdiction over post-confirmation claims by non-debtors against other non-debtors."  *Id.* at 44.

The Court agrees with Plaintiffs that the Court has jurisdiction over the claim.  Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 47–48.  The Court finds that the claim is "inseparable from the bankruptcy context" and that the claim is "an extension of the proceedings already before the bankruptcy court."  *Baker v. Simpson*, 613 F.3d 346, 348–50 (2d Cir. 2010); *see* 28 U.S.C. § 1334(b) ("[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."); *see also Moelis & Co., LLC v. Wilmington Trust FSB (In re Gen. Growth Props., Inc.)*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011) ("The State Court Action is a proceeding falling within this Court's core jurisdiction because it implicates the enforcement or construction of a bankruptcy court order, in this case the confirmation order. A bankruptcy court always has jurisdiction to interpret its own orders. It does not matter that the State Court Action is purportedly between two non-debtors, or that the Chapter 11 Cases have been confirmed." (citations omitted)).

Moreover, the claim also has a "close nexus" to the underlying bankruptcy case, and the Court agrees with Plaintiffs that the claim "concerns a scheme to subvert the implementation, execution, and administration of the Plan to maintain improper control over Holdings and its assets." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 48; *Moelis & Co., LLC*, 460 B.R. at 600 ("[A] Bankruptcy Court retains post-confirmation jurisdiction where: (i) the matter has a close nexus to the bankruptcy plan or proceeding, such as when a matter affects the interpretation, implementation, consummation, execution or administration of the confirmed plan; and (ii) the plan provides for the retention of jurisdiction over the dispute." (citation modified)).[26]

### b. Sufficiency of the pleading

In order to state a claim for aiding and abetting conversion, the complaint must allege that the defendant had "actual knowledge" of the conversion and that the defendant "provide[d] substantial assistance to the primary violator." *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006)). The Reed Smith Defendants argue that Plaintiffs fail to plead either actual knowledge or substantial assistance. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 44–47; Dkt. No. 86 (Reed Smith Defendants' Reply) at 26. The Court agrees with Plaintiffs that the Amended Complaint alleges both actual knowledge and substantial assistance. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 49–51.

The Court notes that the Amended Complaint alleges a range of converted property and funds. *See, e.g.*, Dkt. No. 59 (Amended Complaint) at ¶¶ 265, 465. However, the Court here finds

---

[26] The Plan provides for the retention of jurisdiction over the dispute. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 48 n.49; No. 23-10322, Dkt. No. 1223 (Nov. 4, 2024 Findings of Fact, Conclusions of Law, and Order Confirming Petitioning Creditors' Amended Joint Chapter 11 Plan) at ¶ WW ("The Court may, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases[.]").

it sufficient to survive the Reed Smith Defendants' Motion to dismiss that the Amended Complaint alleges that the Reed Smith Defendants knowingly created the Cypriot Nominee theory in order to subvert the bankruptcy proceeding, including, as alleged, controlling and retaining a substantial escrow account post-petition despite knowing the former D&Os lacked authority and that the funds belonged to Gas (which would rightfully be property of the bankruptcy estate). *See supra* pp. 66–68; *see also* Dkt. No. 59 (Amended Complaint) at ¶¶ 349, 350 ("Reed Smith and Solomon are also aware that the Former D&Os have unlawfully converted Holdings' property and have refused to turn the Converted Funds and/or the Converted Personal Property over to Holdings' true owners. Through their efforts to help the Former D&Os in their quest to avoid the Confirmation Order's requirements and to obstruct implementation of the Plan, Reed Smith and Solomon have substantially assisted Former D&Os' conversion of Holdings' property."), 351, 466 ("Reed Smith and Solomon have also had actual knowledge of the Former D&Os' and the Former Shareholders' conversion because, on information and belief, Reed Smith has received and kept the Converted Funds due to their continued representation of the Former D&Os and the Former Shareholders post-Effective Date, despite knowingly being terminated pursuant to the Plan and Confirmation Order."); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 165962, at *10 (S.D.N.Y. Aug. 26, 2025) ("Reed Smith's representation of Holdings was terminated as a result of the Confirmation Order which became effective in November 2024 and was not appealed or stayed."); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 25-cv-1312, 2025 U.S. Dist. LEXIS 187947, at *39 n.11 (S.D.N.Y. Sept. 22, 2025) ("Given that the same persons that constitute the alleged entity 'Provisional Holdings' are at the helm too of the Former Majority Shareholders, it may ultimately be a distinction without much difference.").

### 5. Count Six Breach of Contract

81

The Reed Smith Defendants argue that the breach of contract claim is premised on their purported breach of this Court's confirmation order, and that a court order does not create a contract such as to give rise to a breach of contract claim. Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 47–48; Dkt. No. 86 (Reed Smith Defendants' Reply) at 26–27; *Lawski v. Frontier Ins. Grp., LLC (In re Frontier Ins. Grp., Inc.)*, 585 B.R. 685, 693 (Bankr. S.D.N.Y.) ("References to chapter 11 plans as contracts or agreements – while useful for purposes of interpreting plans – are only by analogy, however. The binding effect of a chapter 11 plan is in fact premised on statutory and common law claim preclusion." (citation omitted)). Plaintiffs argue that this Court's order does create a binding contract sufficient to predicate a breach of contract claim. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 51–52; *LocalBizUSA, Inc. v. Freund (In re LocalBizUSA, Inc.)*, No. 09-20654, 2015 Bankr. LEXIS 1666, at *28–29 (Bankr. N.J. May 14, 2015) (denying motion to dismiss breach of contract claim based on alleged breaches of Chapter 11 plan), *vacated on other grounds*, No. 15-3976, 2015 U.S. Dist. LEXIS 158833, at *11–12 (D.N.J. Nov. 24, 2015).

The Court agrees with Plaintiffs and the Bankruptcy Court in *LocalBizUSA, Inc.* that a "Chapter 11 plan is considered a contract between the debtor and its creditors and is therefore subject to the relevant state's laws regarding contract interpretation." 2015 Bankr. LEXIS 1666, at *28. Further, "[u]nder the Bankruptcy Code, a confirmed plan of reorganization acts like a contract and is binding on all parties, debtors and creditors alike." *Id.* at *29 (quoting *In re Hyman Companies*, 497 B.R. 465, 479 (Bankr. E.D. Pa. 2013)). The Court thus concludes, in agreement with the Bankruptcy Court in *LocalBizUSA, Inc.*, that a plaintiff can bring a breach of contract claim predicated on an alleged breach of terms of a confirmed plan under the Bankruptcy Code. *See, e.g., Paul v. Monts*, 906 F.2d 1468, 1474–76 (10th Cir. 1990) (per curiam) (reversing and remanding district court's grant of summary judgment to defendants on plaintiff's breach of

82

contract claim "seeking to enforce provision of the plan of reorganization under a contract theory" and holding that "the remedies provided in the Bankruptcy Code for enforcing a Chapter 11 plan of reorganization are [not] exclusive")*; Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005) (holding that bankruptcy court had post-confirmation jurisdiction over breach of contract claims based on alleged violations of plan provisions)*; Myles v. Wells Fargo Bank, N.A. (In re Myles)*, 395 B.R. 599, 605 (Bankr. M.D. La. 2008) (stating that "confirmed plans are binding contracts" and that a plaintiff can bring "contract claims for violations of their terms"); *Shedd v. Wells Fargo Home Mortg., Inc.*, No. 14-275, 2014 U.S. Dist. LEXIS 160997, at *11 (S.D. Ala. Nov. 17, 2014) (concluding that "the Amended Complaint sets forth a viable breach of contract claim based on [Defendant's] alleged breach of the bankruptcy reorganization plan"); *Haynes v. Wells Fargo Bank, N.A.*, No. 2:08-cv-183, 2009 U.S. Dist. LEXIS 137887, at *12 (E.D. Tex. Mar. 11, 2009) (rejecting defendant's argument for dismissal that plaintiff failed to allege a breach of contract claim because the confirmation of the bankruptcy plan did not constitute a contract and holding that "a confirmed plan constitutes a new contract between the debtor and creditors" (citation modified)).

While the Court agrees with the Reed Smith Defendants that an alternative remedy for such a purported breach exists – a sanctions motion – this alternative remedy does not preclude a separate breach of contract claim, and the Reed Smith Defendants do not cite to any caselaw stating that such a claim cannot be brought. *Paul*, 906 F.2d at 1476 ("The availability of alternative remedies within the Code, however, does not persuade us that those remedies are exclusive.").

### 6.  Count Seven Tortious Interference with Contract

The Reed Smith Defendants argue this Court lacks jurisdiction over this claim for the same reasons as discussed regarding aiding and abetting conversion.  Dkt. No. 68-1 (Reed Smith

Defendants' Motion) at 49; Dkt. No. 86 (Reed Smith Defendants' Reply) at 27. The Court finds

that it has jurisdiction over this claim for the same reasons discussed above. *See supra* pp. 79–80.

> As to the sufficiency of the pleadings:

> Under New York law, the elements of tortious interference with contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom.

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (citation modified). The Reed

Smith Defendants argue that Plaintiffs fail to allege that: 1) the Reed Smith Defendants had

knowledge of the contracts between Plaintiffs and the Novum Charterparties, Dkt. No. 68-1 (Reed

Smith Defendants' Motion) at 49–50; Dkt. No. 86 (Reed Smith Defendants' Reply) at 27–28; 2)

the Reed Smith Defendants "wrongfully acted to procure Novum's alleged breach," Dkt. No. 68-

1 (Reed Smith Defendants' Motion) at 50–52; Dkt. No. 86 (Reed Smith Defendants' Reply) at 27–

28; and 3) because "Plaintiffs have failed to allege that the [Reed Smith] Defendants procured a

breach, it necessarily follows that Plaintiffs have also failed to meet their higher burden of alleging

proximate causation," Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 52; Dkt. No. 86 (Reed

Smith Defendants' Reply) at 28.

The Court agrees with Plaintiffs that a reasonable inference exists based on the allegations

in the Amended Complaint that the Reed Smith Defendants "had actual knowledge of the Novum

Charterparty Contracts and that the [Reed Smith] Defendants aided in the intentional procurement

of the breach thereof, thereby damaging Plaintiffs." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed

Smith) at 53–54 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 146–49, 154–57, 163, 264–65,

327, 475–76); *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### 7.  Count Eight Breach of Fiduciary Duty

"To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (citation modified). The Reed Smith Defendants argue that the Plaintiffs fail to allege their knowing breach of a fiduciary duty, stating that the Reed Smith Defendants "were entitled to rely on Provisional Holdings' apparent authority to control Holdings." Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 52–55; Dkt. No. 86 (Reed Smith Defendants' Reply) at 28–29. The Court agrees with Plaintiffs that the Amended Complaint alleges that the Reed Smith Defendants knew that the purported Provisional Holdings was without authority to control Holdings, as the Amended Complaint states that the Reed Smith Defendants "knew before the Provisional Board's inception that its purported authority to act was illegitimate," and accordingly the Court rejects the Reed Smith Defendants' argument that the Amended Complaint fails to allege the Reed Smith Defendants' knowing breach of a fiduciary duty. Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 55–56 & n.60 (citing Dkt. No. 59 (Amended Complaint) at ¶¶ 127, 143, 155, 160, 196–97, 167–75, 180, 238–58); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 228048, at *3–4 (S.D.N.Y. Nov. 18, 2025) ("'Unreorganized Holdings' is simply a fiction created to evade the effect of the Bankruptcy Court's order and to obtain by repeated incantation relief that the officers and directors of Holdings never sought from this Court."); *In re Eletson Holdings Inc.*, 2025 U.S. Dist. LEXIS 187947, at *13 ("Not coincidentally, the purported Provisional Board includes certain of the prior board members of Holdings who resigned, including Vassilis Hadjieleftheriadis, Ioannis Zilakos, Niki Zilakos, Adrianos Psomadis-Karastamatis, Eleni Giannakopoulou, Panos Paxinos, and Emmanuel Andreulaks. . . . The provisional order of the [Greek court purporting to elect the Provisional Board] was later dismissed

by that same court on the basis that post-Bankruptcy Holdings . . . is the entity recognized in the Bankruptcy Proceeding to represent the company."); *id.* at *37 ("[T]here is not now and never was a legitimate 'Provisional Holdings' . . . and . . . the Confirmation Plan did not create such an entity under U.S. law[.]"); *id.* at *39 ("In effect, through their appearance as Provisional Holdings, the former owners and directors of Holdings seek a backdoor means to appeal and challenge the Confirmation Order.").

Similarly, the Court agrees with Plaintiffs that the Amended Complaint adequately alleges that the Reed Smith Defendants "are actively working for the Former D&Os against the interests of their former clients (i.e., Holdings and Corp.)." Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 54–55; *see also* Dkt. No. 59 (Amended Complaint) at ¶¶ 83–88, 480, 486, 491.

### 8.   Count Nine Conspiracy

"To prove a conspiracy, a plaintiff must show a corrupt agreement, an overt act in furtherance of that agreement, and membership in the conspiracy by each defendant." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 239–40 (2d Cir. 1999).  The Reed Smith Defendants first argue that a claim of civil conspiracy does not exist, but the caselaw they cite in support of this proposition merely states that "[i]n order to state a claim for conspiracy . . . there must be allegations of an independent actionable tort." *Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629, 640 (S.D.N.Y. 2018) (citation modified); Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 55–56.  Plaintiffs in their Opposition point to "fraud, conversion, breach of fiduciary duty, and RICO" as the underlying torts, "including" others Plaintiffs do not specify; the Amended Complaint includes tortious interference with contract.  Dkt. No. 59 (Amended Complaint) at ¶ 500; Dkt. No. 84-1 (Plaintiffs' Opposition to Reed Smith) at 60.  The Court notes that Plaintiffs have already pled a conspiracy to commit a RICO violation in Count Two.  However,

86

as to fraud, conversion, breach of fiduciary duty, and tortious interference with contract, the Court concludes that the Amended Complaint sufficiently alleges a conspiracy including the Reed Smith Defendants.   The Reed Smith Defendants argue that "[e]ven if Plaintiffs plausibly alleged a primary tort as to other Defendants, Plaintiffs' claim against the [Reed Smith] Defendants fails for the reasons listed above for RICO conspiracy."  Dkt. No. 68-1 (Reed Smith Defendants' Motion) at 56.  The Court rejects these reasons on the same basis that it did so above.  *See surpa* pp. 77–78.

### ii.  Former Shareholders' Motion to Dismiss

### 1.  Personal Jurisdiction over Elafonissos

"The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant."  *United States Bank Nat'l Ass'n v. Bank of Am. N.A.,* 916 F.3d 143, 150 (2d Cir. 2019).  "First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State."  *Id.* (citation modified).  "Second, the plaintiff's claim must arise out of or relate to the defendant's forum conduct."  *Id.* (citation modified).  "Finally, the exercise of jurisdiction must be reasonable under the circumstances."  *Id.* (citation modified).

As noted by both parties, this Court has previously determined – in the context of a sanctions motion in the main bankruptcy case – that this Court has personal jurisdiction over Elafonissos.  Dkt. No. 71 (Former Shareholders' Motion) at 12 n.5; Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 8–10; Dkt. No. 88 (Former Shareholders' Reply) at 3–6; No. 23-10322, Dkt. No. 1714 (July 7, 2025 Or.); No. 23-10322, Dkt. No. 1721 (Tr. of July 2, 2025 Hr'g) at 13–47.  That decision is pending appeal in the District Court.  *In Re: Eletson Holdings Inc.*, 25-cv-06182 (S.D.N.Y. filed July 28, 2025).  Plaintiffs argue this Court's prior determination

87

is "law of the case" and forecloses the argument in the Former Shareholders' Motion here.  Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 8 (citing *In re AMR Corp.*, 567 B.R. 247, 256 (Bankr. S.D.N.Y. 2017)).  The Former Shareholders' Reply argues it is not, as the Court "did not decide personal jurisdiction for all purposes," but just the sanctions motion, and "the vastly different context require[s] a different legal standard."  Dkt. No. 88 (Former Shareholders' Reply) at 3–4.

At the July 2, 2025 hearing in the bankruptcy main case, this Court determined that it had personal jurisdiction over Elafonissios, as Elafonissos had participated voluntarily and meaningfully in the Chapter 11 plan confirmation process, including by, inter alia, casting a ballot on a proposed plan.  No. 23-10322, Dkt. No. 1721 (Tr. of July 2, 2025 Hr'g) at 29–31.  The Court found that Elafonissos thereby implicitly consented to this Court's jurisdiction through its litigation-related conduct.  *Id.* at 31–32.

The Court also found that "Elafonissos's contacts with this forum arise from its participation in the Chapter 11 plan, confirmation proceedings, and its confirmation conduct."  *Id.* at 36, 40–41.  The Court further found that "Elafonissos's actions as the minority shareholder to seek the appointment of the purported provisional board of the debtor that voluntarily submitted to the jurisdiction of this Court were also actions directed at this forum."  *Id.* at 37–38.  The Court rejected Elafonissos's argument that it was not subject to this Court's jurisdiction because its actions were solely undertaken abroad, as those "foreign actions [were] directed at this forum, the implementation of the confirmation order, and the board composition of the debtor that is before this Court."  *Id.* at 38.  The Court noted how it was "surprising" that "a three-percent minority shareholder, with apparently no other majority shareholder objecting or complaining, was able to petition a court for the entry of an order creating a provisional board to manage the debtor that is

before this Court," and "the principal of Elafonissos, Mr. Ioannis Zilakos, was appointed to the provisional board, reflecting the relationship among the Former Shareholders and the individuals acting in concert to undermine the confirmation order." *Id.* at 38. The Court concluded that Elafonissos had sufficient minimum contacts with this forum, and that traditional notions of fair play and substantial justice did not preclude exercising personal jurisdiction over Elafonissos. *Id.* at 33.

The Court concludes here that it has personal jurisdiction over Elafonissos in this adversary proceeding for the same reasons as articulated in the main bankruptcy case above. The Former Shareholders' Reply argues that "the vastly different context require[s] a different legal standard," Dkt. No. 88 (Former Shareholders' Reply) at 3–4, but does not articulate what that different standard should be or how it would alter the Court's prior analysis. The Court notes that the claims in the Amended Complaint arise out of some of the same actions that underlie the sanctions motion in the bankruptcy main case. And the Court also notes that Plaintiffs may be correct that this Court's prior determination is law of the case. Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 8 (citing *In re AMR Corp.*, 567 B.R. at 256 (concluding that Court's dismissal of claims in an adversary proceeding warranted the dismissal pursuant to the law of the case doctrine of claims later filed in a second adversary proceeding in the same main case)). But even if it were not, the Court would now reach the same conclusions as it did earlier on substantially the same grounds: Elafonissos voluntarily and meaningfully participated in the Chapter 11 bankruptcy, including by casting a ballot on what was ultimately a losing proposal for the Chapter 11 plan; its actions to undermine this Court's confirmation order by, inter alia, seeking the appointment of the purported provisional board of Holdings were foreign actions directed towards this forum; and thus Elafonissos has implicitly consented to this Court's jurisdiction through its litigation-related

conduct and has undertaken actions directed at this forum sufficient to establish specific

jurisdiction over the present claims in the Amended Complaint. *United States Bank Nat'l Ass'n,*

916 F.3d at 150.

### 2. Forum Non Conveniens

> A federal court has discretion to dismiss a case on the ground of forum non
> conveniens when an alternative forum has jurisdiction to hear the case, and . . . trial
> in the chosen forum would establish . . . oppressiveness and vexation to a defendant
> . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum is
> inappropriate because of considerations affecting the court's own administrative
> and legal problems.

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007). "Dismissal for forum

non conveniens reflects a court's assessment of a range of considerations, most notably the

convenience to the parties and the practical difficulties that can attend the adjudication of a dispute

in a certain locality." *Id.* (citation modified). The Supreme Court has "characterized forum non

conveniens as, essentially, a supervening venue provision, permitting displacement of the ordinary

rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to

be declined." *Id.* (citation modified). "A defendant invoking forum non conveniens ordinarily

bears a heavy burden in opposing the plaintiff's chosen forum." *Id.* at 430. "When the plaintiff's

choice is not its home forum, however, the presumption in the plaintiff's favor applies with less

force, for the assumption that the chosen forum is appropriate is in such cases less reasonable."

*Id.* (citation modified).

The Court declines to exercise its discretion to dismiss the Amended Complaint on the

grounds of forum non conveniens. The Court agrees with Plaintiffs that this lawsuit has a bona

fide connection to the United States and specifically to this forum, and that "[r]emaining in this

forum permits an efficient resolution and avoids duplicative litigation across the globe." Dkt. No.

82 (Plaintiffs' Response to Former Shareholders) at 11–13. While the Court notes the purported

90

hardships cited by the Former Shareholders' Motion, the Court agrees with Plaintiffs that the Former Shareholders have demonstrated their capacity to litigate in this forum. *Id.* at 13–14; Dkt. No. 71 (Former Shareholders' Motion) at 15; Dkt. No. 88 (Former Shareholders' Reply) at 7–9.[27] Regardless of whether, as argued in the Former Shareholders' Motion and Reply, Greece is an adequate, alternative forum, Dkt. No. 71 (Former Shareholders' Motion) at 14–15; Dkt. No. 88 (Former Shareholders' Reply) at 7, the Court is not persuaded that it should exercise its discretion to dismiss the Amended Complaint on the grounds of forum non conveniens, given the Former Shareholders' prior participation in the Chapter 11 Bankruptcy, and that much of the Amended Complaint concerns the Former Shareholders' alleged conduct to undermine this Court's confirmation order. "The defendant bears the burden of establishing that a presently available and adequate alternative forum exists, and that the balance of private and public interest factors tilts heavily in favor of the alternative forum." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009). Here, the Former Shareholders' Motion and Reply have failed to meet this burden.

### 3. Count Six Breach of Contract

The Former Shareholders' Motion and Reply argue, as did the Reed Smith Defendants, that Plaintiffs have failed to allege the existence of a contract and complain only of violations of this Court's order confirming the Plan (the proper remedy for which is a sanctions motion). Dkt.

---

[27] The Court rejects the argument in the Former Shareholders' Reply that the burden to litigate here is "untenable now that the alleged officers and former officers of Glafkos, Lassia, and Elafonissos are all subject to arrest and incarceration should they ever enter this forum for discovery or trial." Dkt. No. 88 (Former Shareholders' Reply) at 8. The Court notes first that those persons can all avoid arrest and incarceration simply by complying with this Court's orders, and that the arrest warrants this Court has issued are coercive and not punitive in nature. *See* No. 23-10322, Dkt. No. 1971 (Mar. 12, 2026 Memorandum Opinion and Order Granting In Part Eletson Holdings Inc.'s Motion For Findings Of Contempt And Application For Bench Warrants For Arrest As To The Individual Judgment Debtors). Moreover, it would be an absurd result if the Court were to allow the dismissal of claims against these defendants based on those defendants' own lack of compliance with this Court's orders.

No. 71 (Former Shareholders' Motion) at 16–18; Dkt. No. 88 (Former Shareholders' Reply) at 9–10.  The Court rejects this argument for the same reasons as discussed above as to the Reed Smith Defendants' Motion.  *See supra* pp. 81–83.

The Former Shareholders Motion and Reply next argue that the Plan is not effective and not binding on the Former Shareholders, as the appeal of the Plan is still pending in the Second Circuit, there has not been "Greek recognition" of the Plan, and these conditions precedent were not waivable.  Dkt. No. 71 (Former Shareholders' Motion) at 18–20; Dkt. No. 88 (Former Shareholders' Reply) at 10–11.  The Court rejects this argument.  There is a:

> basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Maness v. Meyers*, 419 U.S. 449, 458 (1975); *see also United States v. Pescatore*, 637 F.3d 128, 144 (2d Cir. 2011) (holding that it is "fundamental law" that a court "error d[oes] not give [a party] the right simply to ignore the court's order," and that the proper remedy is to appeal and seek a stay (citing *Maness*, 419 U.S. at 458)).  Here, the Former Shareholders did not seek a stay of this Court's Confirmation Order, and cannot now argue in this Court that the Plan is not effective and binding on them because of the assertion of purported error in that decision.  *In re Eletson Holdings Inc.*, 2025 U.S. Dist. LEXIS 187947, at *48–49, 51 ("[T]he Confirmation Order is binding on the former shareholders that participated in the bankruptcy process and on their counsel[.]");  *id.* at *51 ("Even though they were both aggrieved and had notice, [the Former Majority Shareholders] did not file an appeal of the Confirmation Plan[.]"); *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 165962, at *10 (S.D.N.Y. Aug. 26, 2025) ("[T]he Confirmation Order . . . became effective in November 2024 and was not appealed or stayed.").

### 4.  Counts Three, Four, Seven, and Nine

### a.  Group pleading

The Former Shareholders' Motion and Reply argue that all of Plaintiffs' tort claims improperly "group plead," and thus fail to satisfy Rule 8's pleading requirements.  Dkt. No. 71 (Former Shareholders' Motion) at 20–24; Dkt. No. 88 (Former Shareholders' Reply) at 11–12; *Sama v. Mullaney (In re Wonderwork, Inc.)*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. Jan. 17, 2020) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, a complaint fails to satisfy the minimum pleading standard required by Rule 8." (citation modified)).  The Former Shareholders' Motion states that "[t]his group-pleading is Plaintiffs' deliberate attempt to extend the tort claims from certain parties *for which they at least claim a factual basis to assert the claims* to separate parties for which there is no such basis."  Dkt. No. 71 (Former Shareholders' Motion) at 23.[28]  To the extent the Former Shareholders' Motion and Reply otherwise challenge the requisite specificity of the Amended Complaint, those arguments are addressed below.

The Court agrees with Plaintiffs that the Amended Complaint does not improperly group plead and gives the Former Shareholders notice of the claims pled against them.  Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 3–7; *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004) ("The key to Rule 8(a)'s requirements is whether adequate notice is given." (citing 2 James Wm. Moore et al., Moore's Federal Practice § 8.04[1] (3d ed. 1999) ("The rule is fashioned

---

[28] The Court notes that this is essentially an omission that, at least as to some claims against some defendants, the Amended Complaint does allege claims sufficient to survive a motion to dismiss. The Former Shareholders' Motion then goes on to acknowledge allegations in the Amended Complaint as to the Former D&Os.  Dkt. No. 71 (Former Shareholders' Motion) at 23.  As discussed further in the text, the Former D&Os are or have been the controlling parties of the Former Shareholders.  *See infra* pp. 95–96.

in the interest of fair and reasonable notice, not technicality.”))).  Fair notice is “that which will

enable the adverse party to answer and prepare for trial, allow the application of res judicata, and

identify the nature of the case so that it may be assigned the proper form of trial.”  *Wynder*, 360

F.3d at 79; *see also Vantone Group LLC v. Yangpu NGT Indus. Co.*, No. 13-cv-7639, 2015 U.S.

Dist. LEXIS 86653, at *12 (S.D.N.Y. July 2, 2015) (“Nothing in Rule 8 prohibits collectively

referring to multiple defendants where the complaint alerts defendants that identical claims are

asserted against each defendant.” (citation modified)).  As Plaintiffs argue, the Amended

Complaint alleges, inter alia, that the Former Shareholders are controlled by the Former D&Os.

Dkt. No. 82 (Plaintiffs’ Response to Former Shareholders) at 4, 6–7; Dkt. No. 59 (Amended

Complaint) at ¶¶ 24–39.  The Court agrees with Plaintiffs that a reasonable inference exists “that

the Former D&Os and Former Shareholders should be considered to have acted collectively and

jointly in opposing the Plan, actions underlying Plaintiffs’ contract and tort claims.”  Dkt. No. 82

(Plaintiffs’ Response to Former Shareholders) at 6.  The Court thus concludes that the Amended

Complaint does not inadequately group plead, and that the Former Shareholders have adequate

notice of the claims plead against them.

### b.  *Noerr-Pennington* doctrine

The Former Shareholders’ Motion and Reply argue, as did the Reed Smith Defendants,

that the tort claims allege only litigation conduct and thus should be dismissed pursuant to the

*Noerr-Pennington* doctrine.  Dkt. No. 71 (Former Shareholders’ Motion) at 24–26; Dkt. No. 88

(Former Shareholders’ Reply) at 13–15.  The Court rejects this argument for the same reasons

stated above.  *See supra* pp. 51–55.

### c.  Pleading

Lastly, the Former Shareholders’ Motion argues that the Amended Complaint should be

94

dismissed as insufficiently pled over and above the arguments concerning group pleading and purported protected litigation conduct. Dkt. No. 71 (Former Shareholders' Motion) at 26–30. The Court rejects this argument for many of the same reasons already discussed in this opinion. To start, as already discussed, the Amended Complaint alleges that the Former Shareholders are controlled by the Former D&Os, and, given the context and history of this case, the Court agrees with Plaintiffs that a reasonable inference exists "that the Former D&Os and Former Shareholders should be considered to have acted collectively and jointly in opposing the Plan, actions underlying Plaintiffs' contract and tort claims." Dkt. No. 59 (Amended Complaint) at ¶¶ 24–39; Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 4, 6–7, 28.[29] Further, the Former Shareholders' Motion repeats the argument that the Plan is not yet in effect, which purportedly undermines the conversion claims (as the purported converted property "never transferred from unreorganized Holdings to Plaintiffs"). Dkt. No. 71 (Former Shareholders' Motion) at 26–27 (acknowledging that the Amended Complaint alleges that "the Charterparty Payments were diverted into accounts held by the Former D&Os." (citing Dkt. No. 59 (Amended Complaint) at ¶ 455)). Similarly, the Former Shareholders' Motion argues that the tortious interference with contract claim fails "because the Plan is not yet in effect, Reorganized Holdings does not exist, and the charterparty contracts are as they were." *Id.* at 28. The Court rejects these arguments for the same reasons

---

[29] As Judge Liman has previously found, there is "little difficulty in concluding that Gas, Laskarina Karastamati, Vassilis Kertsikoff, Vassilis Hadjieleftheriadis, Lassia Investment Company, Family Unity Trust Company, and Glafkos Trust Company are sufficiently in privity with, in active concert with, aiding or abetting [the Cypriot Nominees] to bring them within range of the Court's contempt power." *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 107138, at *30–31 (S.D.N.Y. June 2, 2025) (citation modified); *see also id.* at *26–27 ("Gas that is appearing in the U.K. is controlled by [the Cypriot Nominees], claims to be owned by [the Cypriot Nominees], and is pursuing the interests of [the Cypriot Nominees]. [The Cypriot Nominees] are doing Gas's bidding and Gas is doing [the Cypriot Nominees'] bidding. No evidence has been submitted that they have any existence independent of one another.").

95

discussed above: the Former Shareholders cannot now argue in this Court that the Plan is not effective and binding on them because of their assertion of purported error in this Court's orders and opinions. *See supra* pp. 92; *Eletson Holdings Inc. v. Levona Holdings Ltd.*, No. 23-cv-7331, 2025 U.S. Dist. LEXIS 107138, at *7 (S.D.N.Y. June 2, 2025) ("The former owners of Holdings did not seek a stay of the Confirmation Order, and on November 19, 2024, when Holdings waived conditions precedent, the Plan became effective."); *id.* at *9 ("The former shareholders could have sought a stay of the Confirmation Order . . . . Instead . . . notwithstanding the Confirmation Order, the parties who had lost in the bankruptcy court turned to the Greek court in an effort to frustrate the Plan, rather than turning to another federal court with jurisdiction and asking it to overturn the order."). As to the conspiracy claim, the Court agrees with Plaintiffs that the Amended Complaint has alleged a conspiracy, as the Amended Complaint alleges an "agreement among the Former Shareholders and the other Defendants to hinder and obstruct implementation of the Plan and regain control of Eletson," including multiple (non-litigation based) actions to further that end. Dkt. No. 82 (Plaintiffs' Response to Former Shareholders) at 28–30.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES the Reed Smith Defendants' Motion and the Former Shareholders' Motion.

**IT IS SO ORDERED.**

Dated: August 3, 2026          /s/ John P. Mastando III
New York, New York          HONORABLE JOHN P. MASTANDO III
                            UNITED STATES BANKRUPTCY JUDGE